**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **TENNESSEE EQUALITY PROJECT FOUNDATION, INC.,** | |
| **PLAINTIFF,** | |
| **v.** | **VERIFIED COMPLAINT** |
| **THE CITY OF MURFREESBORO, TENNESSEE**; **THE CITY COUNCIL OF MURFREESBORO, TENNESSEE; SHANE McFARLAND**, *in his personal capacity and official capacity as Mayor of the City of Murfreesboro, Tennessee;* **CRAIG G. TINDALL**, *in his personal capacity and official capacity as City Manager of the City of Murfreesboro, Tennessee*; **MICHAEL BOWEN**, *in his official capacity of Chief of Police for the City of Murfreesboro, Tennessee*; **KEVIN JONES**, *in his official capacity of Director of Code Enforcement for the City of Murfreesboro, Tennessee*; **JAMI AVERWATER**, *in her official capacity as City Council Member of the City of Murfreesboro, Tennessee*; **MADELYN SCALES HARRIS**, *in her official capacity as City Council Member of the City of Murfreesboro, Tennessee*; **AUSTIN MAXWELL**, *in his official capacity as City Council Member of the City of Murfreesboro, Tennessee*; **KIRT WADE**, *in his official capacity as City Council Member of the City of Murfreesboro, Tennessee*; **SHAWN WRIGHT**, *in his official capacity as City Council Member of the City of Murfreesboro, Tennessee,* | |
| **DEFENDANTS.** | |

## VERIFIED COMPLAINT

Plaintiff Tennessee Equality Project Foundation, Inc. ("Plaintiff" or "TEP"), by and through its undersigned attorneys, brings this Verified Complaint against Defendants the City of Murfreesboro, Tennessee; the City Council of Murfreesboro, Tennessee; Shane McFarland (in his personal capacity and official capacity as Mayor of the City of Murfreesboro, Tennessee); Craig D. Tindall (in his personal capacity and official capacity as City Manager of the City of Murfreesboro, Tennessee); Michael Bowen (in his official capacity as Chief of Police for the City of Murfreesboro, Tennessee); Kevin Jones (in his official capacity as Director of Code Enforcement for the City of Murfreesboro, Tennessee); Jami Averwater (in her official capacity as City Council Member of the City of Murfreesboro, Tennessee); Madelyn Scales Harris (in her official capacity as City Council Member of the City of Murfreesboro, Tennessee); Austin Maxwell (in his official capacity as City Council Member of the City of Murfreesboro, Tennessee); Kirt Wade (in his official capacity as City Council Member of the City of Murfreesboro, Tennessee); and Shawn Wright (in his official capacity as City Council Member of the City of Murfreesboro, Tennessee) (collectively, "Defendants" or the "City"), and in support thereof state the following:

## NATURE OF THE ACTION

1. TEP brings this action to remedy the City's flagrant and ongoing violations of TEP's constitutional rights to free speech and expression, due process, and equal protection under the law. Since at least October 2022, the City has engaged in a targeted campaign to silence TEP's speech in support of the Murfreesboro LGBTQ+ community. First, the City put in place a discriminatory policy, prohibiting TEP from obtaining permits to host its annual BoroPride Festival and any other events on City property. Then, it enacted a discriminatory ordinance meant

2

to drive TEP and the City's LGBTQ+ community—and, in particular, its drag performers—out of the City's public spaces. These actions, which were driven by animus against the LGBTQ+ community, are blatantly unconstitutional. Nonetheless, despite being aware that its actions were unconstitutional, the City took them anyway, intentionally disregarding the rights of its constituents. TEP brings this action to vindicate its rights and the rights of the LGBTQ+ community it represents under the law.

2. Plaintiff TEP is a non-profit organization that advocates for the equal rights of LGBTQ+ people in Tennessee. To further its mission, TEP founded and has hosted an annual BoroPride Festival in Murfreesboro since 2016. The BoroPride Festival celebrates and affirms the Murfreesboro LGBTQ+ community. It is intended to be a public and visible event held within the community of Murfreesboro.

3. In August of 2022, TEP entered into an agreement with the City of Murfreesboro to host the sixth annual BoroPride Festival on September 17, 2022 at the City's historic Cannonsburgh Village. The ability to host BoroPride at this central, longstanding public venue is vital to TEP's mission to support and celebrate the LGBTQ+ community.

4. The 2022 BoroPride Festival was met with opposition from a small, but vocal, email and social media campaign. Leading up to the 2022 BoroPride Festival, Murfreesboro City officials, including Mayor Shane McFarland, received emails urging them to cancel the festival and falsely complaining that drag shows, which would be part of the event, necessarily entailed "indecent behavior" that "exploits," "harms" and "contributes to the sexualization" of children and exposes them to "lewd and obscene acts."

5. The 2022 BoroPride Festival went forward as planned on September 17, 2022, and was a tremendous success, with over 7,000 supporters in attendance.

3

6. Five days later, anti-drag activist and aspiring Tennessee politician, Robby Starbuck, posted a video to his Instagram feed purportedly showing a short portion of the drag performances from the 2022 BoroPride Festival and baselessly characterizing these performances—which included fully-clothed individuals performing dance and comedic routines for, what appears to be, a predominantly adult audience—as "illegal sexualization of kids."

7. That same day, Murfreesboro Mayor Shane McFarland received an email with a link to Starbuck's Instagram post, along with the accusation: "you allowed this."

8. To be clear, nothing in the video—or for that matter, the drag performances at the BoroPride Event—was scandalous or inappropriately directed at children. By all appearances, Starbuck and the sender of the email simply opposed drag performances in general.

9. Mayor McFarland initially and correctly recognized that the First Amendment protected the performances. But bowing to pressure from anti-drag activists, he quickly reversed course; and instead of abiding by the Federal and State Constitutions, he and Murfreesboro City Manager Craig Tindall intentionally violated the constitutional rights of their constituents. Indeed, within days, McFarland and Tindall set out to ensure BoroPride events would never again be hosted on City property.

10. The City officials mounted a two-front assault on TEP's constitutional freedoms: first, using City Manager Tindall's unfettered discretion to prohibit the City from issuing any further permits to TEP; and second, pushing for enactment of an ordinance designed to chill speech and expression that the officials were biased against—namely, drag performances and other pro-LGBTQ+ messages from TEP and the LGBTQ+ community of Murfreesboro.

4

11. On October 17, 2022, Tindall sent TEP a letter falsely alleging the 2022 BoroPride event "intentionally exposed young children" to "conduct and speech of an explicitly sexual nature," and stating that he would "deny future special events permit [sic] submitted by [TEP]."

12. That same day, Tindall issued a Memorandum to City of Murfreesboro Parks & Recreation officials forbidding them from renting any City facilities to TEP or any of its affiliates.

13. On November 16, 2022, TEP applied to the City for a permit to host the 2023 BoroPride Festival at the Cannonsburgh Village location on September 16, 2023. For months following that application, the City refused to state whether it would grant the permit, despite TEP's need to begin planning; rather, it insisted that TEP provide unspecified assurances about the content of the event. Despite the impropriety and vagaries of these demands—which, upon information and belief, City officials *only* made to TEP—TEP met and communicated with City representatives and attorneys for months in an attempt to reach a "compromise" and obtain the permit—or at least an answer one way or the other on its pending permit application.

14. Finally, on July 7, 2023, TEP asked the City to state in writing either (i) the exact terms under which a permit would be issued for the 2023 BoroPride festival, and the rationale for any proposed restrictions on festival activities, or (ii) the reasons why TEP's request for a permit to host the festival was denied.

15. After the City failed to follow this clear and simple request, TEP was forced to abandon its plans to host the 2023 BoroPride event at the Cannonsburgh Village location, and seek out a new venue, which it found at Middle Tennessee State University, where TEP will host the 2023 BoroPride event on October 28, 2023—over a month later than the festival's usual mid-September date and a greater cost.

5

16. Behind the scenes, the City was hard at work on the second front of its constitutional assault—a city-wide ordinance imposing manifestly unconstitutional "community decency standards."

17. On June 15, 2023, the Murfreesboro City Council voted to enact Murfreesboro City Ordinance 23-O-22, which modified Murfreesboro City Code Section 21-22 (as amended, the "Ordinance") and went into effect on June 30, 2023.

18. The Ordinance sets forth staggeringly vague and overbroad restrictions on speech and expression throughout the City and provides for civil and criminal penalties for anyone City or law enforcement officials deem to have engaged in "indecent behavior" or to have distributed "indecent materials" or held "indecent events." Such prohibited behavior is defined to include any "printed materials, broadcasts, shows, parades, or other such displays that *suggest*, *advertise*, or *display* indecent behavior *or that is harmful to minors*."

19. Still worse, the Ordinance incorporates an earlier provision that defines "indecent behavior" as including not simply masturbation and sexual intercourse (which most would agree are inappropriate in public), but also any acts of "homosexuality" as a whole. Thus, under the Ordinance and the incorporated definition, any acts that are "homosexual" in nature or any material or event even suggesting homosexuality, could be considered indecent and subject to civil and criminal penalties.

20. City officials intentionally drafted and enacted the Ordinance to chill speech and expression by and related to the LGBTQ+ community, including specifically TEP's speech, and even more specifically, TEP's speech at its BoroPride event. Together with the City's refusal to grant TEP a permit to host the 2023 BoroPride festival on Murfreesboro City Property, the

enactment of the Ordinance amounts to a targeted campaign to harm TEP and the LGBTQ+ community at large.

21. As a result of this targeted campaign, TEP was forced to delay its 2023 BoroPride Festival and to spend time, money, and resources on hurried efforts to identify and secure a new venue in time to host the festival. In addition, TEP has been subjected to biased and patently false allegations that BoroPride puts children in danger of improper sexual conduct from adults.

22. Further, the Ordinance's vague and sweeping prohibitions on "indecent behavior," coupled with the looming threat of criminal and civil penalties, have already and will continue to chill TEP's speech and activism at the BoroPride event and the speech and expression of TEP and the LGBTQ+ community of Murfreesboro more broadly.

23. The City's actions alleged above and herein amount to an official proclamation that TEP is not welcome to host public events on City property.

24. As feared, beyond the BoroPride festival, the City is already making use of the unfettered discretion that the Ordinance grants to City officials to harm and silence the LGBTQ+ community by banning LGBTQ+ books in the City.

25. In sum, the City policy prohibiting the issuance of permits to TEP and the subsequent denial of TEP's permit request are unconstitutional prior restraints and infringement on TEP's protected speech under the First Amendment, as well as unconstitutional retaliation against TEP for exercising its First Amendment rights. The Ordinance passed to silence TEP, on its face, constitutes a content- and viewpoint-based restriction on speech, is substantially overbroad, impermissibly vague, and a violation of TEP's free speech, equal protection and due process rights. Accordingly, TEP now brings this action to vindicate its freedom of speech rights as citizens of equal dignity under the law.

## JURISDICTION AND VENUE

26. This action arises under the United States Constitution, the Tennessee Constitution, 42 U.S.C. § 1983, and this Court's equitable jurisdiction.

27. This case presents a federal question within this Court's jurisdiction under Article III, § 2 of the United States Constitution, and 28 U.S.C. §§ 1331 and 1343.

28. This Court has supplemental jurisdiction over claims arising under the Tennessee Constitution pursuant to 28 U.S.C. § 1367(a).

29. This Court is authorized to issue a declaratory judgment and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1983; Rules 57 and 65 of the Federal Rules of Civil Procedure; and this Court's equitable jurisdiction to enjoin actions by state officials that violate the Constitution, *see Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-27 (2015).

30. This Court has personal jurisdiction over Defendant Shane McFarland, who is the Mayor of the City of Murfreesboro, Tennessee; Craig D. Tindall, who is the City Manager for the City of Murfreesboro, Tennessee; Defendant Michael Bowen, who is the Chief of Police for the City of Murfreesboro, Tennessee; Defendant Kevin Jones, who is the Director of Code Enforcement for Murfreesboro, Tennessee; Jami Averwater, who is a City Council Member of the City of Murfreesboro, Tennessee; Madelyn Scales Harris, who is a City Council Member of the City of Murfreesboro, Tennessee; Austin Maxwell, who is a City Council Member of the City of Murfreesboro, Tennessee; Kirt Wade, who is a City Council Member of the City of Murfreesboro, Tennessee; and Shawn Wright, who is a City Council Member of the City of Murfreesboro, Tennessee. This Court also has personal jurisdiction over Defendant the City of Murfreesboro, Tennessee, which is a municipality incorporated and located in the state of Tennessee, and

8

Defendant the City Council of Murfreesboro, Tennessee, which is the legislative body of the City of Murfreesboro.

31.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(1)-(2) because Defendants reside in this District and/or because a substantial part of the events giving rise to the claims occurred in this District.

## THE PARTIES

32.    Plaintiff TEP is a tax-exempt 501(c)(3) non-profit corporation incorporated in and subject to the law of Tennessee, with a principal office located at 2723 Berrywood Dr., Nashville, TN 37204.

33.    Defendant the City of Murfreesboro is an incorporated city in the State of Tennessee and the county seat of Rutherford County, Tennessee.

34.    Defendant the City Council of Murfreesboro, Tennessee is the legislative body of the City of Murfreesboro.

35.    Defendant Shane McFarland is the Mayor of the City of Murfreesboro, Tennessee, and is sued in both his personal capacity and his official capacity as Mayor of the City of Murfreesboro, Tennessee.

36.    Defendant Craig D. Tindall is the City Manager for the City of Murfreesboro, Tennessee. Under the Ordinance, City Manager Tindall has unilateral authority to authorize other departments of the City of Murfreesboro, Tennessee to assist the Chief of Police in enforcing the Ordinance. Tindall is sued in both his personal capacity and his official capacity as City Manager of the City of Murfreesboro, Tennessee.

37.    Defendant Michael Bowen is the Chief of Police for the City of Murfreesboro, Tennessee. Under the Ordinance, Chief of Police Bowen is responsible for administering and

9

enforcing the provisions of the Ordinance. Chief of Police Bowen is sued in his official capacity as Chief of Police for the City of Murfreesboro, Tennessee.

38.     Defendant Kevin Jones is the Director of Code Enforcement for the City of Murfreesboro, Tennessee. Under the Ordinance, Director Jones must issue and serve a person alleged to have violated the Ordinance with a written notice of said violation. Director Jones is sued in his official capacity as Director of Code Enforcement for the City of Murfreesboro, Tennessee.

39.     Defendants Jami Averwater, Madelyn Scales Harris, Austin Maxwell, Kirt Wade, and Shawn Wright are members of the City Council of Murfreesboro, Tennessee, who enacted the Ordinance, and are sued in their official capacities as members of the City Council of Murfreesboro, Tennessee.

**The Tennessee Equality Project and BoroPride Festival**

40.     LGBTQ+ "Pride" events like BoroPride trace their roots to the 1969 Stonewall protests in New York City, during which Greenwich Village residents organized into activist groups and demanded the right to live openly regarding their sexual orientation, without fear of government interference or arrest.[2] A year later, citizens of Chicago, Los Angeles, New York, and San Francisco marked the anniversary of the Stonewall protests by organizing and participating in the first "Pride" marches.[3]

41.     In the fifty years since these Pride marches began, gay rights organizations have formed in the United States and around the world. As of 2023, there are roughly 400 Pride organizations across the United States[4]—including many in Tennessee. Pride events like BoroPride are held annually across the country, both in remembrance of the Stonewall protests and to celebrate and affirm members of the LGBTQ+ community.

---

[1] The internal City documents described herein were obtained through two sources: (1) a public records request from Tennessee resident Kent Hoover to the City dated January 27, 2023, and subsequently made publicly available on the internet by the MuckRock collaborative news organization, s*ee* https://www.muckrock.com/foi/murfreesboro-30533/city-of-murfreesboro-limits-on-boropride-139633/; and (2) public records requests from the American Civil Liberties Union of Tennessee dated August 16, 2023.

[2] "LGBTQ+" is an acronym used to represent individuals identifying as lesbian, gay, bisexual, transgender and/or queer. The "+" sign is included to recognize the unlimited spectrum of sexual orientations and gender identities used by these individuals. *See Glossary of Terms*, Human Rights Campaign, https://www.hrc.org/resources/glossary-of-terms.

[3] *The History of Pride*, United States Library of Congress, https://www.loc.gov/ghe/cascade/index.html?appid=90dcc35abb714a24914c68c9654adb67.

[4] Pride across the US: celebration and defiance in the face of threats, The Guardian (June 25, 2023), https://www.theguardian.com/world/2023/jun/25/pride-across-the-us-celebration-and-defiance-in-the-face-of-threats.

42.     In recent years, there has been a dramatic increase in anti-LGBTQ+ protests, hate crimes involving sexual orientation biases, and threats to the safety of Pride events. In addition to threats to physical safety, there has been an onslaught of legislative and lobbying efforts aimed at rolling back the hard-fought progress towards equality won by LGBTQ+ groups in the decades since Stonewall.[5]

43.     In the face of these rising threats, Pride events are more important than ever, because they allow members of the LGBTQ+ community to express themselves in a place of safety and acceptance and to continue to advocate for equality. As such, these events epitomize the rights to freedom of speech, expression, and association that are enshrined in the First Amendment.

44.     Founded in 2005, Plaintiff TEP is non-profit organization that advocates for the equal rights of LGBTQ+ people in Tennessee. Since its inception, the BoroPride Festival has welcomed community members of any gender identity and sexual orientation to share in an expression of joy, belonging, and family fun.

45.     To further its mission, TEP provides a variety of educational and organizing programming pertaining to the equal rights of LGBTQ+ people in Tennessee. TEP's programming includes the BoroPride Festival, an annual event celebrating the LGBTQ+ community that TEP has hosted in Murfreesboro since 2016.

---

[5] See *id*.; U.S. Department of Justice, 2021 Hate Crime Statistics for Tennessee (indicating that hate crimes reported in Tennessee that involved a "Sexual Orientation" bias had doubled from 2019 to 2021, and that hate crimes involving a "Gender Identity" bias had quadrupled during that same time period), https://www.justice.gov/hatecrimes/state-data/tennessee.

46.     In 2021, after hosting BoroPride in the Murfreesboro downtown square for five years, TEP moved the event to Murfreesboro's historic Cannonsburgh Village to accommodate growing public support and attendance.[6]

47.     The move to Cannonsburgh Village, a venue in the heart of the community, allowed TEP to expand the BoroPride festival to include two stages with live entertainment, a kids' zone, community information tables, food trucks, and vendors.

## TEP Plans the 2022 BoroPride Festival

48.     On August 12, 2022, the City issued TEP a permit to host the 2022 BoroPride festival at the historic Cannonsburgh Village location in the late afternoon and evening of Saturday, September 17, 2022, as evidenced by a Cooperative Use Agreement. TEP paid the City $1,655.00 to rent the Cannonsburgh Village venue. *See* Exhibit A.

49.     Under the Cooperative Use Agreement, TEP agreed to provide volunteers and security for the Festival. TEP hired ten off-duty Murfreesboro Police Department officers to work as security at the event and worked with the department to monitor social media for threats in the weeks leading up to it.

50.     TEP also obtained a Special Limited Event Beer Permit for the Festival, estimating that there would be over 4,000 people in attendance. *See* Exhibit B.

## The 2022 BoroPride Festival Featured Drag Performances

51.     The 2022 BoroPride Festival included live music and comedic performances, a pride walk, vendors, food trucks, and the participation of other community and non-profit organizations.

---

[6] Lauren Means, Boro Pride: Large Crowds Means New Venue, https://weconnect.lgbt/boro-pride-2021/#:~:text=Boro%20Pride%20has%20grown%20so,10%20p.m.%20Admission%20is%20free.

52.	As had been the case since the event's inception in 2016, the 2022 BoroPride Festival also featured events and performances by drag artists.[7]

53.	Drag is defined as "entertainment in which performers caricature or challenge gender stereotypes (as by dressing in clothing that is stereotypical of another gender, by using exaggeratedly gendered mannerisms, or by combining elements of stereotypically male and female dress) and often wear elaborate or outrageous costumes."[8] For nearly 100 years, drag has been specifically associated with the LGBTQ+ community.

54.	Drag is not a new art form, and it is neither obscene nor indecent. Drag's roots in western culture date back to the theatrical productions of the Ancient Greeks, in which male actors would perform the female roles dressed in women's attire.[9]

55.	Vaudeville shows of the late 1800s and early 1900s featured performances by drag artists, who at the time were commonly referred to as "female impersonators."[10] One popular vaudeville drag artist, Julian Eltinge, appeared on Broadway in the early 1900s, and eventually performed for King Edward VII at Windsor Castle.[11]

---

[7] *See* Middle Tennessee State University 2023 LGBT Plus College Conference "BoroPride" display (noting "[t]he drag show has long been a crowd favorite, from the first BoroPride, August 27, 2016 . . . and up to the most recent BoroPride, September 7, 2022"), https://www.mtsu.edu/mtlambda/2023LGBTPlusCCDisplayText.php.

[8] *Drag,* Merriam-Webster, https://www.merriam-webster.com/dictionary/drag.

[9] Ken Gewertz, When Men Were Men (and Women, Too), The Harvard Gazette (July 17, 2003), https://news.harvard.edu/gazette/story/2003/07/when-men-were-men-and-women-too/

[10] Nan Alamilla Boyd, WIDE OPEN TOWN: A HISTORY OF QUEER SAN FRANCISCO TO 1965 14–15 (2003).

[11] Audrey Fox, *Julian Eltinge and the Early Days of Drag* (May 10, 2023), https://crookedmarquee.com/julian-eltinge-and-the-early-days-of-drag/

14

56.     By 1927, drag had become specifically linked with the LGBTQ+ community, and by the 1950s, drag performances were commonly held in bars and spaces that catered to LGBTQ+ people. In the decades that followed, drag solidified itself as an art form, with performers like David Bowie pioneering the gender-fluid style movement in the 1970s and 1980s, and paving the way for others like singer Harry Styles, who became the first heterosexual male to be featured on the cover of Vogue magazine wearing a dress.[12]

57.     Drag is "[a]t its core . . . a creative act—a powerful and personal form of self-expression. Many performers also credit it with giving them a voice. Others use it to explore sexual and gender identity and expression. Still others say drag helps them accept themselves."[13]

58.     In recent years, drag has increasingly become a topic of political controversy, in large part due to conservative legislative efforts to ban public drag performances in parts of the United States.[14] The Ordinance is an example of one such legislative effort. But conservative lawmakers also have passed legislation at the state-wide level in Tennessee, as well as at the state and local levels in a number of other states, including Arizona, Arkansas, Florida, Montana, South Dakota, Texas, and Utah. Such laws are routinely enjoined or struck down as unconstitutional, including the state-wide Tennessee law.[15] In this political environment, where one political party

---

[12] Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965, University of California Press, 2003; Kiana Shelton, *The Joy of Drag*, Psychiatric Times (June 29, 2022), https://www.psychiatrictimes.com/view/the-joy-of-drag

[13] *Id.*

[14] Josie Lenora, Despite all the talk, no states have active laws banning drag in front of kids, NPR (July 29, 2023), https://www.npr.org/2023/07/29/1190306861/drag-bans-fail-lgbtq-first-amendment-prurient-arkansas-florida-tennessee-montana.

[15] *E.g.*, *Woodlands Pride, Inc. v. Paxton*, Civil Action No. H-23-2847, 2023 U.S. Dist. LEXIS 171268, at *51 (S.D. Tex. Sep. 26, 2023) (declared unconstitutional; enforcement enjoined); *Imperial Sovereign Court v. Knudsen*, No. CV 23-50-BU-BMM, 2023 U.S. Dist. LEXIS 131233, at *23 (D. Mont. July 28, 2023) (enforcement enjoined); *HM Fla.-Orl, LLC v. Griffin*, No. 6:23-

Case 3:23-cv-01044     Document 1     Filed 10/06/23     Page 15 of 67 PageID #: 15

has embarked on a concerted legislative campaign to eradicate the art form from society, the performance of drag, in and of itself, is an act of protest and core political speech. As such, drag performances—like the BoroPride festival more broadly—epitomize the rights to freedom of speech, expression, and association that are enshrined in the First Amendment.[16]

**City of Murfreesboro Officials Receive Complaints from Anti-Drag Activists About the 2022 BoroPride Festival and the Planned Drag Performances**

59.     In the weeks leading up to the 2022 BoroPride festival, City of Murfreesboro officials received pressure from anti-drag activists who opposed the event, and took particular issue with the planned drag performances.

60.     For example, on September 6, 2022, Murfreesboro Mayor Shane McFarland received an email from an individual named Sara Mac, who wrote: "[a]re you aware that there will be a 'family friendly' drag show at the [Boro] Pride festival this year? . . . I URGE you to put a stop to this indecent behavior that exploits and harms children! There is nothing family friendly about this type of event." *See* Exhibit C.

61.     On September 7, 2022, McFarland responded to Sara Mac's email by stating that "[t]he event you are referring to is a private event and the City is not affiliated in any way. We don't get to pick and choose legally who can or who can't use City facilities." *See id*.

---

cv-950-GAP-LHP, 2023 U.S. Dist. LEXIS 134665, at *25 (M.D. Fla. June 24, 2023) (enforcement enjoined); *S. Utah Drag Stars v. City of St. George*, No. 4:23-cv-00044-DN-PK, 2023 U.S. Dist. LEXIS 105876, at *75 (D. Utah June 16, 2023) (enforcement enjoined; City ordered to grant permit); *Friends of Georges, Inc. v. Mulroy*, No. 2:23-cv-02163-TLP-tmp, 2023 U.S. Dist. LEXIS 96766, at *98-100 (W.D. Tenn. June 2, 2023) (declared unconstitutional; enforcement enjoined).

[16] *See, e.g.*, *S. Utah Drag Stars*, 2023 U.S. Dist. LEXIS 105876, at *53-54 ("Given current political events and discussions, drag shows . . . are indisputably protected speech and are a medium of expression, containing political and social messages regarding (among other messages) self-expression, gender stereotypes and roles, and LGBTQIA+ identity.").

62.     On September 11, 2022, Cannonsburgh Village Facility Coordinator Sheila Hodges received an email from an individual named Carole A. Hanket, who wrote: "I am very dismayed that the [BoroPride festival] will feature a drag queen show. . . . Hosting such an event does not comport with the image of Cannonsburgh Village. We live in a conservative & Christian area; many who normally frequent your venue may re-think supporting you...as [sic] my family will."

63.     On September 14, 2022, McFarland received an email from Landon Starbuck—the wife of Robby Starbuck and a fellow anti-drag activist who spearheaded Tennessee's Adult Entertainment Act that targeted drag performances and ultimately was found unconstitutional by the U.S. District Court for the Western District of Tennessee—who wrote:

> I'm reaching out because I've recently been made aware of an upcoming event called Boropride which is marketed as a family friendly event with live entertainment. As I'm sure you're aware, recent Pride related events all over the Country [sic] marketed as 'family friendly' haven't turned out to be family friendly and have featured inappropriate adult entertainment (drag shows) in front of minors. I'm hoping that law enforcement will be present to ensure children are not exposed to any lewd and obscene acts that may arise.

### The 2022 BoroPride Festival is a Success, but
### City Officials Receive More Complaints from Anti-Drag Activists

64.     The BoroPride event took place as planned on Saturday, September 17, 2022. Over 7,000 people attended.

65.     Based on information the City provided in response to a public records request submitted by the ACLU-Tennessee, during the 2022 BoroPride festival, the Murfreesboro Police Department received *zero* complaints regarding scheduled events or performances, made *zero* arrests in connection with the festival, and issued *zero* citations in connection with the festival.

17

66.     On September 22, 2022—five days after the 2022 BoroPride Festival, Robby Starbuck posted to his Instagram feed (@robbystarbuck) a video of some of the BoroPride drag performances,[17] along with a lengthy diatribe against drag performances, stating in part:

> This is what kids at #BoroPridein Murfreesboro, TN were exposed to at their "all ages" drag show. If you think this is appropriate for kids then you need your head examined. We will do everything possible to get illegal sexualization of kids further codified in the law and get it prosecuted. There will be no safe space in Tennessee to sexualize kids. . . . If you stand with us, share this video and send it to your legislators to demand they pass a bill to end the sexualization of children. Legislators can DM me or @landonstarbuck for an outline on what needs to be passed and we're happy to meet with you . . . .

*See* Exhibit D.

67.     Also on September 22, 2022, Sarah Mac followed up on her September 6, 2022 email to McFarland—in which she had expressed concerns regarding the "drag show at the [Boro] Pride festival this year"[18]—by sending McFarland a link to the above-referenced Instagram post by Robby Starbuck, and stating: "You allowed this." *See* Exhibit C.

68.     Later that evening, McFarland responded to Sarah Mac's email above by correctly explaining that:

> The City of Murfreesboro … do[es] not have the authority nor ability to stop a private gathering or something that is advertised to the public. As much as I disagree with different gatherings or activities, ***I legally do not have the authority to stop someone's freedom of speech or right to gather***. ***I took an oath to our constitution and as long as someone is not breaking the law….the***

---

[17] The posted video clips totaled around three and a half minutes of the 82-minute drag show. *See* Scott Broden, Mayor McFarland tells BoroPride supporters to 'find a way to compromise,' Murfreesboro Daily News Journal (Jan. 6, 2023), https://www.dnj.com/story/news/local/2023/01/06/murfreesboro-city-seeks-compromise-from-boropride-for-lgtq-festival/69783167007/.

[18] *See supra*, Paragraph 60.

*[sic] City doesn't have the authority to usurp someone's constitutional rights*.

*See id*. (emphasis added). As discussed below, despite the foregoing acknowledgement of the constitutional rights of his constituents and his oath to uphold those rights, McFarland subsequently made the conscious decision to disregard his oath to protect those rights and the constitutional limits on his authority. *See id*.

69. Indeed, the very next morning McFarland appeared to reconsider his willingness to defend TEP's "constitutional rights," and sent an email to Sarah Mac in which he stated "I am looking into this video. This is disturbing." *See id*.

70. Later that same morning, McFarland sent an email to City Manager Tindall, City Attorney Adam Tucker, and Parks & Recreation director Angela Jackson. The email included a link to the Instagram Post by Robbie Starbuck (summarized above) that Sarah Mac had forwarded to McFarland the day before. *See* Exhibit E.

**The City Establishes an Official Policy**
**Denying the Issuance of ANY Future Permits to TEP**

71. On October 17, 2022, Tindall sent a letter to TEP with the subject line "Boro Pride Festival," stating that "[i]t has come to my attention that the event your organization conducted on September 17, 2022 at a City facility, Cannonsburgh Village, violated City ordinances." *See* Exhibit F. The letter parroted many of the talking points pushed by Starbuck and the anti-drag activists that had contacted the City, accusing BoroPride of being "clearly unsuitable for 'all ages,'" and alleged the event "contain[ed] conduct and speech of an explicitly sexual nature," and "intentionally expos[ed] young children to this conduct" in violation of city and state law. *Id.*

72. Prior to Tindall's October 17 denial letter, Tindall spent several days conferring with like-minded Murfreesboro residents regarding how to penalize TEP and deny future BoroPride permits, including potential penalization under a Murfreesboro beer permit law.

73. Also on October 17, 2022, Tindall circulated a memo to City of Murfreesboro Parks & Recreation officials declaring that he was the arbiter of "community standards of Murfreesboro" and prohibiting the issuance of any permits to TEP in the future:

> Prior to contracting with any organization for use of a City facility, please gather the necessary information necessary [sic] to assure that their activity is planned and will be conducted within the community standards of Murfreesboro. If there are any questions about specific organization [sic] or plans, please call me.
>
> Along these lines, for the reasons set forth in the attached letter[19] the Parks & Recreation Department is prohibited from renting or otherwise contracting for use of a City facility by the Tennessee Equity Project Foundation or any entity affiliated with organization [sic] for purposes of renting a City facility.

*See* Exhibit G.

74. The following day, Tindall circulated his denial letter to McFarland, Vice-Mayor Shacklett, and the City Council. *See* Exhibit H. After noting that the 2022 BoroPride Festival "was advertised as a [sic] 'family friendly,'" Tindall falsely claimed that:

> Unfortunately, a portion of the event involved performances of a sexual nature that intentional [sic] exposed children that [sic] type of content, a violation of state law, City Code, and the terms of the event permit.

*See id*. He went on to explain that "City code permits the City Manager to deny a permit to any organization that previously violated terms of a City permit," and therefore "I have prohibited Parks & Recreation from enter [sic] into further rental contracts with this organization or entities affiliating with it." *Id*. Finally, he falsely accused TEP of "contract[ing] for the event under false and misleading representations" with the "the clear intention of this organization and those similar

---

[19] The "attached letter" Tindall refers to is his October 17 letter to TEP summarized above.

to diminish, if not destroy, community standards necessary to protect children." *Id.* Upon information and belief, the policy in Tindall's letter was final and was adopted by the City.

**City Manager Tindall Denies TEP's Request for a Permit to Host
the 2023 BoroPride Festival at the Cannonsburgh Village Location**

75.     On November 16, 2022, TEP representative Leslie Russell Yost emailed Murfreesboro Parks & Recreation Executive Director Nate Williams TEP's request for a permit for "the use of Cannonsburgh Village for [BoroPride's] 7th annual event on Saturday, September 16, 2023," asking for a response "by end of day Wednesday, November 30, 2022." *See* Exhibit I.

76.     Yost explained that "BoroPride Festival, an all ages event, which is free to attend, will include food trucks, a beer tent, retail and informational vendors, and live entertainment which includes, but is not limited to, live music, karaoke, and drag/artist impersonation performances. BoroPride will continue to ensure that our performers are aware the BoroPride Festival is an all ages event." *Id*.

77.     Executive Director Williams immediately forwarded the email to Tindall. *Id*.

78.     The City did not timely respond.

79.     After five months without an answer to TEP's permit request, on April 11, 2023, representatives from the American Civil Liberties Union ("ACLU") of Tennessee and attorneys for the City held a video conference to discuss TEP's pending request for a permit to hold the 2023 BoroPride event at the Cannonsburgh Village location. In response, the City's attorneys sought information regarding the agenda for the 2023 BoroPride festival, including potential contractual relationships with drag performers and whether the event would be limited to adults, and participants also discussed whether a meeting with City officials would be productive.

80.     On May 12, 2023—having learned nothing new from the City regarding its application for a permit to hold the 2023 BoroPride festival at Cannonsburgh Village—TEP sent

an email to the City asking for a decision, and stating in part: "[a]t some point, delay becomes constructive denial. BoroPride would like to be able to start planning the event." *See* Exhibit J. In response, the City stated that it would have an answer regarding the pending permit request by May 22, 2023. *Id*.

81. On May 22, 2023, the City indicated that it would need additional time to provide an answer regarding TEP's permit application for the 2023 BoroPride festival. *Id*.

82. On June 1, 2023—more than six months after receiving Ms. Yost's November 16, 2023 email requesting a permit to hold the 2023 BoroPride festival at the Cannonsburgh Village location—Tindall finally responded to TEP's permit request via letter. *See* Exhibit K.

83. First, Tindall claimed that Cannonsburgh Village would not be available for the 2023 BoroPride festival due to planned construction. Tindall then referred back to his October 17, 2022 letter, and he accused TEP of refusing to address the issues he identified:

> TEP has failed to identify specific and concrete steps it is willing to take to prevent a drag performer from touching a minor in a sexually suggestive manner during a performance. On the contrary, based on the November email and subsequent discussion with City representatives, TEP plans to conduct an event in the same manner as the 2022 event, which would permit this type of conduct being repeated.

*Id*. These accusations are baseless and malicious. There is no evidence to suggest that any drag performer at the 2022 BoroPride Festival touched a minor in a sexually suggestive manner.

84. Tindall concluded his letter to Ms. Yost by stating as follows:

> Should TEP agree to forgo the type of performance referenced in my previous letter and accept responsibility for conduct at the TEP-sponsored event as is required under the City's Use Agreement, a suitable location for the remainder of the event could be discussed. Alternatively, if TEP desires to sponsor the type of performance it sponsored last year, suitable restrictions and an appropriate location may be discussed. To date, TEP has rejected these discussions.

22

Therefore, TEP provides no basis for further consideration of the organization's request.

*Id.*

85. After receiving Tindall's June 1, 2023 letter, TEP spoke with City officials regarding the possibility of a meeting to address the parties' concerns, but no meeting was ever scheduled.

86. On July 7, 2023, TEP asked the City to either (1) state in writing the exact terms by which a permit will be issued to BoroPride, including an exact and detailed description of behavior that will or will not be allowed and the reasoning for imposing these additional terms on BoroPride, and what "suitable restrictions" and "appropriate location" the City proposes; or (2) state in writing the reasons why TEP's November 2022 permit request was denied. *See* Exhibit L.

87. On July 20, 2023, the City's attorney sent TEP a letter demanding "[s]ignificant information about the event" before the City might issue a permit for an alternate location. The letter expressly stated that the City "will not issue the permit . . . because TEP has not provided the required information about the planned event and has not granted the City any assurances or identified any steps it will take to ensure that performers do not engage in sexually suggestive conduct with minors." *See* Exhibit M.

88. Thus, instead of dealing with TEP in good faith, the City instead chose to double down on the spurious allegations from Tindall's June 1, 2023 letter as a pretext for imposing vague requirements not otherwise included in the permitting process and refusing to grant TEP's permit application.

89. There is no evidence that any drag performer—or anyone at all—at the 2022 BoroPride Festival "engage[d] in sexually suggestive conduct with minors." This demand for

23

assurances appears to have come entirely from the baseless accusations and objections lodged by anti-drag activists.

90. As far as TEP is aware, the City has not demanded these sorts of assurances from any other organization requesting a permit to use a City space for an event. By all appearances, these demands arise entirely out of anti-drag and anti-LGBTQ+ bias—largely stemming from messaging pushed by the Starbucks and others opposed to the inclusion of drag performances at the 2022 BoroPride Festival, which City officials embraced.

91. Frustrated by the City's malicious accusations and consistent refusal to work with TEP towards a productive resolution regarding TEP's request for a permit to hold the 2023 BoroPride event at Cannonsburgh Village, and with little time remaining in which to secure a venue for the event (which was originally slated for September 16, 2023), TEP was forced to find a new venue.

92. Around mid-July 2023, TEP reached an agreement with Middle Tennessee State University to host the 2023 BoroPride event at the school's Miller Coliseum on October 28, 2023. And, while TEP is looking forward to a successful event at Miller Coliseum, the change in venue means that BoroPride will now be held entirely indoors in a stadium segregated from the community at large, rather than at an outdoor location in the heart of the community as planned. This change undercuts the visibility of the event within the community at large, which is one of the core purposes of a Pride event, like BoroPride, designed to increase awareness and acceptance of the LGBTQ+ community. Moreover, even though it was able to obtain a new venue, the City's delay in responding and improper denial caused TEP to waste additional time, money, and effort, which it would not have otherwise incurred had its permit application with the City been approved in a timely manner.

93. Furthermore, due to the City's actions, TEP has chosen to have the much-anticipated drag events during BoroPride at a separate, adults-only venue away from the Miller Coliseum, during evening hours. TEP made this decision out of fears that the City's discriminatory policies, attitude, and discretion in enforcing its unconstitutional Ordinance (which is described in more detail below) would jeopardize a drag event held during the day at 2023 BoroPride. In other words, the City's actions have unquestionably chilled TEP's expressive speech made through its drag performances at 2023 BoroPride.

94. In short, through these unconstitutional actions, the City has engaged in a concerted effort to push drag performers, TEP and the City's LGBTQ+ community at large back into the closet, where they will be out of sight from the community, behind closed doors, and only visible to a limited audience. The City policy prohibiting the issuance of permits to TEP, the City's prolonged delay in responding to TEP's permit request, and the City's ultimate refusal to grant TEP's permit request for discriminatory and unconstitutional reasons has caused great harm to TEP. The City has unlawfully prohibited TEP—as well as members of the LGBTQ+ community that TEP recognizes and supports through public events like BoroPride—from engaging in protected speech and expression on City property based on biased and unfounded claims that such expression would *necessarily* expose young children to "conduct and speech of an explicitly sexual nature." And by purposely delaying its refusal to grant a permit, the City further harmed TEP by causing the organization to spend additional time, money, and resources—all of which could have been used to further TEP's other advocacy and political speech efforts on behalf of the LGBTQ+ community—in a hurried effort to identify and secure a new venue in time to host its annual BoroPride event in the fall of 2023.

95. While evading and delaying its response to TEP's request for a permit for the 2023 BoroPride event, City officials were also working feverishly to draft and pass a new "Community Decency" ordinance that would give City officials, and in particular, the City Manager, unfettered statutory authority to prevent and punish speech, messaging, or expression that City officials deemed inappropriate—speech like the BoroPride event.

96. The first reading of the Ordinance took place on May 25, 2023. The second reading of the Ordinance took place on June 15, 2023, at which time the Ordinance passed by a vote of five to one. Murfreesboro Mayor Shane McFarland and Murfreesboro City Council members Austin Maxwell, Madelyn Scales Harris, Kirt Wade, and Shawn Wright voted in favor of the ordinance. Vice-Mayor Bill Shacklett was the only vote against the Ordinance.

97. A copy of the Ordinance, which became effective on June 30, 2023, is attached as Exhibit N.

98. By its terms, the Ordinance is intended to

> set[] forth . . . contemporary decency standards . . . to promote the health, safety, rights, prosperity, and general welfare of the citizens of Murfreesboro by providing a measure to assist in the determination of conduct, materials, and events that may be judged as obscene or harmful to minors in accordance with the social morals of the community . . . to promote public decency and maintain a family-friendly environment in public places and protect against potential harm to minors from public expressions that appeal to prurient interests and are patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors.

Exhibit N, Part A.

99. The Ordinance includes a vague and sweepingly broad definition of "indecent behavior," which relies largely on the incorporation of other, already-existing statutes:

(1) **Indecent behavior** means indecent exposure, public indecency, lewd behavior, nudity or sexual conduct as defined in Section 21-71 of the Murfreesboro City Code, breach of the peace, and any other conduct that violates Tennessee Code, Title 39, Chapter 13, Part 5, Chapter 17, Parts 3, 4, 9, 10, or 11 or Murfreesboro City Code, Section 21-72 or 21-73; provided, however, indecent behavior does not include the exposure of the breast by a nursing mother or to the nudity of individuals in locker rooms or other designated spaces while they are changing clothes or showering.

100. This definition encompasses large swaths of protected speech and fails to provide individuals of ordinary intelligence a reasonable opportunity to understand whether certain conduct falls within the definition. As just two examples, there is no definition for "lewd behavior" and no limitation on the extent or situations in which "nudity" is considered indecent. Would a suggestive, fully-clothed dance be "lewd"? Would changing a child's diaper or displaying a nude statue constitute "indecent behavior"?

101. Still worse, this definition incorporates Section 21-71 of the Murfreesboro City Code, enacted in 1977 (the "1977 Definition"), which states:

"Sexual conduct" means acts of masturbation, *homosexuality*, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast.

*See* Exhibit O (emphasis added). Thus, when read together with the 1977 Definition, the Ordinance defines any public "acts of . . . homosexuality" as "indecent behavior."

102. The Ordinance prohibits anyone from "engag[ing] in" anything qualifying as "indecent behavior" while in a public space and goes even further, prohibiting speech, writings, advertisements, and expressive conduct that even refer to such "indecent behavior."

103. Specifically, the Ordinance provides that:

No person shall knowingly while in a public space engage in indecent behavior, display, distribute, or broadcast indecent material, conduct indecent events, or facilitate any of the foregoing prohibited acts, or otherwise subject minors to a prurient interest or

27

to behaviors, materials, or events that are patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors.

*Id.*, Part C(1).

104. The referenced "indecent materials or events" are then defined to include "printed materials, broadcasts, shows, parades, or other such displays that ***suggest***, ***advertise***, or ***display*** indecent behavior ***or that is harmful to minors***." *Id.*, Part B(2) (emphasis added).

105. These provisions, separately and together, prohibit large swaths of protected speech and expression and fail to provide individuals of ordinary intelligence a reasonable opportunity to understand whether certain conduct falls within the definition.

106. When read together with the 1977 Definition, which defines "acts of . . . homosexuality" as necessarily indecent, the Ordinance could prohibit any writings, presentations, speech, or conduct that even *suggests* homosexuality—anything from drag performances to advocacy materials in support of LGBTQ+ equality to an advertisement for *Will & Grace* re-runs to a same-sex couple simply walking down the street, holding hands.

107. Part D of the Ordinance grants the City Manager, the Chief of Police, Murfreesboro police officers, and other City officials unfettered discretion to deem constitutionally protected conduct a violation of the Ordinance. *Id.*, Part D.

108. The Ordinance and incorporated provisions provide for both civil and criminal penalties for violations. *Id.*, Part D(3).[20] The Ordinance provides that ***any*** prohibited conduct

---

[20] Additional penalties under Tennessee state law are incorporated via Part D of the Ordinance: Per Tenn. Code Ann. 39-17-305 ("Disorderly conduct"), violation of the disorderly conduct statute is a Class C misdemeanor. Under Tenn. Code Ann. 40-35-111 ("Authorized terms of imprisonment and fines for felonies and misdemeanors"), the penalty for a Class C misdemeanor is imprisonment for "not greater than thirty (30) days or a fine not to exceed fifty dollars ($50.00), or both, unless otherwise provided by statute."

constitutes disorderly conduct. It also grants City officials and law enforcement sweeping discretion to impose these penalties based on what they deem "indecent" under these poorly defined and unconstitutional definitions. *Id.*, Part E. In additional to civil and criminal sanctions, penalties may include a two- or five-year prohibition against obtaining City permits or exposure to additional claims or charges for misappropriation of City funds. *Id.* Put differently, the Ordinance punishes violations by silencing offenders for years.

**Legislative History Shows Murfreesboro City Ordinance 23-O-22 was Enacted to Erase Drag Performances from Public Spaces**

109. During the City Council meeting on June 15, 20232, Vice-Mayor Shacklett, who voted against the Ordinance, highlighted that the Ordinance was drafted and passed in direct response to the drag performances at the 2022 BoroPride Festival and the pressure from anti-drag activists thereafter.[21] He also highlighted many of the constitutional flaws with the Ordinance, putting the rest of the City Council, the Mayor, and other City officials on notice of these deficiencies.

110. For example, at an early point during the second reading, Vice-Mayor Shacklett observed: "I think the origins of the [O]rdinance were pretty clear. We had several discussions about some actions that occurred at Can[n]onsburg[h] and . . . that precipitated what we felt to be some additional action related to actions on [C]ity property."[22]

111. Shacklett also correctly identified the risk that this Ordinance would make the City Manager and Chief of Police the ultimate "arbiters" of "community decency" in Murfreesboro:

---

[21] A video of the June 15, 2023 hearing is available on the City of Murfreesboro's YouTube page (https://www.youtube.com/watch?v=l1pmY1wg16k). A transcript of this video is attached as Exhibit Q.

[22] Exhibit Q at 5:8–12.

> [I]n this Ordinance it's going to fall on our city managers and right now, maybe . . . you're comfortable with that, with our police chief and our city manager being the arbiter of what is . . . accepted standards and behavior as judged by the average member of our community.[23]

112. He also raised concerns about the impact of the Ordinance on "personal freedom and personal choice," and argued that there was no need for the Ordinance because any purported concerns could be addressed by state and municipal statutes that had long been on the books.[24]

113. Finally, he pointed out that City had failed to explore these concerns internally or with the citizens of Murfreesboro:

> If there's concerns--we have never discussed [them] in workshop or in session, some concern about how materials are being handled and passed out on public property or in our library or public schools. We never discussed that. We never had those discussions and yet it appears [in] this document [we're] somehow going to pull all of this together . . . .. I think we've--we've crossed a line into doing something that I'm not sure we have had enough discussion on to get . . . the consensus of our council, or the consensus of our citizens.[25]

114. Vice-Mayor Shacklett's statements proved prescient. Not long after the City Council passed the Ordinance—giving the Mayor and City Manager unfettered discretion to enforce their personal views of "community decency"—McFarland and Tindall visited a Rutherford County Library to identify books that could potentially violate the Ordinance. And on August 28, 2023, the Rutherford County Library System Board held a meeting with public comment to hold a vote on removing certain books from the library, citing violations of the Ordinance. The Board ultimately voted to remove four books from all Rutherford County libraries:

---

[23] *Id.* at 9:3–10.

[24] *Id.* at 14:7–20.

[25] *Id.* at 18:8–19:7.

*Flamer*, *Queerfully & Wonderfully Made*, *Let's Talk About It*, and *This Book Is Gay*. All four books discuss issues related to the LGBTQ+ community.

**<u>Plaintiff is Suffering Ongoing and Irreparable Harm to Its Constitutional Rights</u>**

115. TEP has been irreparably injured by the Defendants' passage of the Ordinance, which is a content- and viewpoint-based restriction on speech that is substantially overbroad and impermissibly vague, and was specifically enacted to target TEP, and prevent TEP from engaging in LGBTQ+ advocacy through events like BoroPride.

116. The City's passage of the Ordinance has already had a chilling effect on TEP and the BoroPride Festival. Given the Ordinance's vague and sweeping prohibitions on "indecent behavior," and associated criminal and civil penalties, the much-anticipated BoroPride drag events will now be held during evening hours at an adults-only venue located over five miles away from the Miller Coliseum where the main BoroPride events will take place. TEP moved the drag events because it was concerned that the City's discriminatory policies, attitude, and discretion in enforcing its unconstitutional Ordinance could place BoroPride organizers, performers, and attendees in legal jeopardy if the drag events were held at the 2023 BoroPride Festival itself.

117. These are not imagined fears. Indeed, the City has already demonstrated its willingness to use the Ordinance to silence LGBTQ+ speech by banning LGBTQ+ books from a local library. And when ACLU representatives emailed the City on behalf of TEP to ask whether it was "the City's opinion that the Ordinance is enforceable against 2023 BoroPride organizers, performers, and/or attendees with respect to conduct that takes place while those individuals are passing through 'Public spaces' (as defined in the Ordinance) on their way to or from the 2023 BoroPride festival," the City responded that "the City's streets and sidewalks obviously do constitute 'public space' under the ordinance, as do the City's buses." *See* Exhibit P. As such, the

31

City has refused to provide any assurance that the Ordinance—which as alleged herein condemns *any* public expression of "homosexuality"—will not be used to unfairly target LGBTQ+ organizers, performers, and/or attendees traveling to or from the Miller Coliseum where the 2023 BoroPride event will be held.

118. TEP has also been irreparably injured by the Defendant's refusal to grant TEP's applications for future BoroPride permits.

119. The City's refusal to grant these permits amounts to a perpetual ban on TEP's efforts to promote LGBTQ+ awareness through events like BoroPride. In doing so, the City has barred TEP from engaging in artistic and political speech—activities that fall squarely within the core of First Amendment protections—in support of LGBTQ+ rights and the LGBTQ+ community. Moreover, Defendants have prohibited TEP from expressing a viewpoint in support of drag, LGBTQ+ rights, and gender nonconformity because they disagree with the views being expressed.

120. As a result of Defendants' discriminatory actions, TEP also has suffered direct and indirect financial losses associated with the delay and rescheduling of a public event as large as BoroPride, along with the time and resources invested in planning the event.

121. TEP's efforts to host all-ages LGBTQ+ events like BoroPride promote a message of inclusivity, visibility, and acceptance within the City of Murfreesboro and the surrounding community. Defendants' unconstitutional efforts to silence TEP send a message that persons identifying as LGBTQ+ should be feared and excluded. By denying the LGBTQ+ community a public space to hold these events, Defendants make crystal clear that LGBTQ+ identities do not meet their "community standards" and are not welcome in the City of Murfreesboro.

122.    In light of the foregoing allegations, Plaintiff hereby brings claims against Defendants for violations of the First and Fourteenth Amendments to the U.S. Constitution; the U.S. Constitution's prohibition on Bills of Attainder; 42 U.S.C. §1983; and Article I, Sections 8 and 19 and Article XI, Section 8 of the Constitution of the State of Tennessee.

33

**FIRST CAUSE OF ACTION**
**Violation of the First Amendment – Content-Based and Viewpoint-Based Discrimination**
**(All Defendants)**

123.    Plaintiff incorporates and realleges all paragraphs alleged above.

124.    On its face, the Ordinance is an unconstitutional content-based and viewpoint-based restriction on speech in violation of the First Amendment to the U.S. Constitution. By enacting it and threatening enforcement of it, Defendants have violated Plaintiff's constitutional rights. The Court should declare it unconstitutional and enjoin Defendants from its future enforcement.

125.    The Ordinance prohibits broad swaths of protected speech, writing, and expressive behavior based on the topic discussed or the idea or message expressed, namely, because the content relates to the LGBTQ+ community and is vaguely sexual in nature, alludes to something sexual in nature, or includes content that the City deems potentially "harmful to minors."

126.    The City Council enacted the Ordinance with the impermissible purpose of chilling speech by and relating to the LGBTQ+ community, and in direct retaliation of TEP's inclusion of drag performances at the 2022 BoroPride Festival. Thus, even if the Ordinance were content-neutral on its face (and it is not), it is a content-based restriction on speech and expression.

127.    Independent of, but in addition to, the unconstitutional content-based restrictions in the Ordinance, the Ordinance also is an unconstitutional viewpoint-based restriction on expression in violation of the First Amendment to the U.S. Constitution. The Ordinance, via its incorporation of the 1977 Definition of "sexual conduct" that includes acts of "homosexuality," discriminates against some expressions of sexual orientation—namely, expression of sexual orientation based

on the viewpoint of homosexual orientation and other LGBTQ+ viewpoints, but not expression of sexual orientation from other viewpoints.

128. The Ordinance cannot survive strict scrutiny. The Ordinance is not narrowly tailored to achieve a compelling state interest.

129. The City cannot identify any compelling state interest that would justify the Ordinance or establish that the Ordinance is necessary or likely to protect that interest. To the extent the Ordinance purports to protect minors, a government's interest in protecting children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n.*, 564 U.S. 786, 794 (2011).

130. Even if the City could identify a compelling state interest that the Ordinance could achieve, the Ordinance is not narrowly tailored to achieve that interest. Indeed, it is not narrowly tailored at all—on its face, the Ordinance seeks to prohibit *any* materials, information, or speech even suggesting or alluding to anything sexual in nature.

131. The Ordinance provides a mechanism for Defendants to penalize Plaintiff, both civilly and criminally, for engaging in protected speech. The threat of civil and criminal penalties has chilled, is chilling, and will continue to chill Plaintiff's speech and expression.

132. Absent injunctive and declaratory relief, the Ordinance and threat of penalty thereunder will have an ongoing chilling effect on Plaintiff's protected speech and expression.

**SECOND CAUSE OF ACTION**
**Violation of the First Amendment – Overbreadth**
**(All Defendants)**

133. Plaintiff incorporates and realleges all paragraphs alleged above.

134. On its face, the Ordinance is an unconstitutionally overbroad restriction on speech in violation of the First Amendment to the U.S. Constitution. By enacting it and threatening

35

enforcement of it, Defendants have violated Plaintiff's constitutional rights. The Court should declare it unconstitutional and enjoin Defendants from its future enforcement.

135. A government entity cannot restrict protected speech in its efforts to circumscribe nonprotected speech. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999); *Broadrick v. Oklahoma*, 413 U.S. 601, 612–15 (1973).

136. Courts should invalidate a statute where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

137. The First Amendment protects speech and expressive conduct.

138. The Ordinance is unconstitutionally overbroad, because even if the Ordinance imposed some constitutionally acceptable limits—and the City has not shown that it does—it also places a substantial number of unconstitutional limitations on speech, in violation of the First Amendment.

139. For example, the Ordinance as drafted may allow Defendants to penalize Plaintiff and other Murfreesboro residents for the following speech and expression protected by the First Amendment: (1) engaging in non-obscene drag performances on public property; (2) the sale and distribution of romance novels at a farmer's market on City property; (3) a family movie night in a City park showing a children's movie with artfully curated, adult-directed innuendos; (4) playing sports at a public park and tapping a teammate on the buttocks as a customary communication of approval; or (5) holding hands on a public sidewalk as a same-sex couple.

140. The City was aware of the Ordinance's unconstitutional overbreadth at the time of enactment.

141. The Ordinance's prohibitions on protected speech and expression, enforced by the threat of civil and criminal penalties, chill and will continue to chill Plaintiff's speech and expression.

142. Absent injunctive and declaratory relief, the Ordinance and threat of penalty thereunder will have an ongoing chilling effect on Plaintiff's protected speech and expression.

## THIRD CAUSE OF ACTION
### Violation of the First and Fourteenth Amendments – Vagueness
### (All Defendants)

143. Plaintiff incorporates and realleges all paragraphs alleged above.

144. On its face, the Ordinance is unconstitutionally vague in violation of the First and Fourteenth Amendments to the U.S. Constitution. By enacting it and threatening enforcement of it, Defendants have violated Plaintiff's constitutional rights. The Court should declare it unconstitutional and enjoin Defendants from its future enforcement.

145. A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentilev v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).

146. "The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961).

147. "Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the [void for vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976). The literal scope of the Ordinance

37

reaches speech sheltered by the First Amendment, including expressive "conduct" and "printed materials, broadcasts, shows, parades, or other such displays."

148. A government entity cannot impose restrictions on speech that "fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct" is prohibited or "authorize[] or even encourage[] arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

149. The Ordinance expressly prohibits "indecent behavior"; the "display, distribut[ion], or broadcast [of] indecent material"; and conducting "indecent events" in public spaces. The Ordinance defines "indecent behavior" by the undefined terms: "public indecency," undefined "lewd behavior," undefined "breach of the peace," and (via the 1977 Definition) acts of "homosexuality."

150. Each of these terms—"indecent behavior," "indecent material," "indecent events," "public indecency," "lewd behavior," "breach of the peace," and acts of "homosexuality"—is unconstitutionally vague, and any one of these terms would render the Ordinance unconstitutionally vague

151. The Ordinance denies people of ordinary intelligence a reasonable opportunity to understand whether certain conduct violates the Ordinance.

152. The City was aware of the Ordinance's impermissible vagueness at the time of enactment.

153. In addition to Due Process concerns, the Ordinance's vagueness, including as to prohibitions on protected speech and expression, enforced by the threat of civil and criminal penalties, chill and will continue to chill Plaintiff's speech and expression.

154.     Absent injunctive and declaratory relief, the Ordinance and threat of penalty thereunder will have an ongoing chilling effect on Plaintiff's Fourteenth Amendment rights and related First Amendment rights.

**FOURTH CAUSE OF ACTION**
**Violation of the Fourteenth Amendment – Equal Protection Violation Based on Sex and Sexual Orientation Discrimination**
**(All Defendants)**

155.     Plaintiff incorporates and realleges all paragraphs alleged above.

156.     On its face, the Ordinance is an unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. By enacting it and threatening enforcement of it, Defendants have violated Plaintiff's constitutional rights. The Court should declare it unconstitutional and enjoin Defendants from its future enforcement.

157.     The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

158.     By denying Plaintiff a public forum and limiting their speech based on the LGBTQ+ nature of their speech, the Ordinance discriminates against them based on sex and LGBTQ+ status in violation of Plaintiff's Fourteenth Amendment right to equal protection under the law.

159.     Discrimination based on sex stereotypes, gender, gender identity, sexual orientation and sex characteristics are all forms of discrimination on the basis of sex. *Frontiero v. Richardson*, 411 U.S. 677, 687–88 (1973) (plurality opinion); *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994); *cf. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741–42 (2020).

160.     Government discrimination based on LGBTQ+ status also is presumptively unconstitutional and subject to at least heightened scrutiny.

39

161. LGBTQ+ persons have suffered a long history of discrimination in Tennessee and across the country and continue to suffer such discrimination to this day. They are a discrete and insular group and lack the political power to protect their rights through the legislative process. They largely have been unable to secure explicit legal protections against discrimination. Their LGBTQ+ status bears no relation to their ability to contribute to society. And LGBTQ+ identity is a core, defining trait so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

162. Drag performance involves gender nonconforming dress and comportment. Its history and current practice are symbolically associated with the LGBTQ+ community, and drag performers are disproportionately LGBTQ+ persons.

163. The Ordinance discriminates based on LGBTQ+ identity, and based on nonconformance to gender-stereotyped dress and comportment and, thus, sex and LGBTQ+ status.

164. The Ordinance distinguishes LGBTQ+ individuals based on generalized fears, negative attitudes, stereotypes, and moral disapproval of LGBTQ+ people, and people who fail to conform to sex stereotypes, which are not legitimate bases for unequal treatment under any level of scrutiny.

165. The City drafted and enacted the Ordinance with a discriminatory intent.

166. Discrimination against the LGBTQ+ community was a substantial motivating factor in enacting the challenged provision. The City enacted the Ordinance in direct retaliation to Plaintiff's BoroPride event in 2022 and with the purpose of preventing LGBTQ+ individuals from receiving equal protection of Murfreesboro law.

167. The Ordinance is subject to heightened scrutiny: at least, intermediate scrutiny. Intermediate scrutiny is appropriate because the Ordinance discriminates based on homosexuality,

and therefore on the basis of sex. Intermediate scrutiny is also appropriate, because (A) the LGBTQ+ community as a group has historically endured persecution and discrimination; (B) homosexuality has no relation to aptitude or ability to contribute to society; (C) LGBTQ+ people are a discernible group with non-obvious distinguishing characteristics; and (D) the class remains a politically weakened minority, members of the LGBTQ+ community are a quasi-suspect class. *See Windsor v. United States*, 699 F.3d 169, 181–82 (2d Cir. 2012).

168. "The prohibition against sex-based discrimination includes discrimination based on [one]'s sexual orientation." *Kilpatrick v. HCA Hum. Res., LLC*, No. 3:17-cv-00670, 2022 U.S. Dist. LEXIS 50801, at *13 (M.D. Tenn. Mar. 22, 2022) (citing *Bostock*, 140 S. Ct. at 1731).

169. Government regulations based on sex are subject to intermediate scrutiny. *J.E.B.*, 511 U.S. at 152.

170. The Ordinance cannot survive any level of scrutiny.

171. The City has no legitimate interest in preventing LGBTQ+ events or homosexuality in general. A "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

172. Absent injunctive and declaratory relief, the Ordinance and threat of penalty thereunder will have an ongoing effect on Plaintiff's Fourteenth Amendment Equal Protection rights.

## FIFTH CAUSE OF ACTION
### Violation of Article I, § 19 of the Constitution of the State of Tennessee – Content-Based and Viewpoint-Based Discrimination
### (All Defendants)

173. Plaintiff incorporates and realleges all paragraphs alleged above.

174. On its face, the Ordinance is an unconstitutional content-based and viewpoint-based restriction on speech in violation of the Article I, Section 19 of the Constitution of the State

of Tennessee. By enacting it and threatening enforcement of it, Defendants have violated Plaintiff's rights guaranteed by the Constitution of the State of Tennessee. The Court should declare it unconstitutional and enjoin Defendants from its future enforcement.

175. Article I, Section 19 of the Tennessee Constitution has been "construed" by the Tennessee Supreme Court "'to have a scope *at least* as broad as that afforded' the freedoms of speech and of the press by the First Amendment." *Knight v. Montgomery Cnty.*, 592 F. Supp. 3d 651, 670 (M.D. Tenn. 2022) (emphasis added) (quoting *State v. Mitchell*, 343 S.W.3d 381, 392, n.3 (Tenn. 2011)).

176. The Ordinance prohibits broad swaths of protected speech, writing, and expressive behavior based on the topic discussed or the idea or message expressed, namely, because the content relates to the LGBTQ+ community and is vaguely sexual in nature, alludes to something sexual in nature, or includes content that the City deems potentially "harmful to minors."

177. The City Council enacted the Ordinance with the impermissible purpose of chilling speech by and relating to the LGBTQ+ community, and in direct retaliation of TEP's inclusion of drag performances at the 2022 BoroPride Festival. Thus, even if the Ordinance were content-neutral on its face (and it is not), it is a content-based restriction on speech and expression.

178. Independent of, but in addition to, the unconstitutional content-based restrictions in the Ordinance, the Ordinance also is an unconstitutional viewpoint-based restriction on expression in violation of the Tennessee Constitution. The Ordinance, via its incorporation of the 1977 Definition of "sexual conduct" that includes acts of "homosexuality," discriminates against some expressions of sexual orientation—namely, expression of sexual orientation based on the viewpoint of homosexual orientation and other LGBTQ+ viewpoints, but not expression of sexual orientation from other viewpoints.

179. The Ordinance cannot survive strict scrutiny. The Ordinance is not narrowly tailored to achieve a compelling state interest.

180. The City cannot identify any compelling state interest that would justify the Ordinance or establish that the Ordinance is necessary or likely to protect that interest. To the extent the Ordinance purports to protect minors, a government's interest in protection children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

181. Even if the City could identify a compelling state interest that the Ordinance could achieve, the Ordinance is not narrowly tailored to achieve that interest. Indeed, it is not narrowly tailored at all—on its face, the Ordinance seeks to prohibit *any* materials, information, or speech even suggesting or alluding to anything sexual in nature.

182. The Ordinance provides a mechanism for Defendants to penalize Plaintiff, both civilly and criminally, for engaging in protected speech. The threat of civil and criminal penalties chills and will continue to chill Plaintiff's speech and expression.

183. Absent injunctive and declaratory relief, the Ordinance and threat of penalty thereunder will have an ongoing chilling effect on Plaintiff's speech and expression protected by the Tennessee Constitution.

## SIXTH CAUSE OF ACTION
### Violation of Article I, § 8 and Article XI, § 8 of the Constitution of the State of Tennessee – Equal Protection Violation Based on Sex and Sexual Orientation Discrimination
### (All Defendants)

184. Plaintiff incorporates and realleges all paragraphs alleged above.

185. On its face, the Ordinance is an unconstitutional violation of the equal protection guarantees of Article I, Section 8 and Article XI, Section 8 of the Constitution of the State of Tennessee. By enacting it and threatening enforcement of it, Defendants have violated Plaintiff's

rights guaranteed by the Constitution of the State of Tennessee. The Court should declare the Ordinance unconstitutional and enjoin Defendants from enforcing it.

186. "The right to equal protection is guaranteed by the Fourteenth Amendment of the United States Constitution . . . [and] by Article I, section 8, and Article XI, section 8, of the Tennessee Constitution." *McClay v. Airport Mgmt. Servs., LLC*, 596 S.W.3d 686, 695 (Tenn. 2020). "While recognizing that '[t]he equal protection provisions of the Tennessee Constitution and the Fourteenth Amendment are historically and linguistically distinct,' th[e] Court has stated that Article I, § 8 and Article XI, § 8 of the Tennessee Constitution confer 'essentially the same protection' as the equal protection clause of the United States Constitution." *State v. Tester*, 879 S.W.2d 823, 827 (Tenn. 1994) (quoting *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993)).

187. "The concept of equal protection espoused by the federal and of our state constitutions guarantees that 'all persons similarly circumstanced shall be treated alike.'" *Doe v. Norris*, 751 S.W.2d 834, 841 (Tenn. 1988) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 (1920)).

188. "[A] state cannot act with animus against individuals based on their sexual orientation." *Gay v. Cabinet for Health & Family Servs. Dep't*, No. 18-5285, 2019 U.S. App. LEXIS 2336, at *14 (6th Cir. Jan. 23, 2019).

189. The Ordinance disadvantages members of the LGBTQ+ community by discriminatorily subjecting them to unconstitutional limitations on speech and expression enforced through civil and criminal punishment. As such, the Ordinance deprives the LGBTQ+ community equal protection under the law in violation of the Fourteenth Amendment.

190. The City drafted and enacted the Ordinance with a discriminatory intent.

191. Discrimination against the LGBTQ+ community was a substantial motivating factor in enacting the challenged provision. The City enacted the Ordinance in direct retaliation to Plaintiff's conduct related to BoroPride in 2022 and with the purpose of preventing LGBTQ+ individuals from receiving equal protection of Murfreesboro law.

192. The Ordinance is subject to heightened scrutiny: at least, intermediate scrutiny. Because (A) the LGBTQ+ community as a group has historically endured persecution and discrimination; (B) homosexuality has no relation to aptitude or ability to contribute to society; (C) LGBTQ+ people are a discernible group with non-obvious distinguishing characteristics; and (D) the class remains a politically weakened minority, members of the LGBTQ+ community are a quasi-suspect class. *Windsor*, 699 F.3d at 181-82.

193. "The prohibition against sex-based discrimination includes discrimination based on [one]'s sexual orientation." *Kilpatrick*, 2022 U.S. Dist. LEXIS 50801, at *13 (citing *Bostock v.*, 140 S. Ct. at 1731).

194. Government regulations based on sex are subject to intermediate scrutiny. *J.E.B.*, 511 U.S. at 152 (1994).

195. The Ordinance cannot survive any level of scrutiny.

196. The City has no interest in preventing homosexuality. A "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer*, 517 U.S. at 635.

197. Absent injunctive and declaratory relief, the Ordinance and threat of penalty thereunder will have an ongoing effect on Plaintiff's equal protection rights guaranteed by the Tennessee Constitution.

**CLAIMS RELATING TO THE 1977 DEFINITION'S INCLUSION OF
"HOMOSEXUALITY" AS PROHIBITED "SEXUAL CONDUCT"
IN MURFREESBORO CITY CODE SECTION 21-71**

**SEVENTH CAUSE OF ACTION**
**Violation of the First Amendment – Content-Based and Viewpoint-Based Discrimination
Related to Explicit Categorization of "Homosexuality"**
**(All Defendants)**

198.	Plaintiff incorporates and realleges all paragraphs alleged above.

199.	On its face, Murfreesboro City Code Section 21-71 (defined above as the "1977 Definition") is an unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. By enacting the 1977 Definition, incorporating it into other ordinances, and threatening enforcement, Defendants have violated Plaintiff's constitutional rights. The Court should declare it unconstitutional and enjoin Defendants from future enforcement of the 1977 Definition and any law incorporating it or, in the alternative, strike the word "homosexuality" from the 1977 Definition.

200.	The 1977 Definition defines sexual conduct as "acts of masturbation, ***homosexuality***, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast" (emphasis added).

201.	The 1977 Definition of "sexual conduct" is incorporated into prohibitions in several other provisions within the Murfreesboro City Code, including Sections 21-22 (via the Ordinance) and 21-72 through -75.

202.	"Sexual expression which is indecent but not obscene is protected by the First Amendment." *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989). Non-obscene displays of affection are protected expressions of sexual orientation. *See, e.g.*, *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1188 (C.D. Cal. 2007); *Boyd Cnty. High Sch. Gay Straight Alliance v. Bd. of Educ.*, 258

F. Supp. 2d 667, 690 (E.D. Ky. 2003); *Henkle v. Gregory*, 150 F. Supp. 2d 1067, 1076 (D. Nev. 2001); *Fricke v. Lynch*, 491 F. Supp. 381, 385–86 (D.R.I. 1980).

203.    To the extent the Ordinance and other City Code provisions incorporate the 1977 Definition and prohibit "sexual conduct" as defined to include acts of "homosexuality," they regulate protected expression based on its content, namely, non-obscene expressions of same-sex sexual orientation.

204.    To the extent the Ordinance and other City Code provisions incorporate the 1977 Definition and prohibit "sexual conduct" as defined to include acts of "homosexuality," they regulate protected expression based on its viewpoint, namely, the viewpoint of homosexuality or the homosexual nature of the non-obscene expressions of sexuality or sexual orientation.

205.    "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based" or viewpoint-based. *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015). The 1977 Definition and the Ordinance and other City Code Provisions that incorporate the 1977 Definition cannot survive strict scrutiny.

206.    Officials acting under the color of state law cannot censor or restrict speech or expression based on its content, "its message," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992), unless "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, 270 (1981).

207.    The 1977 Definition is not narrowly tailored to achieve a compelling state interest.

208.    The City cannot identify a compelling state interest or show that the 1977 Definition is necessary to advance that interest. The City has no interest in preventing "homosexuality."

209. Even if the City could show a compelling state interest advanced by the 1977 Definition, it cannot show that including "homosexuality" as a whole would be narrowly tailored to advance that interest.

210. The provisions of Murfreesboro City Code that incorporate the 1977 Definition provide a mechanism for the City to penalize Plaintiff, both civilly and criminally, for engaging in prohibited conduct.

211. The threat of civil and criminal penalties chills and will continue to chill Plaintiff's speech and expression.

212. Absent injunctive and declaratory relief, the 1977 Definition and the threat of penalty thereunder will have an ongoing chilling effect on Plaintiff's protected speech and expression.

<u>**EIGHTH CAUSE OF ACTION**</u>
**Violation of the Fourteenth Amendment - Equal Protection Violation Related to Explicit Categorization of "Homosexuality"**
**(All Defendants)**

213. Plaintiff incorporates and realleges all paragraphs alleged above.

214. On its face, the 1977 Definition is an unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. By enacting the 1977 Definition, incorporating it into other ordinances, and threatening enforcement, Defendants have violated Plaintiff's constitutional rights. The Court should declare it unconstitutional and enjoin Defendants from future enforcement of the 1977 Definition and any law incorporating it or, in the alternative, strike the word "homosexuality" from the 1977 Definition.

215. The 1977 Definition defines "sexual conduct" as "acts of masturbation, *homosexuality*, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast" (emphasis added).

48

216.    The definition of "sexual conduct" enumerated in the 1977 Definition is incorporated into prohibitions in several other provisions within the Murfreesboro City Code, including Sections 21-22 (via the Ordinance) and 21-72 through -75.

217.    The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

218.    The Ordinance is unconstitutional and violates the Equal Protection Clause of the Fourteenth Amendment because it makes an impermissible distinction between homosexual acts and non-homosexual acts with respect to what acts or displays are permitted in a public space. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92 (1972).

219.    "[A] state cannot act with animus against individuals based on their sexual orientation." *Gay*, 2019 U.S. App. LEXIS 2336, at *14.

220.    The 1977 Definition is subject to heightened scrutiny: at least, intermediate scrutiny. Because (A) the LGBTQ+ community as a group has historically endured persecution and discrimination; (B) homosexuality has no relation to aptitude or ability to contribute to society; (C) LGBTQ+ people are a discernible group with non-obvious distinguishing characteristics; and (D) the class remains a politically weakened minority, members of the LGBTQ+ community are a quasi-suspect class. *Windsor*, 699 F.3d at 181–82.

221.    "The prohibition against sex-based discrimination includes discrimination based on [one]'s sexual orientation." *Kilpatrick*, 2022 U.S. Dist. LEXIS 50801, at *13 (citing *Bostock*, 140 S. Ct. at 1731).

222.    Government regulations based on sex are subject to intermediate scrutiny. *J.E.B.*, 511 U.S. at 152.

223. The 1977 Definition cannot survive any level of scrutiny.

224. The City has no interest in preventing homosexuality. A "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer*, 517 U.S. at 635.

225. Absent injunctive and declaratory relief, the 1977 Definition and the threat of penalty thereunder will have an ongoing effect on Plaintiff's Equal Protection rights.

## NINTH CAUSE OF ACTION
**Violation of Article I, § 19 of the Constitution of the State of Tennessee – Content-Based and Viewpoint-Based Discrimination Related to Explicit Categorization of "Homosexuality"
(All Defendants)**

226. Plaintiff incorporates and realleges all paragraphs alleged above.

227. On its face, the 1977 Definition is an unconstitutional content-based and viewpoint-based restriction on speech in violation of Article I, Section 19 of the Constitution of the State of Tennessee. By enacting it, incorporating it into other ordinances and threatening enforcement of it, Defendants have violated Plaintiff's rights guaranteed by the Constitution of the State of Tennessee. The Court should declare it unconstitutional and enjoin Defendants from future enforcement of the 1977 Definition and any law incorporating it or, in the alternative, strike the word "homosexuality" from the 1977 Definition.

228. The 1977 Definition defines sexual conduct as "acts of masturbation, *homosexuality*, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast" (emphasis added).

229. This definition of "sexual conduct" in the 1977 Definition is incorporated into prohibitions in several other provisions within the Murfreesboro City Code, including Sections 21-22 (via the Ordinance) and 21-72 through -75.

50

230. "Sexual expression which is indecent but not obscene is protected by the First Amendment." *Sable Commc'ns*, 492 U.S. at 126. Non-obscene displays of affection are protected expressions of sexual orientation. *See, e.g.*, *Nguon*, 517 F. Supp. 2d at 1188; *Boyd Cnty. High School*, 258 F. Supp. 2d at 690; *Henkle*, 150 F. Supp. 2d at 1076; *Fricke*, 491 F. Supp. at 385–86.

231. To the extent the Ordinance and other City Code provisions include the 1977 Definition and prohibit "sexual conduct" as defined to include acts of "homosexuality," they regulate protected speech and expression based on its content, namely, non-obscene expressions of sexual orientation.

232. To the extent the Ordinance and other City Code provisions incorporate the 1977 Definition and prohibit "sexual conduct" as defined to include acts of "homosexuality," they regulate protected speech and expression based on its viewpoint, namely, the viewpoint of homosexuality or the homosexual nature of the non-obscene expressions of sexuality or sexual orientation.

233. "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based" or viewpoint-based. *Reed*, 576 U.S. at 166. The 1977 Definition and the Ordinance and other City Code Provisions that incorporate its definition cannot survive strict scrutiny.

234. Officials acting under the color of state law cannot censor or restrict speech based on its content, "its message," *R.A.V.*, 505 U.S. at 395, unless "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Widmar*, 454 U.S. at 270.

235. The 1977 Definition is not narrowly tailored to achieve a compelling state interest.

236. The City cannot identify a compelling state interest or show that the 1977 Definition's is necessary to advance that interest. The City has no interest in preventing

homosexuality. A "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer*, 517 U.S. at 635.

237. Even if the City could show a compelling state interest advanced by the 1977 Definition, it cannot show that including "homosexuality" as a whole would be narrowly tailored to advance that interest.

238. The provisions of Murfreesboro City Code that incorporate the 1977 Definition provide a mechanism for the City to penalize Plaintiff, both civilly and criminally, for engaging in prohibited conduct.

239. The threat of civil and criminal penalties chills and will continue to chill Plaintiff's speech and expression.

240. Absent injunctive and declaratory relief, the 1977 Definition and the threat of penalty thereunder will have an ongoing chilling effect on Plaintiff's protected speech and expression.

**TENTH CAUSE OF ACTION**
**Violation of Article I, § 8 and Article XI, § 8 of the Constitution of the State of Tennessee -**
**Equal Protection Violation Related to Explicit Categorization of "Homosexuality"**
**(All Defendants)**

241. Plaintiff incorporates and realleges all paragraphs alleged above.

242. On its face, the 1977 Definition is an unconstitutional content-based and viewpoint-based restriction on speech in violation of Article I, Section 19 of the Constitution of the State of Tennessee. By enacting it, incorporating it into other ordinances and threatening enforcement of it, Defendants have violated Plaintiff's rights guaranteed by the Constitution of the State of Tennessee. The Court should declare it unconstitutional and enjoin Defendants from future enforcement of the 1977 Definition and any law incorporating it or, in the alternative, strike the word "homosexuality" from the 1977 Definition.

52

243. The 1977 Definition defines "sexual conduct" as "acts of masturbation, *homosexuality*, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast" (emphasis added).

244. The definition of "sexual conduct" enumerated in the 1977 Definition is incorporated into prohibitions in several other provisions within the Murfreesboro City Code, including Sections 21-22 (via the Ordinance) and 21-72 through -75.

245. "[N]o man shall be . . . disseized of his . . . liberties or privileges, . . . or in any manner destroyed or deprived of his life, liberty or property." Tenn. Const. Article I, § 8. "The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie[s], or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law." Tenn. Const. Article XI, § 8.

246. "[A] state cannot act with animus against individuals based on their sexual orientation." *Gay*, 2019 U.S. App. LEXIS 2336, at *14.

247. The 1977 Definition is subject to at least intermediate scrutiny because it singles out a quasi-suspect class of LGBTQ+ persons for differential treatment under the law. Because (A) the LGBTQ+ community as a group has historically endured persecution and discrimination; (B) homosexuality has no relation to aptitude or ability to contribute to society; (C) LGBTQ+ people are a discernible group with non-obvious distinguishing characteristics; and (D) the class remains a politically weakened minority, members of the LGBTQ+ community are a quasi-suspect class. *Windsor*, 699 F.3d at 181–82.

248. "The prohibition against sex-based discrimination includes discrimination based on an [one]'s sexual orientation." *Kilpatrick*, 2022 U.S. Dist. LEXIS 50801, at *13 (quoting *Bostock*, 140 S. Ct. at 1731).

249. Government regulations based on sex are subject to intermediate scrutiny. *J.E.B.*, 511 U.S. at 152.

250. The 1977 Definition cannot survive any level of scrutiny.

251. The City has no interest in preventing homosexuality. A "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer*, 517 U.S. at 635.

252. "[A] state cannot act with animus against individuals based on their sexual orientation." *Gay*, 2019 U.S. App. LEXIS 2336, at *14.

253. Absent injunctive and declaratory relief, the 1977 Definition and the threat of penalty thereunder will have an ongoing effect on Plaintiff's Equal Protection rights.

## ELEVENTH CAUSE OF ACTION
### Violation of U.S. Constitution Article I, Section 10, clause 1 - Bill of Attainder
### (All Defendants)

254. Plaintiff incorporates and realleges all paragraphs alleged above.

255. On its face, the 1977 Definition is an unconstitutional Bill of Attainder in violation of Article I, Section 10, clause 1 of the U.S. Constitution. By enacting it, incorporating it into other ordinances and threatening enforcement of it, Defendants have violated Plaintiff's constitutional rights. The Court should declare it unconstitutional and enjoin Defendants from future enforcement of the 1977 Definition and any law incorporating it or, in the alternative, strike the word "homosexuality" from the 1977 Definition.

256. Article I, Section 10, clause 1 of the U.S. Constitution prohibits any state or municipality thereof from passing a Bill of Attainder.

257. The Ordinance, via its incorporation of the definition of "sexual conduct" from the 1977 Definition, is a Bill of Attainder.

258. A law is a Bill of Attainder where it (1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial trial. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 468 (1977).

259. The 1977 Definition defines "sexual conduct" as "acts of masturbation, ***homosexuality***, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast" (emphasis added).

260. The Ordinance prohibits engaging in indecent behavior, such as sexual conduct as defined by the 1977 Definition, which includes acts of "homosexuality," in public spaces. In other words, the Ordinance prohibits acts of homosexuality in public places.

261. A law that punishes an individual based on his or her sexual status or identity is an unconstitutional Bill of Attainder. *See, e.g.*, *Meinhold v. United States DOD*, 808 F. Supp. 1453, 1455 (C.D. Cal. 1992) ("The Navy's regulations, which mandate the discharge of all homosexual service members on the basis of their sexual status, is a bill of attainder in violation of Art. I, § 9 of the U.S. Constitution.").

262. The identity of a "homosexual" person (or LGBTQ+ persons in today's terms) is inextricably linked to the action of "homosexuality." One engages in an act of homosexuality simply by having an attraction to a member of the same sex or expressing that attraction in any manner.

263.    Thus, by prohibiting acts of homosexuality in public spaces, the Ordinance specifies the affected group of persons: homosexuals.

264.    Violation of the Ordinance results in punishment, including but not limited to, a loss of access to City property to exercise one's First Amendment rights, fines, and criminal penalties. *See* Ordinance, Section (E).

265.    The City has no non-punitive legislative purpose for prohibiting homosexuality. A "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer*, 517 U.S. at 635.

266.    The legislative history and City records demonstrate an intent to punish members of the LGBTQ+ community.

267.    The Ordinance provides a mechanism for the Murfreesboro City Manager and/or the Murfreesboro Chief of Police to adjudge a violation of the Ordinance and enforce the Ordinance's penalties without a judicial proceeding.

268.    Absent injunctive and declaratory relief, the 1977 Definition (via incorporation into the Ordinance) and the threat of penalty thereunder will constitute an ongoing violation of the U.S. Constitution's prohibition on passing Bills of Attainder in violation of Plaintiff's rights.

**CLAIMS RELATING TO THE CITY'S POLICY PROHIBITING PERMITS FOR TEP**

**TWELFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violation of the First Amendment – Prior Restraint and Retaliation**
**(City Policy against Issuing Future Permits to TEP)**
**(Defendants City of Murfreesboro, McFarland, Tindall)**

269.    Plaintiff incorporates and realleges all paragraphs alleged above.

270.    Acting under color of state law, Defendants the City of Murfreesboro, McFarland, and Tindall imposed a policy of denying all Plaintiff's future permit applications. Defendants the

City, McFarland, and Tindall imposed this policy in retaliation for Plaintiff exercising its free speech rights and as a prior restraint in violation of the First Amendment to the U.S. Constitution. By imposing the policy and threatening enforcement of it, Defendants the City and Tindall have violated Plaintiff's constitutional rights. The Court should declare the policy unconstitutional and enjoin the City, McFarland, and Tindall from future enforcement of the policy. It also should award compensatory, punitive damages, and attorney fees against the City, as well as against McFarland and Tindall in their personal and official capacities.

271. In September 2022, Mayor McFarland received complaints from anti-drag activists urging him to ban drag performances in the City of Murfreesboro. McFarland initially acknowledged that taking such action would violate the constitutional rights of Murfreesboro's LGBTQ+ citizens. Nonetheless, he forwarded those complaints to Tindall and other City officials.

272. In response to those complaints, on October 17, 2022, McFarland, Tindall and the City imposed an official policy prohibiting the issuance of any special event permits to TEP, both through Tindall's letter to TEP and the Memorandum issued to City officials with McFarland's implicit approval.

273. The policy imposed by the City, McFarland and Tindall prohibiting the issuance of permits to TEP remains in effect and constitutes an unconstitutional prior restraint on TEP's speech and expression, in violation of the First Amendment.

274. The City, McFarland and Tindall also unconstitutionally imposed this policy in retaliation against TEP for its pro-LGBTQ+ messaging and/or its exercise of its First Amendment rights, namely, its speech, messaging, and inclusion of a drag performance at its 2022 BoroPride Festival.

275. Defendants' retaliatory action caused Plaintiff to suffer injury, including chilling TEP from continuing to engage in its protected speech.

276. The City's permitting scheme grants the City Manager unbridled discretion to deny permit applications, resulting in chilled speech and censorship.

277. The City policy is not limited to a specified, brief period or to maintain the status quo. It is a perpetual and uniquely targeted restriction on TEP's free speech rights.

278. Absent injunctive and declaratory relief preventing Defendants' perpetual prior restraint, Defendants' actions will have an ongoing effect on TEP's First Amendment rights.

279. Plaintiff seeks compensatory and punitive damages arising out of this violation, as well as attorney fees.

**THIRTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violation of the First Amendment – Infringement on Free Speech and Retaliation**
**(Denial of TEP Permit for 2023 BoroPride)**
**(Defendants City of Murfreesboro, McFarland, Tindall)**

280. Plaintiff incorporates and realleges all paragraphs alleged above.

281. Acting under color of state law, Defendants the City of Murfreesboro, McFarland, and Tindall denied Plaintiff's permit application in retaliation for Plaintiff exercising its free speech rights and in violation of the First Amendment to the U.S. Constitution. By denying Plaintiff's permit, Defendants the City, McFarland, and Tindall have violated Plaintiff's constitutional rights. The Court should award compensatory and punitive damages and attorney fees against the City, as well as against McFarland and Tindall in their personal and official capacities.

282. In October 2022, the City, McFarland and Tindall enacted an official policy denying the issuance of any further permits to TEP.

58

283. On November 16, 2022, TEP applied for a permit to hold the 2023 BoroPride Festival on City property on September 16, 2023.

284. Like the 2022 BoroPride Festival, the 2023 BoroPride Festival was intended to be a celebration of the LGBTQ+ community of Murfreesboro, Tennessee. TEP planned for the Festival to contain, among other protected speech, discussion of LGBTQ+ issues and drag performances.

285. The City and Tindall failed to make a final determination on the permit application for over six months.

286. The City and Tindall's failure to make a timely determination after meaningful review amounted to constructive denial of the permit.

287. Through the constructive denial of TEP's permit application, the City, McFarland and Tindall infringed on TEP's First Amendment rights to use City property for protected speech.

288. During the period of delay, Tindall sent TEP multiple letters indicating that he and the City would not make a determination on the application for the 2023 BoroPride Festival unless TEP constructively forfeited its right to engage in certain protected speech, namely, non-obscene drag performances for all BoroPride attendees.

289. The City's records discussed above show a concerted effort by City officials to ensure that TEP would not be able to host the 2023 BoroPride Festival on Murfreesboro's property due to the intended content of the event.

290. The City, McFarland and Tindall's constructive denial of the permit request was an impermissible retaliation against TEP for its pro-LGBTQ+ messaging and for its pro-LGBTQ+ messaging and/or its First Amendment rights, namely, its speech, messaging, and inclusion of a drag performance at its 2022 BoroPride Festival.

59

291. Upon information and belief, the City, McFarland and Tindall's denial of the permit request was caused by the City's October 2022 policy denying the issuance of any future permit to TEP.

292. As a result of the delay, TEP incurred actual financial harm, including additional costs and effort, because it was unable to conduct the necessary preparations for the 2023 BoroPride Festival and it had to seek an alternate date and an alternate venue.

293. Plaintiff seeks both compensatory and punitive damages arising out of this violation, as well as attorney fees.

**FOURTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment – Equal Protection Violation**
**(Defendants City of Murfreesboro, McFarland, Tindall)**

294. Plaintiff incorporates and realleges all facts alleged above.

295. Acting under color of state law, Defendants the City of Murfreesboro, McFarland, and Tindall imposed a policy of denying all Plaintiff's permit applications. Defendants the City, McFarland, and Tindall imposed this policy with the discriminatory purpose of depriving Plaintiff of its Equal Protection rights guaranteed by the Fourteenth Amendment to the U.S. Constitution. By imposing the policy and threatening enforcement of it, Defendants the City, McFarland and Tindall have violated Plaintiff's constitutional rights. The Court should enjoin the City, McFarland, and Tindall from future enforcement of the policy. It also should award compensatory and punitive damages and attorney fees against the City, as well as against McFarland and Tindall in their personal and official capacities.

296. In October 2022, the City, McFarland and Tindall enacted an official policy denying the issuance of any further permits to TEP.

297. On November 16, 2022, TEP applied for a permit to hold the 2023 BoroPride Festival on City property on September 16, 2023.

298. Like the 2022 BoroPride Festival, the 2023 BoroPride Festival was intended to be a celebration of the LGBTQ+ community of Murfreesboro, Tennessee.

299. Despite TEP sending multiple requests to the City and Tindall for a final determination on TEP's permit application, the City and Tindall failed to make a final determination on the permit application for over six months.

300. As a result of the delay, TEP was unable to conduct the necessary preparations for the 2023 BoroPride Festival, and TEP had to seek an alternate date and an alternate venue.

301. The City and Tindall's failure to make a timely determination after meaningful review amounted to constructive denial of the permit.

302. Upon information and belief, the City, McFarland and Tindall's denial of the permit request was caused by the City's October 2022 policy denying the issuance of any future permit to TEP.

303. The City's records discussed above show a concerted effort by City officials to ensure that TEP would not be able to host the 2023 BoroPride Festival on Murfreesboro's property due to the intended content of the event.

304. Accordingly, the City, McFarland and Tindall constructively denied the permit in a manner to discriminate against LGBTQ+ people and in violation of TEP's Equal Protection rights.

305. Because the LGBTQ+ community is a quasi-suspect class, the constructive denial is subject to at least intermediate scrutiny.

306. The constructive denial cannot survive any level of scrutiny, because the City, McFarland and Tindall have no interest in denying the LGBTQ+ community equal protection under the law.

307. Absent injunctive and declaratory relief, Defendants' actions will have an ongoing effect on Plaintiff TEP's Fourteenth Amendment Equal Protection rights.

308. Plaintiff seeks both compensatory and punitive damages arising out of this violation, as well as attorney fees.

## **PRAYER FOR RELIEF**

Plaintiff has no adequate legal, administrative, or other remedy to prevent or minimize the immediate, irreparable, and ongoing harm to its First and Fourteenth Amendment rights from Defendants' unconstitutional conduct. Defendants are liable to Plaintiff in law and equity for depriving Plaintiff of its "rights, privileges, or immunities secured by" the First and Fourteenth Amendments. In its capacity as a court of equity, this Court has the power to review and restrain unconstitutional action by government actors.

WHEREFORE, Plaintiff demands judgment against Defendants on each Count of the Verified Complaint and prays for the following relief:

1. Declare Murfreesboro City Code Section 21-22, as modified by Ordinance 23-O-22, unconstitutional;

2. Preliminarily and permanently enjoin enforcement of Murfreesboro City Code Section 21-22, as modified by Ordinance 23-O-22;

3. Declare the definition of "sexual conduct" as including acts of "homosexuality" in Murfreesboro City Code Section 21-71 unconstitutional;

4.    Preliminarily and permanently enjoin enforcement of all sections of Murfreesboro City Code that incorporate the definition of "sexual conduct" as including acts of "homosexuality" in Murfreesboro City Code Section 21-71, or in the alternative, strike the word "homosexuality" from the definition of "sexual conduct" in Murfreesboro City Code Section 21-71;

5.    Declare Defendants' threat to deny all future special event permit applications by Plaintiff unconstitutional;

6.    Enjoin Defendants' policy of denying all future special event permit applications by Plaintiff;

7.    Compensatory and punitive damages arising out of violations by Defendants the City, McFarland, and Tindall under 42 U.S.C. § 1983;

8.    Award Plaintiff reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988;

9.    Award Plaintiff costs and expenses incurred in this action pursuant to Federal Rule of Civil Procedure 54;

10.   Grant Plaintiff such further relief as the Court may deem just and proper.


Respectfully submitted,

*/s/ J. Alex Little*
Alex Little, # 029858
Burr Forman LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
(615) 724-3200
alex.little@burr.com

Stella Yarbrough, # 033637
Lucas Cameron-Vaughn, # 038451
Jeff Preptit, # 038451
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212

(615) 320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org

Li Nowlin-Sohl (*pro hac vice forthcoming*)
(admitted only in Washington)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org

Michael P. Robotti (*pro hac vice forthcoming*)
Jacquelyn N. Schell (*pro hac vice forthcoming*)
Catherine I. Seibel (*pro hac vice forthcoming*)
Ballard Spahr LLP
1675 Broadway, 19th Floor
New York , NY 10019-5820
(212) 223-0200
robottim@ballardspahr.com
schellj@ballardspahr.com
seibelc@ballardspahr.com

Andrew M. Hensley (*pro hac vice forthcoming*)
Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: (602) 798-5400
hensleyd@ballardspahr.com

D. Alan White (*pro hac vice forthcoming*)
Ballard Spahr LLP
999 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
(678) 420-9300
whiteda@ballardspahr.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

TENNESSEE EQUALITY PROJECT
FOUNDATION, INC.,

    **PLAINTIFF,**

    **v.**

THE CITY OF MURFREESBORO,
TENNESSEE; THE CITY COUNCIL OF
MURFREESBORO, TENNESSEE;
**SHANE McFARLAND**, *in his personal
capacity and official capacity as Mayor of the
City of Murfreesboro, Tennessee;* **CRAIG G.
TINDALL**, *in his personal capacity and
official capacity as City Manager of the City
of Murfreesboro, Tennessee;* **MICHAEL
BOWEN**, *in his official capacity of Chief of
Police for the City of Murfreesboro,
Tennessee;* **KEVIN JONES**, *in his official
capacity of Director of Code Enforcement for
the City of Murfreesboro, Tennessee;* **JAMI
AVERWATER**, *in her official capacity as
City Council Member of the City of
Murfreesboro, Tennessee;* **MADELYN
SCALES HARRIS**, *in her official capacity
as City Council Member of the City of
Murfreesboro, Tennessee;* **AUSTIN
MAXWELL**, *in his official capacity as City
Council Member of the City of Murfreesboro,
Tennessee;* **KIRT WADE**, *in his official
capacity as City Council Member of the City
of Murfreesboro, Tennessee;* **SHAWN
WRIGHT**, *in his official capacity as City
Council Member of the City of Murfreesboro,
Tennessee,*

    **DEFENDANTS.**

**VERIFICATION**

## VERIFICATION

I, Chris Sanders, declare as follows:

1. I am the Executive Director of the Tennessee Equality Project, the Plaintiff in the above-captioned action. I am an adult citizen of the United States of America, and a resident of the State of Tennessee.

2. I verify that the factual allegations asserted in the foregoing Verified Complaint concerning: (i) TEP; (ii) TEP's 2022 BoroPride Festival and plans to host the BoroPride Festival in 2023; (iii) TEP's communications with the Defendants regarding the 2022 BoroPride Festival, TEP's request for a permit for the 2023 BoroPride Festival, and the City of Murfreesboro's denial of that request; (iv) TEP's planning for and relocation of the 2023 BoroPride Festival to the Middle Tennessee State University's Miller Coliseum; and (v) TEP's decision to host the planned drag performances at a private location separate from the Miller Coliseum, are true and correct to the best of my knowledge, based upon my personal knowledge of those facts and my review of TEP's regularly-kept business records. If called on to testify, I would competently testify that those factual allegations are true.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the allegations described above are true and correct to the best of my knowledge. As to paragraphs of the Verified Complaint alleged upon information and belief or relating to Defendants' internal communications to which I was not a party, I believe those allegations to be true and correct based upon my review of the documents cited the Complaint and my personal knowledge of TEP's interactions.

Executed on: Oct, 5, 2023

2

Signature:

3