# EXHIBIT Q

REPORTER'S TRANSCRIPT OF CITY COUNCIL MEETING

JUNE 15, 2023

Prepared by:

JENNIFER SMITH, RPR
Certified Reporter
Certificate No. 50180

Case 3:23-cv-01044    Document 1-17    Filed 10/06/23    Page 2 of 32 PageID #: 127

June 15, 2023

P R O C E E D I N G S

(Beginning of YouTube video.)

MR. McFARLAND:  All right.  We'll now consider 23-0-22 Community Decency Substandard Ordinance.  This is the second reading as amended.

MR. MAXWELL:  So moved.

MR. SHACKLETT:  All right.  I haven't had a chance to look at all the redlines.  There's been some changes and I haven't had a chance to look at them materially.  So I'm speaking from what -- a document that was prepared early.  So I want to hopefully -- I have a couple of questions.  Since the ordinance was prepared by our city attorney and city manager, I want to ask them a question and just, um, the concern was reiterated within the document that, you know, is in compliance with existing municipal code and the TCA, the Tennessee Code annotated, and as I looked at those two documents, there's a lot of the same language that's used in the, uh, uh, municipal code.  I almost felt like I had to take a shower sometimes.

When I looked at TCA, it was just pretty complicated to look at a legal document that's referring

to everything and I'm not trying to find something to capture every consideration.  It's hard to do that, but I wanted to ask them, what is covered in this ordinance that is not already covered in our municipal code and the Tennessee Code annotated that -- that would be -- grant us enforcement that is not already granted under the Tennessee Code annotated?  And either one of you or both of you can answer.

MR. TINDALL:  Well, the ordinance refers to both the city code and the Tennessee code, um, and it does so in a manner that really describes for the community that this is a community standard that we want to -- that we want to -- that the council wants to express and so it does establish a standard in a clear fashion, um, that is the expectations for conduct, and the other thing it does is it does apply administrative penalties for violation of the standard and the other statutes of course don't do that.  They have other -- they have -- they seek other remedies or other penalties for a violation.  So this ordinance does say from an administrative standpoint, it -- it provides additional penalties for violations that don't exist any place else.

MR. SHACKLETT:  Adam.

MR. TUCKER:  I would, um -- I largely -- I agree with Craig's explanation.  I'll add a couple things.  The

way I looked at this ordinance is that there's kind of two -- two parts.  There is the part that where we're defining what constitutes indecent behavior and decent material and those are almost entirely, I would say entirely, linked to existing state law or city code provisions.  So -- so we're defining the conduct that way, and that the what is, what is significant about this ordinance is that there is in addition -- an additional remedial measure in the form of, um, if there is a -- in addition to a penalty or remedy that might exist in a current law, there is the civil penalty of forfeiting a right to get a permit for -- for an event on city property if after going through a due process proceeding.

The other thing -- the thing, though, that I think is new and it doesn't -- what?  Yeah.  The part that I think is new is the part that if you look at C(2) of the ordinance is the appropriation part which places restrictions on how city funds could be used.  There's -- there's nothing explicitly in, that I know of, that I've seen, that explicitly mirrors that and so that is new. That's kind of -- that's a new violation, a new restriction in terms of how city funds are used.  I'm not suggesting at all that they've ever been used in violation of that, but that -- that then in the remedial section of the ordinance, which is section -- shoot.  Sorry.  I just

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

5

strolled past it. The remedial section of the ordinance, which is section E, there is, um, a person who, um, misappropriates city funds in violation of that section C(2) could be referred to or face civil or criminal penalties under existing law.

So those are the two parts of the ordinance. That's how I see it.

MR. SHACKLETT: I think the origins of the ordinance were pretty clear. We had several discussions about some actions that occurred at Canonsburg and -- and that precipitated what we felt to be some additional action related to actions on city property, but I was wondering why we moved from something that we had discussed that needed to be codified or have a penalty portion of it and now we've moved into materials and is it my understanding that the arbiter of discerning an offense are the prevailing standards rest entirely -- we are -- the authority is in the hands of the city manager to make -- if somebody has trouble with some piece of material, whether they find it in the public schools, which are funded by the city, or any public building that the city owns and operates and somebody has a problem with that material, they should go to the city manager to make -- or chief of police for enforcement on if they're concerned about the material that is being presented and

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

whether it is appropriate for minors.

I mean, there's several penalties that are pretty strict on this and I just wondered, does it help the public understand what we are asking to do?  How do you flesh this out?  How -- how is this actually going to be fleshed out?  I mean, decency is something I'm for.  I will -- I will carry a banner and carry the pom-poms and do a cheer for decency and protecting our children, but I'm just not sure how this is going to flesh out.

MR. TINDALL:  Well, from -- from the standpoint of the material -- the -- the libraries and those materials, um, they can seek an assessment.  They can -- if there's a violation, then they would probably get an assessment as to whether or not it complied with the decency standard or not.  The ordinance itself doesn't oppose a penalty directly.  It references that it would be handled as any other misappropriation of funds would be handled.  So there's no -- there's no penalty assessed for that.  The penalties that are assessed under this ordinance have to do with losing the ability to get a -- gain a permit.

MR. McFARLAND:  But the schools are already under the state law.

MR. TINDALL:  This is consistent with state law. That's true.

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

MR. McFARLAND: The school -- for example, school libraries have a very defined process.

MR. SHACKLETT: I know that very well and I that's the kind of the concern that we're moving into the public sector, the same kind of perspective that we have in public schools and if that's the way the council believes that we're a healthier community for that, that they're certain the same kind of materials need to be not in our public library, as we say, or not in our public schools, but I'm saying we're going to -- if that responsibility rest completely in our city manager, is that what we want? Is that the -- is that the way we see this being fleshed out? I mean, where does -- what if somebody wants recourse? Somebody has a book or a material that they think is inappropriate, who do they go to? Where do they go?

There's already -- you know, in our library system, there's already a recourse of people who don't agree with where a placement for a book is or whether it's appropriate. There's a procedure that's in place and ultimately, it resides with the library's board, but if you'd rather that be resting on the shoulders of our city -- chief of police and our city manager to make that evaluation, then I just want to make it clear that that's what we want and if you violate that -- and I'll just

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

point you to section E, the eighth item that says, "Any person who utilizes funds in violation of this section may be subject to additional civil and criminal penalties for misappropriation of public funds."

So someone that says, "Wait a minute.  This is not -- we've got a system that's in place and this is not appropriate for us to make that decision", then we could -- we could criminally process -- prosecute them, and I'm just concerned that we throw something up on the wall and we think there's some unintended consequences that I'm not sure we -- we fully thought of and I tried to present that the last time we had -- and if we can clarify, I can be fine with this, but I don't think there -- it's clear, but if you're fine with it and they're for you, they feel fine with this, folks, I've said it before, if I --  if this is what you want and we -- the will of council is to move this forward, then move it forward, but I've got to register my concern about unintended consequences by the -- and how we have kind of in a very sense moved from what is a legitimate concern.

We all were concerned about an event that occurred at a particular place and we felt there was hole in our ordinances that need to be addressed and we decided to leak into another concern and, I don't know, maybe you've gotten a lot of phone calls about, "Man, that

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

library's full of a bunch of books. It's just terrible." Maybe you have, but I don't know if that's the way -- I mean, if that's the way you want to address it, but in this ordinance, it's going to fall on our city managers and right now, maybe that's -- you're comfortable with that, with our police of chief and our city manager being the arbiter of what is -- what is considered to be the average member of our community, the behavior and conducts, accepted standards and behavior as judged by the average member of our community. Maybe you feel comfortable with that.

MS. HARRIS: Mr. Shacklett, how would you like to see it?

MR. MAXWELL: That was my next question.

MS. HARRIS: I mean, I understand what you're saying, so...

MR. SHACKLETT: I would like to charge -- I -- this is kind of where we ended up after the last meeting because I said is there a way to write this where it excludes, uh, action so that we have institutions like our public library in their system in place to address concerns the public has about the material that's in the library. If it's not doing a good job, then we need to address that and that's addressed through the library board, but to me, I would -- I would think moving into

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

that area of where we're trying to control what is in the public library is not a good move for this council to make.

MR. MAXWELL: I wouldn't say that we're trying to control what's in the public library. The one thing I see here, Bill, I'm looking at D(1) and it says, "The city manager may authorize other city departments to assist the chief of police in enforcing this article."

My view is it's the city manager, whether that's Craig or whomever beyond Craig in 10 years or whenever, would designate the head librarian or the library board, and you're on the library board, correct, Shawn?

MR. WRIGHT: Yeah. I was about to say I looked at it. Let the library board take its course and if the person that had the complaint wasn't happy with that process, then take it to Craig or take it to the chief of police. Let it run up the ladder like it's supposed to and then if they're not happy with that set of -- that process, then go that next step further.

MR. TINDALL: Yeah. A couple -- a couple of points. So the statute specifically says -- or the statute. The ordinance, I'm sorry, specifically says that doesn't preempt any other process. So it doesn't preempt the process that's in place now at the library and I would certainty hope that that would stay in place and be the

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

first and the start and a stop of any type of complaints that -- that would happen there. I don't think that that's been the case in a lot of libraries in this country or perhaps even in our library.

So this is another mechanism and counsel has the right to decide how it wants a limited resource such as the appropriation it gives the library to be expended on something that's not technically, but as a practical matter, is in infinite demand because there are lots and lots of books that can be put into the library, but council can decide and has a right to decide where it wants its money spent, where it wants it to be focused on and this is a statement that it's not to be spent for the type of books for minors that are specifically outlined in the ordinance itself.

So, yeah, we're not taking away they should continue to do that. They should continue to have their processes there and the decision is -- this council and the city manager or anybody doesn't prosecute anyone. That goes to another system. That goes to our justice system and that's handled through there. That decision doesn't rest. The most that can be done from if it came to my desk or a subsequent city manager's desk, is to perhaps render an assessment of what that is or refer it to this -- the County Attorney or some other -- some other

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

means, but that --

You know, as I said before, there's -- there's no penalties that the ordinance sets for this, but it's a very clear statement to the library that this council is appropriating funds and the funds are to be spent in a manner that focuses on this, just like it focuses on other books that the libraries considers and rejects from -- from buying.

MR. SHACKLETT: Yeah. One more point that I'd like to make, too, and have somebody answer for me, the phrase within the whereas portion of this concern me a little bit. "Whereas, patently offensive prevailing standards in the adult community with respect to what is suitable for minors when taken as a whole lacks series literary artistic, political and scientific value."

Is our police chief and our city manager capable of making -- I mean, this is not a knock on Craig. It's what are we asking these people to discern to have the capacity to make that decision? I -- I -- I'm not concerned, and my other question, I'm -- is when we pass this ordinance, I mean, there's a move now that says we can't continue to have a stack of laws that make it difficult for people to understand what am I supposed to do and what am I not supposed to do and the issue is we add one more layer. With this in place, how are our

children safer?  That's my -- that's my point.

I mean, the intent of this is to make our children safer and I'm all for that.  Like I said, I'd be the -- I think my life has said I was cheerleading for children a long time ago and will always advocate for young people and pouring good stuff in them and creating a safe and nuturing environment in our community for children to grow and feel safe, but I'm not sure this ordinance tomorrow makes a safer community.  I'm not sure that this ordinance -- it sounds good and I've gotten -- I guess I got three or four emails today and I've tried to address them.  I want to go talk to people and if anybody out there wants to talk to me about this, please call me. I'd be glad to talk to you about it and what my concerns are.  I'm -- I'm not advocating nothing.

I'm not advocating that we don't as a person -- you know, as a city and a community have personal -- have responsibility, but some of these decisions are best left to parents for parents to decide because the diversity of our community demands that somebody may not see it the same way as I do and because something sits on a shelf, doesn't mean that my children have to have access to it. It means that parents and grandparents, we have to be active and engaged and with -- in our children's lives, but simply because something that disagrees with my moral

values sits on a shelf somewhere doesn't mean that I'm irresponsible or that I haven't done my duty. So I don't know.

Like I say, it's been hard -- a couple things that we've had to decide recently, it's been hard. I don't like being on this side of this issue because of my faith. I'm a person of faith. You all know that, but I'm concerned of what this says to a community about the value of personal freedom and personal choice. I'm not sure -- and if the intent is to make our children safer, which kind of is the default phrase throughout this document is to create a safer community for children and minors, is that what we have done when we pass this? Will we be safer tomorrow than we were today? If we got Tennessee Code annotated and we've got our municipal code, we've got those instruments that are already and for generations have been using our community to -- those blatant things that people will do in our community, they are -- they are adjudicated under Tennessee Code annotated and the existing municipal code.

To add another layer and another consideration, does that really make our children safer, and that's my question. If it is, then we should do it, but my consideration is that it may -- I'm not sure it is and there's some unintended consequences to some of the

wording of this document that -- that caused me caution and raises red flags and is the reason that I can't vote for it and I hope you understand.

MR. TINDALL: Um, a couple of things. The ordinance applies, um -- what's the phrase? Public places, I think? Public spaces? So it does address only public spaces. So private property, private, um, establishments, private homes, it doesn't -- it doesn't address those at all, and the phrase serious artistically -- no. I'm sorry. Literary artistic, political and scientific values is a phrase that comes out of case law, so that's why it appears there. Yeah. Yeah, and it's in TCA, but it originated with case law. So it does have a context to it that can be explored and understood. If that was a defense that was raised, if someone were to come and ask for an assessment where they were facing violation, that's -- there is some -- some case law that can be referenced to gain legal advice and make a decision on that front.

MR. McFARLAND: I want to -- you know, first of all, Bill, you know how much everyone on this council respects you. So you don't ever have to apologize for you having an opinion on something. I don't want any council member ever to feel like you have to apologize to someone else for voicing your opinion. That's what you're elected

to do.

You know, I think the purpose of this ordinance really hits two areas.  I think it reflects the legislative judgment of the council.  The council is the one who determines those decency factors inside -- inside a community.  Unfortunately, I think we have people not just in our community, but now it doesn't take too much to research what's happening many other places that you just look at and it's -- I forget what the Supreme Court Justice who was asked to define pornography, but he said, "I can't tell you what it is, but I can tell you when I see it."  And so, you know, I think it's important for this body who represents this community to voice what those standards are.  I think that's what our job is. That's what we're elected to do.

I do understand what you're saying is in regards to the city manager, but, you know, we provide guidance to the city manager that the city manager, either he or she, can take that guidance and if that city manager doesn't take that guidance as a majority of the council, then there's other ramifications that come with that -- with those decisions.  I think that's what we're elected to do.

Secondly, the reason I'm supporting this is that it sets penalties that do not exist in any of the legislation that we currently have.  I think it -- it

defines and elevates a penalty that specifically involves minors on public property and I don't want to get into the weeds on -- you know, Bill, I can argue in the library right now, there may be things that I agree with that aren't allowed in the library right now. There are things I'm sure that I disagree with that are in the library, but you know, the years that I've been up here doing this, I try to set a standard to say we don't ask you whether you're Republican or Democrat, gay, straight. We don't ask what your ethnicity is when we come and pick up your trash. We provide services. Unfortunately I think where we are now is we have to have some specific guidelines on what's appropriate for city property. That's where I am on this and I think that's what this does.

Look, if you -- and, you know, we've gotten lots of comments. I think as early as this morning, I had someone on social media calling me a Nazi or transphobe because I commented about a very national figure who's coming to Murfreesboro next week to speak that she believes that biological males shouldn't be competing against biological females in sports and just like we all have a right to give our opinion, I did the same thing and I'm a Nazi because I say that and so I just think -- but that's on -- that event's on private property and so I think this defines what is on public property. It's

measured, it's concise and it gives a process which is why I think it's -- it's fair.

MR. SHACKLETT: If it -- if it were addressing actions, I think that's what precipitated this original document was the actions and there may have been some other things. The concern that I would have if there are council members that are hearing something other than concern -- I mean, if there's concerns -- we have never discussed in workshop or in session, some concern about how materials are being handled and passed out on public property or in our library or public schools. We never discussed that. We never had those discussions and yet it appears this document were somehow going to pull all of this together, the actions on public property and the material, printed material on public property, we're going to somehow bring all of that together and -- and put that authority and that arbiter in the hands of our city manager and -- to make those decisions and I just -- that's asking a lot.

I mean, I'm speaking from Craig's standpoint. He's told me, "I don't" -- you know, that's just another brick on his load, but to me, I'm not sure that's asking do you want to see a list of 350 books that are being potentially bought at the library and can you research those and just determine which one of those are

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

appropriate or are we just going to wait until the public says, "This one has a rainbow on it and I don't think it's appropriate for it to be in the library"?  Is that -- I mean, I think we've -- we've crossed a line into doing something that I'm not sure we have had enough discussion on to get what is the -- believed to be the consensus of our council or the consensus of our citizens.

Have you ever thought -- we spoke about the community standards here.  We haven't had an open hearing.  We haven't had a public comments.  Yes, we've had a lot of public comments over an issue where the people were screaming at us and stuff like that and I think that generated some of the concern that we had to generate a document, but I'm not so sure that if we have a document that we're saying speaks to the -- the community standards that we have, then it might fill this room up three people over.  I mean, we may have to do 14 of them to get everybody to listen to it, but if it -- if we were writing a document that says it speaks to the community standards, maybe we need to listen to the community standards.  Let them tell us that we're Nazis and let them tell us that we're narrow-minded.  I mean, that -- that idea is we're trying to find what is the right thing to do and I'm -- I'm concerned that we moved it a little fast on this document, that -- that -- that -- but, like I said, I'm

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

just one.

MS. HARRIS: So you're suggesting that we table this and discuss it further?

MR. SHACKLETT: What are your -- does anybody have a thought that, you know, we're talking -- speaking to community standards and we have not even thought about having a community? You know, we haven't had a public comment session since we presented this. So, I mean -- and you might get both sides. You might get advocates. I mean, as we did that in the other issue, we had a full room on both sides of the issue.

MR. McFARLAND: Bill, wouldn't you agree that we've talked about this for almost three weeks now and there's not been one single person that -- that I've seen that -- is there anyone here for the Community Standards Act? That's okay. You can say -- you can tell him that you are if you were. Yeah, I just -- that's what I'm -- I'm -- I've not received a single email on that.

MR. SHACKLETT: And you also realize -- oh, you haven't got a single email? Well, I've gotten four, okay, today, but I'm just saying I wonder then, then there might be a whole other issue. The whole other issue might be that people don't know what we're doing and they haven't read the standards or agree. Are they agreed? Yeah, and that -- that -- that -- but is the assumption is it fair

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

to assume that they agree or is it more prudent and more responsible as an elected official to say, "Wait a minute. Do I need to hear from the public?" I mean -- I mean, that's the only concern that I would have is that, yes, I mean, we often do this. I'll say, "Well, I didn't hear a single vote. So they must all be for me." Then all of a sudden we find out after we voted, we went -- there's all this pushback from what. "Well, how did you all ever do that? Well, we felt you agreed with us." So I don't know.

MS. HARRIS: I was asked -- um. Okay. Can we give an example of what we are talking about so the average citizen will know what we're talking about? So can you all give a pro and con on what we're talking about so that people out there can -- they don't know exactly the details of what we're talking about. Can you just give an example?

MR. SHACKLETT: Do you want me to try?

MR. McFARLAND: Sure.

MR. SHACKLETT: My -- my -- my trying is and -- is that there's two aspects of this ordinance. There's one that addresses actions and there's one that addresses speech and thought and -- and we've tried to do both of them in one ordinance. We've tried to address both of them and -- and it does get a little, uh -- because the

penalty section of this is addressed primarily towards actions, is it -- I mean, towards the action on city property, actions on city property. There's not -- it's not clear whether the penalties that are described for the actions on public property are also entailed for anybody other than the funding mechanism -- as a funding mechanism to the city that I mean...

MR. TINDALL: Well, I -- well, I think distribution of obscene materials would fall within that.

MR. SHACKLETT: Yeah. Okay. Yeah, if you were passing out pornography or anything like that?

MR. TINDALL: Right. Yeah.

MR. SHACKLETT: But I think, you know, it's clearly defined that the actions on a public property are trying to be -- we're trying to be more definitive as to what that is, but a lot of that is -- I mean, a lot of that is in the municipal code already. Nudity, you know, obscene actions on public property, a lot of that is in the city code already. If you haven't looked at it, look at it. It's in the city code already that, you know, where we've been operating for years that somebody can't do whatever, you know, on a -- at a city park or a -- you know, that's -- that can be prosecuted as it is. That was my question about what are we getting that we haven't already got.

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

MR. MAXWELL: Bill, I have all the respect in the world for you. You've served this city for many, many years. Um, can you help me understand what you mean by speech or thought or where that's outlined in this ordinance because I've read it and I've looked at it, I think it's a good ordinance, I support it, but I don't see where it says speech or thought in this ordinance?

MR. SHACKLETT: Thoughts are determined -- are represented in books. Books represent thought. Books represent speech and that -- that is -- I mean, that -- I don't know if there's a law that says that or anything, but I think books and thoughts and speech are, in my mind, very similar because that's how people express their thoughts. That's how, you know, they speak is in a book and if we deny someone that says, "Well, here is something related to a religion that I don't necessarily agree with and I don't think it's healthy", then we've said you should have the opportunity to expose to a variety of thoughts and that is the strength of our democracy is that we don't limit thought. In fact, historically when cultures have limited thought, a despot, not somebody that says, "You must think this way. You must have this perspective", there is -- there's a challenge to democracy that I think we're standing up for something and I'm -- I'm afraid the tables are turned a little bit.

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

The challenge is not from diversity or from somebody challenging.  If we are confirmed in our beliefs and our thoughts and we take -- and we value our children, all these -- all -- everybody that values their children, then take care of them.  Watch after them.  Pour into them good things.  Expose them to the positive things.  Don't be overcome.

I mean, we -- we have this kind of thing in our culture now that we think evil is going to take us over.  It won't if good does.  If we do our job as good and represent and are confirmed in our beliefs and allow for that, then it can actually be a strength.  I choose it's freedom.  It's free will.  You have free will to choose and simply saying it's not available to you is not necessarily a strength.

Now -- and that's one man's opinion and I'm sure -- again, I would love to talk to anybody that -- that has a challenge to this or wants to debate it with me, but my -- my concern is that this ordinance doesn't move us to protecting -- to making our children safer and there are some implications for when we try to flesh this out, there might be some unintended consequences and I'm not sure how the public -- what do we expect the public to do if they see something in the public library that they don't like?  Do they go to the library staff or the

library board or do they come to the city now because, ultimately, the city is given the authority to decide what is appropriate and what isn't appropriate.

MR. WRIGHT: But the ordinance says they go through the standard procedure. This does -- this -- they still go through the normal procedure. This would be like an appellate-type thing. The ordinance says the regular procedures stay in place.

MR. SHACKLETT: But it's settled. That makes the decision and right now, that settles it. You know, it's dealt with, but -- but what we're saying is we need another level of discernment and that level is the city manager and I just -- I think that's asking a lot of our city manager and our police force, too. Can you imagine a policeman coming through the library and somebody saying, "Well, I want this out of our library"? Is that -- is that what we want? I don't know.

Like I said, if you deem it's the responsible thing to do, then, you know, four votes can go for it, and I -- and I will commit to what I said last time, I will support whatever council decides, but I will -- I've got to raise these -- these red flags that I do not believe this is appropriate.

(End of YouTube video.)

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

STATE OF ARIZONA   )
                   )  Ss.
COUNTY OF MARICOPA )

              BE IT KNOWN that the foregoing proceedings were taken before me, JENNIFER SMITH, Certified Reporter, No. 50180, that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing 25 pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

              [ ]  Review and signature was requested.
              [ ]  Review and signature waived.
              [X]  Review and signature not requested.


              I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome thereof.

              I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206.  DATED at Mesa, Arizona, this 13th day of September, 2023.



                    _____
                          JENNIFER SMITH, RPR
                          Certified Reporter
                          Certificate No. 50180


                          *      *      *


     I CERTIFY that DS REPORTING, LLC, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).


                    _____
                            DS REPORTING, LLC
                        Registered Reporting Firm
                         Arizona RRF No. R1042

DS REPORTING, LLC | 480.703.1866 | ds-reporting.com

## 1

**10** [1] - 10:9
**13th** [1] - 26:13
**14** [1] - 19:16
**15** [2] - 1:11, 1:25

## 2

**2023** [3] - 1:11, 1:25, 26:13
**23-0-22** [1] - 2:6
**25** [1] - 26:5

## 3

**350** [1] - 18:22

## 5

**50180** [3] - 1:25, 26:4, 26:17

## 6

**6)** [1] - 26:21

## 7

**7-206** [2] - 26:13, 26:20

## A

**ability** [2] - 6:19, 26:6
**accepted** [1] - 9:8
**access** [1] - 13:21
**accurate** [1] - 26:5
**ACJA** [2] - 26:13, 26:20
**Act** [1] - 20:15
**action** [3] - 5:11, 9:19, 22:1
**actions** [11] - 5:9, 5:11, 18:3, 18:4, 18:13, 21:21, 22:1, 22:2, 22:4, 22:13, 22:17
**active** [1] - 13:23
**Adam** [1] - 3:22
**add** [3] - 3:24, 12:24, 14:20
**addition** [2] - 4:7, 4:9
**additional** [4] - 3:20, 4:7, 5:10, 8:2

**address** [7] - 9:2, 9:20, 9:23, 13:11, 15:5, 15:8, 21:23
**addressed** [3] - 8:22, 9:23, 21:25
**addresses** [2] - 21:21
**addressing** [1] - 18:2
**adjudicated** [1] - 14:18
**administrative** [2] - 3:15, 3:19
**adult** [1] - 12:12
**advice** [1] - 15:17
**advocate** [1] - 13:4
**advocates** [1] - 20:8
**advocating** [2] - 13:14, 13:15
**afraid** [1] - 23:24
**ago** [1] - 13:4
**agree** [7] - 3:23, 7:18, 17:3, 20:11, 20:23, 20:25, 23:15
**agreed** [2] - 20:23, 21:8
**allow** [1] - 24:10
**allowed** [1] - 17:4
**almost** [3] - 2:21, 4:3, 20:12
**amended** [1] - 2:7
**annotated** [5] - 2:19, 3:4, 3:6, 14:14, 14:18
**answer** [2] - 3:7, 12:9
**apologize** [2] - 15:21, 15:23
**appellate** [1] - 25:6
**appellate-type** [1] - 25:6
**applies** [1] - 15:4
**apply** [1] - 3:15
**appropriate** [9] - 5:25, 7:19, 8:6, 17:12, 18:25, 19:2, 25:2, 25:22
**appropriating** [1] - 12:4
**appropriation** [2] - 4:16, 11:6
**arbiter** [3] - 5:15, 9:6, 18:16
**area** [1] - 9:25
**areas** [1] - 16:2
**argue** [1] - 17:2
**Arizona** [2] - 26:13, 26:23
**ARIZONA** [1] - 26:1
**article** [1] - 10:7
**artistic** [2] - 12:14, 15:9
**artistically** [1] - 15:9

**aspects** [1] - 21:20
**assessed** [2] - 6:17, 6:18
**assessment** [4] - 6:11, 6:13, 11:23, 15:15
**assist** [1] - 10:6
**assume** [1] - 20:25
**assumption** [1] - 20:24
**Attorney** [1] - 11:24
**attorney** [1] - 2:15
**authority** [3] - 5:17, 18:16, 25:1
**authorize** [1] - 10:6
**available** [1] - 24:13
**average** [3] - 9:7, 9:9, 21:12

## B

**banner** [1] - 6:6
**BE** [1] - 26:3
**Beginning** [1] - 2:3
**behavior** [3] - 4:2, 9:7, 9:8
**beliefs** [2] - 24:1, 24:10
**believes** [2] - 7:6, 17:19
**best** [2] - 13:17, 26:5
**beyond** [1] - 10:9
**Bill** [5] - 10:5, 15:20, 17:2, 20:11, 22:25
**biological** [2] - 17:19, 17:20
**bit** [2] - 12:11, 23:24
**blatant** [1] - 14:16
**board** [6] - 7:20, 9:24, 10:10, 10:11, 10:13, 24:25
**body** [1] - 16:12
**book** [3] - 7:13, 7:18, 23:13
**Books** [2] - 23:8
**books** [7] - 8:25, 11:9, 11:13, 12:6, 18:22, 23:8, 23:11
**bought** [1] - 18:23
**brick** [1] - 18:21
**bring** [1] - 18:15
**building** [1] - 5:20
**bunch** [1] - 8:25
**buying** [1] - 12:7

## C

**C(2** [2] - 4:15, 5:3
**Canonsburg** [1] - 5:9

**capable** [1] - 12:15
**capacity** [1] - 12:18
**capture** [1] - 3:1
**care** [1] - 24:4
**carry** [2] - 6:6
**case** [4] - 11:2, 15:11, 15:12, 15:17
**caused** [1] - 14:25
**caution** [1] - 14:25
**certain** [1] - 7:7
**certainty** [1] - 10:24
**Certificate** [2] - 1:25, 26:17
**Certified** [3] - 1:24, 26:3, 26:16
**CERTIFY** [3] - 26:10, 26:12, 26:20
**challenge** [3] - 23:22, 23:25, 24:17
**challenging** [1] - 24:1
**chance** [2] - 2:10, 2:11
**changes** [1] - 2:11
**charge** [1] - 9:16
**cheer** [1] - 6:7
**cheerleading** [1] - 13:3
**chief** [6] - 5:23, 7:22, 9:5, 10:7, 10:15, 12:15
**children** [12] - 6:7, 12:25, 13:2, 13:4, 13:7, 13:21, 14:9, 14:11, 14:21, 24:2, 24:3, 24:19
**children's** [1] - 13:23
**choice** [1] - 14:8
**choose** [2] - 24:11, 24:12
**citizen** [1] - 21:12
**citizens** [1] - 19:6
**CITY** [1] - 1:10
**city** [42] - 2:15, 3:9, 4:4, 4:11, 4:17, 4:21, 5:2, 5:11, 5:17, 5:20, 5:21, 5:22, 7:10, 7:22, 9:3, 9:5, 10:5, 10:6, 10:8, 11:18, 11:22, 12:15, 13:16, 16:16, 16:17, 16:18, 17:12, 18:16, 22:1, 22:2, 22:6, 22:18, 22:19, 22:21, 23:1, 24:25, 25:1, 25:11, 25:13
**civil** [3] - 4:10, 5:3, 8:2
**clarify** [1] - 8:12
**clear** [6] - 3:13, 5:8, 7:23, 8:13, 12:3, 22:3
**clearly** [1] - 22:13

**code** [11] - 2:18, 2:21, 3:3, 3:9, 4:4, 14:14, 14:19, 22:16, 22:18, 22:19
**Code** [5] - 2:18, 3:4, 3:6, 14:14, 14:18
**codified** [1] - 5:13
**comfortable** [2] - 9:4, 9:10
**coming** [2] - 17:18, 25:14
**comment** [1] - 20:7
**commented** [1] - 17:17
**comments** [3] - 17:15, 19:9, 19:10
**commit** [1] - 25:19
**Community** [2] - 2:6, 20:14
**community** [23] - 3:10, 3:11, 7:6, 9:7, 9:9, 12:12, 13:6, 13:8, 13:16, 13:19, 14:7, 14:11, 14:16, 14:17, 16:5, 16:6, 16:12, 19:8, 19:14, 19:18, 19:19, 20:5, 20:6
**competing** [1] - 17:19
**complaint** [1] - 10:14
**complaints** [1] - 10:25
**completely** [1] - 7:10
**compliance** [1] - 2:17
**complicated** [1] - 2:24
**complied** [3] - 6:13, 26:12, 26:20
**con** [1] - 21:13
**concern** [12] - 2:16, 7:3, 8:17, 8:19, 8:23, 12:10, 18:5, 18:7, 18:8, 19:12, 21:3, 24:18
**concerned** [6] - 5:24, 8:8, 8:20, 12:19, 14:7, 19:23
**concerns** [3] - 9:21, 13:13, 18:7
**concise** [1] - 17:25
**conduct** [2] - 3:14, 4:5
**conducts** [1] - 9:8
**confirmed** [2] - 24:1, 24:10
**consensus** [2] - 19:5, 19:6
**consequences** [4] - 8:9, 8:18, 14:24, 24:21
**consider** [1] - 2:5
**consideration** [3] - 3:1, 14:20, 14:23

considered [1] - 9:6
considers [1] - 12:6
consistent [1] - 6:23
constitutes [1] - 4:2
context [1] - 15:13
continue [3] - 11:16, 12:21
control [2] - 9:25, 10:4
correct [1] - 10:11
COUNCIL [1] - 1:10
council [15] - 3:12, 7:5, 8:16, 10:1, 11:10, 11:17, 12:3, 15:20, 15:22, 16:3, 16:19, 18:6, 19:6, 25:20
counsel [1] - 11:4
country [1] - 11:2
County [1] - 11:24
COUNTY [1] - 26:2
couple [6] - 2:14, 3:24, 10:19, 14:3, 15:3
course [2] - 3:16, 10:13
Court [1] - 16:8
covered [2] - 3:2, 3:3
Craig [4] - 10:9, 10:15, 12:16
Craig's [2] - 3:24, 18:19
create [1] - 14:11
creating [1] - 13:5
criminal [2] - 5:3, 8:2
criminally [1] - 8:7
crossed [1] - 19:3
culture [1] - 24:8
cultures [1] - 23:20
current [1] - 4:10

## D

D(1 [1] - 10:5
DATED [1] - 26:13
dealt [1] - 25:10
debate [1] - 24:17
decency [4] - 6:5, 6:7, 6:14, 16:4
Decency [1] - 2:6
decent [1] - 4:2
decide [6] - 11:5, 11:10, 13:18, 14:4, 25:1
decided [1] - 8:22
decides [1] - 25:20
decision [6] - 8:6, 11:17, 11:20, 12:18, 15:18, 25:9
decisions [3] - 13:17,

16:21, 18:17
deem [1] - 25:17
default [1] - 14:10
defense [1] - 15:14
define [1] - 16:9
defined [2] - 7:1, 22:13
defines [2] - 16:25, 17:24
defining [2] - 4:2, 4:5
definitive [1] - 22:14
demand [1] - 11:8
demands [1] - 13:19
democracy [2] - 23:18, 23:22
Democrat [1] - 17:8
deny [1] - 23:14
departments [1] - 10:6
described [1] - 22:3
describes [1] - 3:10
designate [1] - 10:10
desk [2] - 11:22
despot [1] - 23:20
details [1] - 21:15
determine [1] - 18:24
determined [1] - 23:7
determines [1] - 16:4
difficult [1] - 12:22
direction [1] - 26:7
directly [1] - 6:15
disagree [1] - 17:5
disagrees [1] - 13:24
discern [1] - 12:17
discerning [1] - 5:15
discernment [1] - 25:11
discuss [1] - 20:2
discussed [3] - 5:13, 18:8, 18:11
discussion [1] - 19:4
discussions [2] - 5:8, 18:11
distribution [1] - 22:8
diversity [2] - 13:18, 23:25
document [11] - 2:12, 2:17, 2:24, 14:10, 14:25, 18:4, 18:12, 19:13, 19:18, 19:24
documents [1] - 2:19
done [4] - 11:21, 14:1, 14:12, 26:5
down [1] - 26:6
DS [2] - 26:20, 26:22
due [1] - 4:12
duly [1] - 26:4
duty [1] - 14:1

## E

early [2] - 2:13, 17:15
eighth [1] - 7:25
either [2] - 3:6, 16:17
elected [4] - 15:24, 16:14, 16:21, 21:1
elevates [1] - 16:25
email [2] - 20:17, 20:19
emails [1] - 13:10
End [1] - 25:23
ended [1] - 9:17
enforcement [2] - 3:5, 5:23
enforcing [1] - 10:7
engaged [1] - 13:23
entailed [1] - 22:4
entirely [3] - 4:3, 4:4, 5:16
environment [1] - 13:6
establish [1] - 3:13
establishments [1] - 15:7
ethical [2] - 26:13, 26:20
ethnicity [1] - 17:9
evaluation [1] - 7:23
event [2] - 4:11, 8:20
event's [1] - 17:23
evil [1] - 24:8
exactly [1] - 21:14
example [3] - 6:25, 21:11, 21:16
excludes [1] - 9:19
exist [3] - 3:21, 4:9, 16:23
existing [4] - 2:18, 4:4, 5:4, 14:19
expect [1] - 24:22
expectations [1] - 3:14
expended [1] - 11:6
explanation [1] - 3:24
explicitly [2] - 4:18, 4:19
explored [1] - 15:13
expose [1] - 23:17
Expose [1] - 24:5
express [2] - 3:12, 23:12

## F

face [1] - 5:3
facing [1] - 15:16
fact [1] - 23:19
factors [1] - 16:4

fair [2] - 18:1, 20:24
faith [2] - 14:6
fall [2] - 9:3, 22:8
fashion [1] - 3:13
fast [1] - 19:23
felt [4] - 2:21, 5:10, 8:21, 21:8
females [1] - 17:20
figure [1] - 17:17
fill [1] - 19:15
fine [3] - 8:12, 8:13, 8:14
Firm [1] - 26:23
first [2] - 10:25, 15:19
flags [2] - 15:1, 25:21
flesh [3] - 6:4, 6:8, 24:20
fleshed [2] - 6:5, 7:12
focused [1] - 11:11
focuses [2] - 12:5
folks [1] - 8:14
force [1] - 25:13
foregoing [2] - 26:3, 26:5
forfeiting [1] - 4:10
forget [1] - 16:8
form [1] - 4:8
forth [2] - 26:13, 26:20
forward [2] - 8:16, 8:17
four [3] - 13:10, 20:19, 25:18
free [2] - 24:12
freedom [2] - 14:8, 24:12
front [1] - 15:18
full [3] - 8:25, 20:9, 26:5
fully [1] - 8:10
funded [1] - 5:20
funding [2] - 22:5
funds [8] - 4:17, 4:21, 5:2, 6:16, 8:1, 8:3, 12:4
FURTHER [1] - 26:12

## G

gain [2] - 6:20, 15:17
gay [1] - 17:8
generate [1] - 19:12
generated [1] - 19:12
generations [1] - 14:15
given [1] - 25:1
glad [1] - 13:13
grandparents [1] - 13:22
grant [1] - 3:4

granted [1] - 3:5
grow [1] - 13:7
guess [1] - 13:10
guidance [3] - 16:16, 16:18, 16:19
guidelines [1] - 17:11

## H

handled [4] - 6:16, 6:17, 11:20, 18:9
hands [2] - 5:17, 18:16
happy [2] - 10:14, 10:17
hard [3] - 3:1, 14:3, 14:4
HARRIS [4] - 9:11, 9:14, 20:1, 21:10
head [1] - 10:10
healthier [1] - 7:6
healthy [1] - 23:16
hear [2] - 21:2, 21:4
hearing [2] - 18:6, 19:8
help [2] - 6:2, 23:2
hereto [1] - 26:11
historically [1] - 23:19
hits [1] - 16:2
hole [1] - 8:21
homes [1] - 15:7
hope [2] - 10:24, 15:2
hopefully [1] - 2:13

## I

idea [1] - 19:21
imagine [1] - 25:13
implications [1] - 24:20
important [1] - 16:11
inappropriate [1] - 7:14
indecent [1] - 4:2
infinite [1] - 11:8
inside [2] - 16:4
institutions [1] - 9:19
instruments [1] - 14:15
intent [2] - 13:1, 14:9
interested [1] - 26:11
involves [1] - 16:25
irresponsible [1] - 14:1
issue [7] - 12:23, 14:5, 19:10, 20:9, 20:10, 20:21
IT [1] - 26:3

**item** [1] - 7:25
**itself** [2] - 6:14, 11:14

## J

**J)(1)(g)(1** [1] - 26:21
**JENNIFER** [3] - 1:24, 26:3, 26:16
**job** [3] - 9:22, 16:13, 24:9
**judged** [1] - 9:8
**judgment** [1] - 16:3
**JUNE** [1] - 1:11
**June** [1] - 1:25
**justice** [1] - 11:19
**Justice** [1] - 16:9

## K

**kind** [9] - 3:25, 4:20, 7:3, 7:4, 7:7, 8:18, 9:17, 14:10, 24:7
**knock** [1] - 12:16
**KNOWN** [1] - 26:3

## L

**lacks** [1] - 12:13
**ladder** [1] - 10:16
**language** [1] - 2:20
**largely** [1] - 3:23
**last** [3] - 8:11, 9:17, 25:19
**law** [9] - 4:4, 4:10, 5:4, 6:22, 6:23, 15:11, 15:12, 15:17, 23:10
**laws** [1] - 12:21
**layer** [2] - 12:24, 14:20
**leak** [1] - 8:23
**left** [1] - 13:17
**legal** [2] - 2:24, 15:17
**legislation** [1] - 16:24
**legislative** [1] - 16:3
**legitimate** [1] - 8:19
**level** [2] - 25:11
**librarian** [1] - 10:10
**libraries** [4] - 6:10, 7:1, 11:2, 12:6
**library** [26] - 7:8, 7:16, 9:20, 9:22, 9:23, 10:1, 10:4, 10:10, 10:11, 10:13, 10:23, 11:3, 11:6, 11:9, 12:3, 17:2, 17:4, 17:5, 18:10, 18:23, 19:2, 24:23, 24:24, 24:25, 25:14, 25:15
**library's** [2] - 7:20,

8:25
**life** [1] - 13:3
**limit** [1] - 23:19
**limited** [2] - 11:5, 23:20
**line** [1] - 19:3
**linked** [1] - 4:4
**list** [1] - 18:22
**listen** [2] - 19:17, 19:19
**Literary** [1] - 15:9
**literary** [1] - 12:14
**lives** [1] - 13:23
**LLC** [2] - 26:20, 26:22
**load** [1] - 18:21
**look** [6] - 2:10, 2:11, 2:24, 4:15, 16:8, 22:18
**Look** [1] - 17:14
**looked** [6] - 2:19, 2:23, 3:25, 10:12, 22:18, 23:4
**looking** [1] - 10:5
**losing** [1] - 6:19
**love** [1] - 24:16

## M

**majority** [1] - 16:19
**males** [1] - 17:19
**Man** [1] - 8:24
**man's** [1] - 24:15
**manager** [17] - 2:15, 5:17, 5:22, 7:10, 7:22, 9:5, 10:6, 10:8, 11:18, 12:15, 16:16, 16:17, 16:18, 18:17, 25:12, 25:13
**manager's** [1] - 11:22
**managers** [1] - 9:3
**manner** [2] - 3:10, 12:5
**MARICOPA** [1] - 26:2
**material** [9] - 4:3, 5:19, 5:22, 5:24, 6:10, 7:14, 9:21, 18:14
**materially** [1] - 2:12
**materials** [5] - 5:14, 6:11, 7:7, 18:9, 22:8
**matter** [1] - 11:8
**MAXWELL** [4] - 2:8, 9:13, 10:3, 22:25
**McFARLAND** [6] - 2:5, 6:21, 6:25, 15:19, 20:11, 21:18
**mean** [25] - 6:1, 6:5, 7:12, 9:2, 9:14, 12:16, 12:20, 13:1,

13:21, 13:25, 18:7, 18:19, 19:3, 19:16, 19:21, 20:7, 20:9, 21:2, 21:4, 22:1, 22:15, 23:2, 23:9, 24:7
**mean..** [1] - 22:6
**means** [2] - 11:25, 13:22
**measure** [1] - 4:8
**measured** [1] - 17:25
**mechanism** [3] - 11:4, 22:5
**media** [1] - 17:16
**MEETING** [1] - 1:10
**meeting** [1] - 9:17
**member** [3] - 9:7, 9:9, 15:23
**members** [1] - 18:6
**Mesa** [1] - 26:13
**might** [7] - 4:9, 19:15, 20:8, 20:20, 20:21, 24:21
**mind** [1] - 23:11
**minded** [1] - 19:21
**minors** [5] - 5:25, 11:13, 12:13, 14:11, 17:1
**minute** [2] - 8:4, 21:1
**mirrors** [1] - 4:19
**misappropriates** [1] - 5:2
**misappropriation** [2] - 6:16, 8:3
**money** [1] - 11:11
**moral** [1] - 13:24
**morning** [1] - 17:15
**most** [1] - 11:21
**move** [5] - 8:16, 8:17, 10:1, 12:20, 24:19
**moved** [5] - 2:8, 5:12, 5:14, 8:19, 19:23
**moving** [2] - 7:3, 9:24
**MR** [35] - 2:5, 2:8, 2:9, 3:8, 3:22, 3:23, 5:7, 6:9, 6:21, 6:23, 6:25, 7:2, 9:13, 9:16, 10:3, 10:12, 10:19, 12:8, 15:3, 15:19, 18:2, 20:3, 20:11, 20:18, 21:17, 21:18, 21:19, 22:7, 22:9, 22:11, 22:12, 22:25, 23:7, 25:3, 25:8
**MS** [4] - 9:11, 9:14, 20:1, 21:10
**municipal** [6] - 2:18, 2:21, 3:3, 14:14, 14:19, 22:16
**Murfreesboro** [1] -

17:18
**must** [3] - 21:5, 23:21

## N

**narrow** [1] - 19:21
**narrow-minded** [1] - 19:21
**national** [1] - 17:17
**Nazi** [2] - 17:16, 17:22
**Nazis** [1] - 19:20
**necessarily** [2] - 23:15, 24:14
**need** [6] - 7:7, 8:22, 9:22, 19:19, 21:2, 25:10
**needed** [1] - 5:13
**never** [3] - 18:7, 18:10, 18:11
**new** [5] - 4:14, 4:15, 4:19, 4:20
**next** [3] - 9:13, 10:18, 17:18
**normal** [1] - 25:5
**nothing** [2] - 4:18, 13:14
**Nudity** [1] - 22:16
**nuturing** [1] - 13:6

## O

**obligations** [2] - 26:13, 26:20
**obscene** [2] - 22:8, 22:17
**occurred** [2] - 5:9, 8:21
**OF** [3] - 1:10, 26:1, 26:2
**offense** [1] - 5:15
**offensive** [1] - 12:11
**official** [1] - 21:1
**often** [1] - 21:4
**one** [12] - 3:6, 10:4, 12:24, 16:4, 18:24, 19:1, 19:25, 20:13, 21:21, 21:23, 24:15
**One** [1] - 12:8
**open** [1] - 19:8
**operates** [1] - 5:21
**operating** [1] - 22:20
**opinion** [4] - 15:22, 15:24, 17:21, 24:15
**opportunity** [1] - 23:17
**oppose** [1] - 6:15
**Ordinance** [1] - 2:6
**ordinance** [30] - 2:14,

3:2, 3:8, 3:19, 3:25, 4:7, 4:16, 4:24, 4:25, 5:5, 5:8, 6:14, 6:19, 9:3, 10:21, 11:14, 12:2, 12:20, 13:8, 13:9, 15:4, 16:1, 21:20, 21:23, 23:4, 23:5, 23:6, 24:18, 25:3, 25:6
**ordinances** [1] - 8:22
**original** [1] - 18:3
**originated** [1] - 15:12
**origins** [1] - 5:7
**outcome** [1] - 26:11
**outlined** [2] - 11:13, 23:3
**overcome** [1] - 24:6
**owns** [1] - 5:21

## P

**pages** [1] - 26:5
**parents** [3] - 13:18, 13:22
**park** [1] - 22:21
**part** [4] - 4:1, 4:14, 4:15, 4:16
**particular** [1] - 8:21
**parties** [1] - 26:11
**parts** [2] - 4:1, 5:5
**pass** [2] - 12:19, 14:12
**passed** [1] - 18:9
**passing** [1] - 22:10
**past** [1] - 4:25
**patently** [1] - 12:11
**penalties** [10] - 3:15, 3:18, 3:20, 5:4, 6:1, 6:18, 8:2, 12:2, 16:23, 22:3
**penalty** [7] - 4:9, 4:10, 5:13, 6:15, 6:17, 16:25, 21:25
**people** [12] - 7:17, 12:17, 12:22, 13:5, 13:11, 14:17, 16:5, 19:10, 19:15, 20:22, 21:14, 23:12
**perhaps** [2] - 11:3, 11:23
**permit** [2] - 4:11, 6:20
**person** [6] - 5:1, 8:1, 10:14, 13:15, 14:6, 20:13
**personal** [3] - 13:16, 14:8
**perspective** [2] - 7:4, 23:22
**phone** [1] - 8:24
**phrase** [5] - 12:10,

14:10, 15:4, 15:8, 15:10
**pick** [1] - 17:9
**piece** [1] - 5:18
**place** [9] - 3:21, 7:19, 8:5, 8:21, 9:20, 10:23, 10:24, 12:24, 25:7
**placement** [1] - 7:18
**places** [3] - 4:16, 15:5, 16:7
**point** [3] - 7:25, 12:8, 12:25
**points** [1] - 10:20
**police** [7] - 5:23, 7:22, 9:5, 10:7, 10:16, 12:15, 25:13
**policeman** [1] - 25:14
**political** [2] - 12:14, 15:10
**pom** [1] - 6:6
**pom-poms** [1] - 6:6
**poms** [1] - 6:6
**pornography** [2] - 16:9, 22:10
**portion** [2] - 5:14, 12:10
**positive** [1] - 24:5
**potentially** [1] - 18:23
**Pour** [1] - 24:4
**pouring** [1] - 13:5
**practical** [1] - 11:7
**precipitated** [2] - 5:10, 18:3
**preempt** [2] - 10:22
**Prepared** [1] - 1:23
**prepared** [2] - 2:13, 2:14
**present** [1] - 8:11
**presented** [2] - 5:24, 20:7
**pretty** [3] - 2:23, 5:8, 6:1
**prevailing** [2] - 5:16, 12:11
**primarily** [1] - 21:25
**print** [1] - 26:6
**printed** [1] - 18:14
**private** [4] - 15:6, 15:7, 17:23
**pro** [1] - 21:13
**problem** [1] - 5:21
**procedure** [3] - 7:19, 25:4, 25:5
**procedures** [1] - 25:7
**proceeding** [1] - 4:12
**proceedings** [3] - 26:3, 26:5, 26:6
**process** [8] - 4:12, 7:1, 8:7, 10:15,

10:18, 10:22, 10:23, 17:25
**processes** [1] - 11:17
**property** [15] - 4:11, 5:11, 15:6, 17:1, 17:12, 17:23, 17:24, 18:10, 18:13, 18:14, 22:2, 22:4, 22:13, 22:17
**prosecute** [2] - 8:7, 11:18
**prosecuted** [1] - 22:22
**protecting** [2] - 6:7, 24:19
**provide** [2] - 16:16, 17:10
**provides** [1] - 3:20
**provisions** [1] - 4:5
**prudent** [1] - 20:25
**Public** [2] - 15:4, 15:5
**public** [30] - 5:19, 5:20, 6:3, 7:4, 7:5, 7:8, 8:3, 9:20, 9:21, 10:1, 10:4, 15:6, 17:1, 17:24, 18:9, 18:10, 18:13, 18:14, 18:25, 19:9, 19:10, 20:6, 21:2, 22:4, 22:13, 22:17, 24:22, 24:23
**pull** [1] - 18:12
**purpose** [1] - 16:1
**pushback** [1] - 21:7
**put** [2] - 11:9, 18:15

### Q

**questions** [1] - 2:14

### R

**R1042** [1] - 26:23
**rainbow** [1] - 19:1
**raise** [1] - 25:21
**raised** [1] - 15:14
**raises** [1] - 15:1
**ramifications** [1] - 16:20
**rather** [1] - 7:21
**read** [2] - 20:23, 23:4
**reading** [1] - 2:7
**realize** [1] - 20:18
**really** [3] - 3:10, 14:21, 16:2
**reason** [2] - 15:1, 16:22
**received** [1] - 20:17
**recently** [1] - 14:4

**record** [1] - 26:5
**recourse** [2] - 7:13, 7:17
**red** [2] - 15:1, 25:21
**redlines** [1] - 2:10
**reduced** [1] - 26:6
**refer** [1] - 11:23
**referenced** [1] - 15:17
**references** [1] - 6:15
**referred** [1] - 5:3
**referring** [1] - 2:24
**refers** [1] - 3:8
**reflects** [1] - 16:2
**regards** [1] - 16:15
**register** [1] - 8:17
**Registered** [1] - 26:23
**regular** [1] - 25:6
**reiterated** [1] - 2:16
**rejects** [1] - 12:6
**related** [3] - 5:11, 23:15, 26:10
**religion** [1] - 23:15
**remedial** [3] - 4:8, 4:23, 4:25
**remedies** [1] - 3:18
**remedy** [1] - 4:9
**render** [1] - 11:23
**Reporter** [3] - 1:24, 26:3, 26:16
**REPORTER'S** [1] - 1:10
**REPORTING** [2] - 26:20, 26:22
**Reporting** [1] - 26:23
**represent** [3] - 23:8, 23:9, 24:10
**represented** [1] - 23:8
**represents** [1] - 16:12
**Republican** [1] - 17:8
**requested** [2] - 26:8, 26:9
**research** [2] - 16:7, 18:23
**resides** [1] - 7:20
**resource** [1] - 11:5
**respect** [2] - 12:12, 22:25
**respects** [1] - 15:21
**responsibility** [2] - 7:10, 13:17
**responsible** [2] - 21:1, 25:17
**rest** [3] - 5:16, 7:10, 11:21
**resting** [1] - 7:21
**restriction** [1] - 4:21
**restrictions** [1] - 4:17
**Review** [3] - 26:8, 26:8, 26:9

**room** [2] - 19:15, 20:10
**RPR** [2] - 1:24, 26:16
**RRF** [1] - 26:23
**run** [1] - 10:16

### S

**safe** [2] - 13:6, 13:7
**safer** [8] - 12:25, 13:2, 13:8, 14:9, 14:11, 14:13, 14:21, 24:19
**school** [2] - 6:25
**schools** [5] - 5:19, 6:21, 7:5, 7:9, 18:10
**scientific** [2] - 12:14, 15:10
**screaming** [1] - 19:11
**second** [1] - 2:7
**Secondly** [1] - 16:22
**section** [8] - 4:23, 4:24, 4:25, 5:1, 5:2, 7:25, 8:1, 21:25
**sector** [1] - 7:4
**see** [9] - 5:6, 7:11, 9:12, 10:4, 13:19, 16:11, 18:22, 23:5, 24:23
**seek** [2] - 3:17, 6:11
**sense** [1] - 8:19
**September** [1] - 26:13
**series** [1] - 12:13
**serious** [1] - 15:8
**served** [1] - 23:1
**services** [1] - 17:10
**session** [2] - 18:8, 20:7
**set** [4] - 10:17, 17:7, 26:13, 26:20
**sets** [2] - 12:2, 16:23
**settled** [1] - 25:8
**settles** [1] - 25:9
**several** [2] - 5:8, 6:1
**SHACKLETT** [15] - 2:9, 3:22, 5:7, 7:2, 9:16, 12:8, 18:2, 20:3, 20:18, 21:17, 21:19, 22:9, 22:12, 23:7, 25:8
**Shacklett** [1] - 9:11
**Shawn** [1] - 10:11
**shelf** [2] - 13:20, 13:25
**shoot** [1] - 4:24
**shorthand** [1] - 26:6
**shoulders** [1] - 7:21
**shower** [1] - 2:21
**side** [1] - 14:5
**sides** [2] - 20:8, 20:10
**signature** [3] - 26:8,

26:8, 26:9
**significant** [1] - 4:6
**similar** [1] - 23:12
**simply** [2] - 13:24, 24:13
**single** [4] - 20:13, 20:17, 20:19, 21:5
**sits** [2] - 13:20, 13:25
**skill** [1] - 26:5
**SMITH** [3] - 1:24, 26:3, 26:16
**so..** [1] - 9:15
**social** [1] - 17:16
**someone** [5] - 8:4, 15:15, 15:23, 17:16, 23:14
**sometimes** [1] - 2:22
**somewhere** [1] - 13:25
**Sorry** [1] - 4:24
**sorry** [2] - 10:21, 15:9
**sounds** [1] - 13:9
**spaces** [2] - 15:5, 15:6
**speaking** [3] - 2:12, 18:19, 20:4
**speaks** [2] - 19:14, 19:18
**specific** [1] - 17:11
**specifically** [4] - 10:20, 10:21, 11:13, 16:25
**speech** [5] - 21:22, 23:3, 23:6, 23:9, 23:11
**spent** [3] - 11:11, 11:12, 12:4
**sports** [1] - 17:20
**ss** [1] - 26:1
**stack** [1] - 12:21
**staff** [1] - 24:24
**standard** [6] - 3:11, 3:13, 3:16, 6:14, 17:7, 25:4
**standards** [10] - 5:16, 9:8, 12:12, 16:13, 19:8, 19:14, 19:18, 19:19, 20:5, 20:23
**Standards** [1] - 20:14
**standing** [1] - 23:23
**standpoint** [3] - 3:19, 6:9, 18:19
**start** [1] - 10:25
**STATE** [1] - 26:1
**state** [3] - 4:4, 6:22, 6:23
**statement** [2] - 11:12, 12:3
**statute** [2] - 10:20, 10:21
**statutes** [1] - 3:16

**stay** [2] - 10:24, 25:7
**step** [1] - 10:18
**still** [1] - 25:5
**stop** [1] - 10:25
**straight** [1] - 17:8
**strength** [3] - 23:18, 24:11, 24:14
**strict** [1] - 6:2
**strolled** [1] - 4:25
**stuff** [2] - 13:5, 19:11
**subject** [1] - 8:2
**subsequent** [1] - 11:22
**Substandard** [1] - 2:6
**sudden** [1] - 21:6
**suggesting** [2] - 4:22, 20:1
**suitable** [1] - 12:13
**support** [2] - 23:5, 25:20
**supporting** [1] - 16:22
**supposed** [3] - 10:16, 12:22, 12:23
**Supreme** [1] - 16:8
**sworn** [1] - 26:4
**system** [5] - 7:17, 8:5, 9:20, 11:19, 11:20

## T

**table** [1] - 20:1
**tables** [1] - 23:24
**TCA** [3] - 2:18, 2:23, 15:12
**technically** [1] - 11:7
**Tennessee** [6] - 2:18, 3:4, 3:6, 3:9, 14:13, 14:18
**terms** [1] - 4:21
**terrible** [1] - 8:25
**testify** [1] - 26:4
**testifying** [1] - 26:4
**thereafter** [1] - 26:6
**thereof** [1] - 26:11
**they've** [1] - 4:22
**Thoughts** [1] - 23:7
**thoughts** [4] - 23:11, 23:13, 23:18, 24:2
**three** [3] - 13:10, 19:15, 20:12
**throughout** [1] - 14:10
**throw** [1] - 8:8
**TINDALL** [7] - 3:8, 6:9, 6:23, 10:19, 15:3, 22:7, 22:11
**today** [3] - 13:10, 14:13, 20:20
**together** [2] - 18:13, 18:15

**tomorrow** [2] - 13:8, 14:13
**towards** [2] - 21:25, 22:1
**TRANSCRIPT** [1] - 1:10
**transphobe** [1] - 17:16
**trash** [1] - 17:10
**tried** [4] - 8:10, 13:10, 21:22, 21:23
**trouble** [1] - 5:18
**true** [2] - 6:24, 26:5
**truth** [1] - 26:4
**try** [3] - 17:7, 21:17, 24:20
**trying** [7] - 2:25, 9:25, 10:3, 19:22, 21:19, 22:14
**TUCKER** [1] - 3:23
**turned** [1] - 23:24
**two** [6] - 2:19, 4:1, 5:5, 16:2, 21:20
**type** [3] - 10:25, 11:13, 25:6

## U

**ultimately** [2] - 7:20, 25:1
**under** [6] - 3:5, 5:4, 6:18, 6:21, 14:18, 26:6
**understood** [1] - 15:14
**Unfortunately** [2] - 16:5, 17:10
**unintended** [4] - 8:9, 8:18, 14:24, 24:21
**up** [7] - 8:8, 9:17, 10:16, 17:6, 17:9, 19:15, 23:23
**utilizes** [1] - 8:1

## V

**value** [3] - 12:14, 14:7, 24:2
**values** [3] - 13:25, 15:10, 24:3
**variety** [1] - 23:17
**video** [2] - 2:3, 25:23
**view** [1] - 10:8
**violate** [1] - 7:24
**violation** [8] - 3:15, 3:18, 4:20, 4:22, 5:2, 6:12, 8:1, 15:16
**violations** [1] - 3:20

**voice** [1] - 16:12
**voicing** [1] - 15:24
**vote** [2] - 15:1, 21:5
**voted** [1] - 21:6
**votes** [1] - 25:18

## W

**wait** [1] - 18:25
**Wait** [2] - 8:4, 21:1
**waived** [1] - 26:8
**wall** [1] - 8:9
**wants** [7] - 3:12, 7:13, 11:5, 11:11, 13:12, 24:17
**Watch** [1] - 24:4
**weeds** [1] - 17:2
**week** [1] - 17:18
**weeks** [1] - 20:12
**whereas** [1] - 12:10
**Whereas** [1] - 12:11
**whole** [4] - 12:13, 20:21, 26:4
**witness** [1] - 26:4
**wonder** [1] - 20:20
**wondered** [1] - 6:2
**wondering** [1] - 5:12
**wording** [1] - 14:25
**workshop** [1] - 18:8
**world** [1] - 23:1
**WRIGHT** [2] - 10:12, 25:3
**write** [1] - 9:18
**writing** [1] - 19:17

## Y

**years** [4] - 10:9, 17:6, 22:20, 23:2
**young** [1] - 13:5
**YouTube** [2] - 2:3, 25:23