**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **TENNESSEE EQUALITY PROJECT**<br>**FOUNDATION, INC.,**<br><br>  **Plaintiff,**<br><br> **v.**<br><br>**THE CITY OF MURFREESBORO, et al.,**<br><br>  **Defendants.** | **Case No. 3:23-cv-01044** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**TENNESSEE EQUALITY PROJECT FOUNDATION INC.'S**
**MOTION FOR PRELIMINARY INJUNCTION**

**Ballard Spahr LLP**
1675 Broadway, 19th Floor
New York , NY 10019-5820

**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004

**ACLU Foundation of Tennessee**
P.O. Box 120160
Nashville, TN 37212

**Burr Forman LLP**
222 Second Avenue South, Suite 2000
Nashville, TN 37201

*Counsel for Plaintiff*
*Tennessee Equality Project Foundation, Inc.*

**Table of Contents**

Page

INTRODUCTION ................................................................................................ 1

SUMMARY OF FACTS ..................................................................................... 3

ARGUMENT ...................................................................................................... 7

I.      LIKELIHOOD OF SUCCESS ................................................................. 8

      A.     The Ordinance is an Unconstitutional Restriction on Speech, in Violation of the First Amendment ............................................................... 8

            1.     The Ordinance is a Viewpoint Based Restriction ....................................... 9

            2.     Even if the Court were to Strike "Homosexuality" from the 1977 Definition, the Ordinance is At Least a Content-Based Restriction ........ 10

            3.     The City Passed the Ordinance for an Impermissible Purpose ................. 11

            4.     The Ordinance Does Not Pass Strict Scrutiny ......................................... 12

      B.     The Ordinance is Unconstitutionally Overbroad ................................... 13

      C.     The Ordinance is Also Unconstitutionally Vague ................................. 14

      D.     The Ordinance's Targeting of Homosexuality Violates the Equal Protection Clause ................................................................................... 15

            1.     The Ordinance Discriminates Based on a Quasi-Suspect Class .............. 16

            2.     The Ordinance Cannot Survive Intermediate Scrutiny ........................... 17

      E.     The Ordinance is an Unlawful Bill of Attainder .................................... 18

      F.     The City's Policy Against Issuing Permits to TEP is Unconstitutional .............. 18

            1.     The Policy is an Unconstitutional Prior Restraint .................................. 19

            2.     The Policy is an Unconstitutional Retaliation Against TEP for the Exercise of its First Amendment Rights ................................................. 20

II.     TEP WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION ................. 23

III.    THE PROPOSED INJUNCTION IS IN THE PUBLIC INTEREST AND DOES NOT POSE ANY RISK OF HARM TO OTHERS ......................................... 24

CONCLUSION ................................................................................................... 25

CERTIFICATE OF CONFERENCE ................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
   978 F.3d 481 (6th Cir. 2020) ..............................................................................9, 10

*Bloch v. Ribar*,
   156 F.3d 673 (6th Cir. 1998) ...........................................................................21, 23

*Bowen v. Gilliard*,
   483 U.S. 587 (1987).................................................................................................16

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011).................................................................................................13

*Carey v. Brown*,
   447 U. S. 455 (1980)............................................................................................9, 18

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
   511 F.3d 535 (6th Cir. 2007) .....................................................................................7

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC*,
   142 S. Ct. 1464 (2022).............................................................................................12

*City of Cleburne v. Cleburne Living Center, Inc.*,
   473 U.S. 432 (1985).................................................................................................16

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*,
   274 F.3d 377 (6th Cir. 2001) ...................................................................................19

*Does #1-9 v. Lee*,
   574 F. Supp. 3d 558 (M.D. Tenn. 2021)..................................................................24

*Freedman v. Maryland*,
   380 U.S. 51 (1951)..............................................................................................19, 20

*Gay v. Cabinet for Health & Family Servs.*,
   No. 18-5285 2019 U.S. App. LEXIS 2336 (6th Cir. Jan. 23, 2019)........................15

*Hill v. Colorado*,
   530 U.S. 703 (2000).................................................................................................14

*Holzemer v. City of Memphis*,
   621 F.3d 512 (6th Cir. 2010) ...................................................................................21

*J.E.B. v. Ala. ex rel. T.B.*,
  511 U.S. 127 (1994)..................................................................................................17

*Kilpatrick v. HCA Hum. Res., LLC*,
  No. 3:17-cv-00670, 2022 U.S. Dist. LEXIS 50801 (M.D. Tenn. Mar. 22,
  2022) ........................................................................................................................17

*Knight v. Montgomery Cnty.*,
  592 F. Supp. 3d 651 (M.D. Tenn. 2022)....................................................................8

*Libertarian Party of Ohio v. Husted*,
  751 F.3d 403 (6th Cir. 2014) ...................................................................................15

*Love v. Beshear*,
  989 F. Supp. 2d 536 (W.D. Ky. 2014)......................................................................16

*Meinhold v. United States DOD*,
  808 F. Supp. 1453 (C.D. Cal. 1992) .........................................................................18

*Neveux v. Webcraft Techs., Inc.*,
  921 F. Supp. 1568 (E.D. Mich. 1996).........................................................................7

*Nixon v. Administrator of General Services*,
  433 U.S. 425 (1977)..................................................................................................18

*Obergefell v. Wymyslo*,
  962 F. Supp. 2d 968 (S.D. Ohio 2013) .....................................................................16

*Odle v. Decatur County*,
  421 F.3d 386 (6th Cir. 2005) ...................................................................................19

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992)....................................................................................................9

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)........................................................................................8, 9, 11

*Reno v. ACLU*,
  521 U.S. 844 (1997)..................................................................................................15

*Roman Catholic Diocese v. Cuomo*,
  141 S. Ct. 63 (2020)..................................................................................................23

*Romer v. Evans*,
  517 U.S. 620 (1996)............................................................................................12, 17

*S. Utah Drag Stars v. City of St. George*,
  No. 4:23-cv-00044-DN-PK, 2023 U.S. Dist. LEXIS 105876 (D. Utah June 16,
  2023) ...........................................................................................................................23, 24

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)..............................................................................................................19

*Smith v. Goguen*,
  415 U.S. 566 (1974)..............................................................................................................14

*Sorrell v. IMS Health, Inc.*,
  564 U.S. 552 (2011)..............................................................................................................12

*Speech First, Inc. v. Schlissel*,
  939 F.3d 756 (6th Cir. 2019) ..................................................................................................7

*Sweatt v. Painter*,
  339 U.S. 629 (1950)..............................................................................................................15

*Thaddeus-X v. Blatter*,
  175 F.3d 378 (6th Cir. 1999) ................................................................................................21

*Triplett Grille v. City of Akron*,
  40 F.3d 129 (6th Cir. 1994) ..................................................................................................14

*United States v. Stevens*,
  559 U.S. 460 (2010)..............................................................................................................13

*United States v. Williams*,
  553 U.S. 285 (2008)........................................................................................................13, 14

*Vitolo v. Guzman*,
  999 F.3d 353 (6th Cir. 2021) ................................................................................................24

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012)..................................................................................................17

*Woodlands Pride, Inc. v. Paxton*,
  No. H-23-2847, 2023 U.S. Dist. LEXIS 171268 (S.D. Tex. Sept. 26, 2023)..........................24

**Statutes**

42 U.S.C. § 1983...........................................................................................................................2

Murfreesboro City Code Section 21-71 .......................................................................................1

TN Code § 39-13-517 (2021) .....................................................................................................14

**Other Authorities**

Tennessee Constitution Article I, Section 19.................................................................................8

U.S. Const. Art. 1, § 10, cl. 1 .................................................................................................18

# INTRODUCTION

The First Amendment to the U.S. Constitution guarantees that all citizens shall have access to public spaces for expressive and political speech. For years, Plaintiff Tennessee Equality Project Foundation Inc. ("TEP") has used these public spaces to educate and advocate for equal rights and inclusion for LGBTQ+ individuals. The City of Murfreesboro and the City officials named as Defendants (together, the "City"), however, have taken it upon themselves to exclude TEP from the public spaces of Murfreesboro and to enact discriminatory ordinances meant to chill, if not silence, speech from TEP and others who use their voices to advocate for the rights and equality of the LGBTQ+ community.

Last fall, TEP hosted its annual BoroPride event—a hugely successful, family-friendly event with food trucks, live music, comedy performances, and drag shows—in Murfreesboro's historic Cannonsburgh Village. As is increasingly common in the current political climate, the 2022 BoroPride Festival's pro-LGBTQ+ message and drag performances were met with opposition from a small, but vocal, group of anti-drag advocates who falsely claim that drag performances are inherently obscene or intended to "sexualize" children.

Although the City initially acknowledged TEP's First Amendment rights to engage in political and expressive speech in the public square, the City, including Murfreesboro Mayor Shane McFarland and City Manager Craig Tindall, quickly began a campaign to retaliate against TEP and prevent TEP and others advancing similar messages from using the City's public spaces. Within days of the Festival, Tindall instituted a City policy prohibiting the issuance of any permits to TEP. When TEP applied for a permit for the 2023 BoroPride Festival, the City delayed for months, imposed unclear and unwarranted barriers to TEP's permit request, and ultimately denied the permit, per the policy. Then, in June 2023, the City passed a new "Community Decency" Ordinance 23-O-22 (the "Ordinance"), granting law enforcement and City officials sweeping

discretion to penalize and even criminalize anything they perceive as "indecent behavior," distribution of "indecent materials" or hosting of "indecent events." Even worse, the Ordinance's definition of prohibited "indecent behavior" incorporates Murfreesboro City Code Section 21-71, enacted November 23, 1977 (the "1977 Definition"), which defines "indecent behavior" not just as acts that are inappropriate in public, such as masturbation and sexual intercourse, but also, without limitation or definition, "homosexuality." This Ordinance has had an immediate chilling effect on pro-LGBTQ+ speech within the City.

The City's policy and the Ordinance violate the First and Fourteenth Amendments of the U.S. Constitution, the Tennessee Constitution, and 42 U.S.C. § 1983. They are causing irreparable harm to TEP and others in the community by chilling protected political and expressive speech and infringing on constitutional rights, they do not protect against any real risk of harm, and the balance of the equities weighs in favor of the Court's immediate intervention.

TEP respectfully requests that the Court preliminarily enjoin the City from (1) enforcing its retaliatory and discriminatory policy against issuing permits to TEP, and (2) enforcing or taking any action pursuant to the Ordinance and the underlying 1977 Definition while this action is pending. Immediate equitable relief is necessary so that TEP can proceed with the 2023 BoroPride Festival, scheduled for October 28, 2023, without fear of civil or criminal penalties under the Ordinance, and so that the broader LGBTQ+ citizens of Murfreesboro may engage in constitutionally protected activities without the same such fears.

## SUMMARY OF FACTS[1]

TEP is a non-profit organization that advocates for the equal rights of LGBTQ+ people in Tennessee. *See* Compl. ¶¶ 40-57. TEP founded and has hosted the annual BoroPride Festival in Murfreesboro since 2016. *Id.* Originally held in the City's downtown square, TEP relocated the event to Murfreesboro's larger, historic Cannonsburgh Village in 2021 to accommodate growing public support and attendance. *Id.* For TEP and BoroPride attendees, the growing crowd and the ability to host BoroPride at this longstanding public venue symbolized the Murfreesboro community's support and acceptance of its LGBTQ+ citizens. *Id.* ¶¶ 3, 5, 43–47, 64–65. And in fact, last year's 2022 BoroPride was the largest yet. For the first time since 2016, however, TEP will not host its annual BoroPride Festival in a public forum in Murfreesboro, as a direct result of the discriminatory and unconstitutional actions of the City. *Id.* ¶¶ 91–94, 115–121.

In the days leading up to the 2022 BoroPride Festival, a small group of anti-drag activists began emailing City officials to oppose the event, falsely claiming that the planned drag performances would feature "lewd and obscene acts" and "indecent behavior" that "exploits," "harms" and "contributes to the sexualization" of children. *Id.* ¶¶ 59–62 & Ex. C. Murfreesboro Mayor Shane McFarland initially—and correctly—responded that the City "do[es]n't get to pick and choose legally who can or who can't use City facilities." *Id.* ¶ 61 & Ex. C. On September 17, 2022, the BoroPride Festival went forward as planned at Cannonsburgh Village and was a huge success, with over 7,000 supporters in attendance. *Id.* ¶ 64.

Five days later, anti-drag activist and aspiring Tennessee politician Robby Starbuck posted a video to Instagram purportedly showing portions of the drag performances from the 2022

---

[1] TEP refers the Court to the more detailed recitation of facts in its Verified Complaint (Dkt. 1), but summarizes the key facts here for the Court's convenience.

BoroPride Festival. *Id*. ¶¶ 6, 66 & Ex. D. In a hateful screed brimming with malicious buzzwords, Starbuck baselessly mischaracterized these performances—as "illegal sexualization of kids." *Id*. Contrary to Starbuck's claims, none of the BoroPride drag performances—including those shown in Starbuck's video—were at all indecent or inappropriately directed at children. *Id*. ¶¶ 6, 8, 89. By all appearances, Starbuck and the other anti-drag activists simply opposed drag performances. *Id*. The same day that Starbuck made his Instagram post, a different activist forwarded it to Mayor McFarland, along with the accusation: "you allowed this." *Id*. ¶¶ 7, 67 & Ex. C.

This time, the Mayor caved to the anti-drag activists, elevating their concerns over his oath to uphold the constitutional rights of his constituents. *Id*. ¶¶ 67-70. He initially acknowledged that "I legally do not have the authority to stop someone's freedom of speech or right to gather . . . the City doesn't have the authority to usurp someone's constitutional rights." *Id*. ¶ 68 & Ex. C. But by the following morning, he began working with City Manager Tindall and like-minded City officials to ensure BoroPride events would never again be hosted on City property. *Id*. ¶¶ 69–70.

First, Tindall instituted a policy prohibiting the issuance of City event permits to TEP. *Id*. ¶¶ 71–74. On October 17, 2022, Tindall sent TEP a letter falsely accusing TEP and the 2022 BoroPride event of "intentionally expos[ing] young children" to "conduct and speech of an explicitly sexual nature," and stating he would "deny future special events permit [sic] submitted by [TEP]." *Id*. ¶ 71 & Ex. F. That same day, Tindall issued a Memorandum to City of Murfreesboro Parks & Recreation officials forbidding them from renting City facilities to TEP or any of its affiliates. *Id*. ¶ 73 & Ex. G. The following day, Tindall reported his efforts to McFarland, Vice-Mayor Bill Shacklett, and the Murfreesboro City Council, informing them that "I have prohibited Parks & Recreation from enter [sic] into further rental contracts with [TEP] or entities affiliating

with it," and claiming this was done because TEP's "clear intention" for the BoroPride Festival was "to diminish, if not destroy, community standards necessary to protect children." *Id*. ¶ 74.

Undeterred by Tindall's unconstitutional policy, on November 16, 2022, TEP applied for a permit to host the 2023 BoroPride Festival again at Cannonsburgh Village. *Id*. ¶¶ 75–76 & Ex. I. For months, the City refused to grant or deny the permit—despite TEP's stated need to begin planning the 2023 event—and instead required TEP to provide unclear and unwarranted advance assurances about the content of the event as a condition for even considering the permit request. *Id*. ¶¶ 77–85 & Exs. J, K. Finally, on July 7, 2023, TEP asked the City to state in writing either (i) the exact terms under which the City would issue a 2023 BoroPride permit, and the City's rationale for any proposed restrictions on festival activities, or (ii) the reasons why TEP's request for a permit was being denied. *Id*. ¶ 86 & Ex. L. As the City refused to respond to this straightforward request, TEP had no choice but to abandon its plans to host the 2023 BoroPride event at Cannonsburgh Village and seek out a new venue. *Id*. ¶¶ 89–94.

Meanwhile, the City went to work on the second front of its constitutional assault against TEP. City officials hurriedly drafted a "community decency" ordinance designed to eradicate drag performances within public spaces in the City. *Id*. ¶¶ 95–114 & Ex. N–O, Q. On June 15, 2023, the Murfreesboro City Council voted to enact the Ordinance—Murfreesboro City Ordinance 23-O-22, which became effective on June 30, 2023. *Id*. ¶¶ 96–97 & Ex. N. The Ordinance sets forth staggeringly overbroad restrictions on speech and expression throughout the City, and provides for civil and criminal penalties against any person whom City officials deem guilty of "indecent behavior," distribution of "indecent materials" or hosting "indecent events." *Id*. ¶¶ 98–100, 102–108 & Ex. N. Such prohibited behavior is vaguely defined as including any "printed materials,

broadcasts, shows, parades, or other such displays that suggest, advertise, or display indecent behavior or that is harmful to minors." *Id*. ¶ 104.

Even more alarmingly, the Ordinance incorporates the earlier 1977 Definition that defines **any** acts of "homosexuality" as "indecent behavior." *Id*. ¶ 101 & Ex. O. Thus, in combination with this earlier statute, the Ordinance facially prohibits any public conduct or publicly distributed materials that even suggest homosexuality—including not only drag performances like those featured at BoroPride festivals, but also LGBTQ+ advocacy materials distributed by TEP or like-minded organizations, advertisements for LGBTQ+ television shows, or even a same-sex couple walking hand in hand down a City sidewalk. *Id*. ¶¶ 101–106 & Exs. N, O. It is clear that City officials intended the Ordinance to chill speech and expression by and related to the LGBTQ+ community in Murfreesboro and to prohibit TEP's speech and expression as embodied by the BoroPride Festival and associated drag events. *Id*. ¶¶ 95, 109–110, 115–121 & Exs. P, Q.

The City's subsequent enforcement of the new Ordinance shows that the inclusion of this "homosexuality" language from the earlier City statute was intentional. *Id*. ¶¶ 111–114. Indeed, the City has already used its unfettered discretion under the Ordinance to ban LGBTQ+ books from a local library, as part of the next step in its concerted effort to silence the LGBTQ+ community. *Id.* ¶ 114. When TEP's counsel asked the City whether it believed the Ordinance was "enforceable against 2023 BoroPride organizers, performers, and/or attendees," the City refused to provide any assurance that the Ordinance—which condemns *any* public expression of "homosexuality"—would not be used to unfairly target LGBTQ+ organizers, performers, and/or attendees at or on their way to the 2023 BoroPride event. *Id*. ¶ 117 & Ex. P.

As a result of the City's unconstitutional actions, TEP had to postpone its 2023 BoroPride Festival until October 28, 2023, and spend time, money, and resources to identify and secure a

new venue. *Id*. ¶¶ 15, 21, 91–92, 94. Out of concern about the Ordinance and the City's clear bias against drag shows and pro-LGBTQ+ speech, TEP moved the much-anticipated drag events from public spaces to an adults-only venue located over five miles away from where the main BoroPride events will take place. *Id*. ¶¶ 93, 115–116. These changes, made for the safety of performers and attendees alike, will undercut the visibility of the event within the community at large and the core purpose of BoroPride, which like all Pride events, is to increase public awareness and acceptance of the LGBTQ+ community. *Id*. ¶¶ 92, 115–121. Shortly after 2023 BoroPride, TEP will begin planning 2024 BoroPride. The City's policy against issuing permits to TEP limits the spaces available to TEP and will again require additional time, effort, and cost—all of which will be further exacerbated by the uncertainty and chilling effect created by the Ordinance.

The City has sent a clear message to the community at large that events like BoroPride—conceived as a public and visible celebration and affirmation of the Murfreesboro LGBTQ+ community—should take place outside of the public eye. *Id*. ¶¶ 119–121. On October 6, 2023, TEP filed this action against the City, seeking to put an end to its discriminatory and unconstitutional practices. *Id*. ¶ 122.

## ARGUMENT

Because the 2023 BoroPride Festival is mere weeks away, the Ordinance is already chilling speech, and the threat of further enforcement is looming, TEP asks the Court to enter a preliminary injunction against enforcement of (1) the Ordinance and the underlying 1977 Definition and (2) the City's policy. Such an injunction is necessary so that TEP and the citizens of Tennessee can engage in protected speech and activities without fear of unconstitutional penalties while this case is pending.

In evaluating motions for a preliminary injunction, courts balance four factors: (1) the likelihood of success on the merits; (2) the risk of irreparable injury absent an injunction; (3) the

risk of substantial harm to others; and (4) the public interest served by an injunction. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). No single factor is a prerequisite to the issuance of a preliminary injunction. *Neveux v. Webcraft Techs., Inc.*, 921 F. Supp. 1568, 1570-71 (E.D. Mich. 1996) (citing *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995)). However, in cases like this one that involve a potential constitutional violation, "likelihood of success on the merits will often be the determinative factor." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). TEP has satisfied all four factors, and the Court should enter a preliminary injunction.

I. **LIKELIHOOD OF SUCCESS**

TEP will be able to demonstrate that the Ordinance is unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution as well as the Tennessee Constitution,[2] *see* Compl. Counts I through XI; and that the City's policy against issuing TEP event permits is an unconstitutional infringement on TEP's First and Fourteenth Amendment rights, *see id.* Counts XII, XIV. Thus, TEP has satisfied the first factor for a preliminary injunction.

A. **The Ordinance is an Unconstitutional Restriction on Speech, in Violation of the First Amendment**

Under the First Amendment, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citing *Police*

---

[2] The Tennessee Constitution's protections for freedom of speech and equal protection track those outlined by the Federal Constitution and are addressed together herein. "Article I, Section 19 of the Tennessee Constitution has been 'construed' by the Tennessee Supreme Court 'to have a scope at least as broad as that afforded the freedoms of speech and of the press by the First Amendment.'" *Knight v. Montgomery Cnty.*, 592 F. Supp. 3d 651, 670 (M.D. Tenn. 2022) (quoting *State v. Mitchell*, 343 S.W.3d 381, 392 n.3 (Tenn. 2011)).

*Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Attempts to regulate speech based on the content or the viewpoint of the message conveyed are presumptively unconstitutional and will pass constitutional muster "only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*; *see Carey v. Brown*, 447 U. S. 455, 462 (1980) ("Any restriction on expressive activity because of its content would completely undercut the profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." (internal quotation marks omitted)).

Regulations are "content-based" if they apply based on the particular topic or category of speech at issue. *Reed*, 576 U.S. at 156 (ruling that town sign code, which imposed different limitations on signs depending on whether they conveyed political, ideological, or other types of messages, was content-based). A regulation is "viewpoint-based" if, rather than "treat[ing] an entire subject as off limits," it "permits some private speech on the subject and only disfavors certain points of view." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 498 (6th Cir. 2020). Viewpoint-based regulations are particularly egregious, as they "raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992).

### 1. The Ordinance is a Viewpoint Based Restriction

The Ordinance and the incorporated 1977 Definition are impermissible viewpoint-based discriminations on speech. *Am. Freedom Def. Initiative*, 978 F.3d at 499 ("Viewpoint discrimination obviously exists when the government allows speech conveying one point of view . . . but prohibits speech conveying the opposite point of view"). One key indicator of viewpoint-based discrimination is whether legislation directly targets a specific groups of speakers. As the court noted in *Friends of Georges, Inc. v. Mulroy*, a statute restricting "male or female

impersonat[ion]"—*i.e.*, drag performance—directly impacted performers and, specifically, performers "who wish to impersonate a gender that is different from the one with which they are born." No. 2:23-cv-02163-TLP-tmp, 2023 U.S. Dist. LEXIS 96766, at *32, *62-64 (W.D. Tenn. June 2, 2023). Thus, the restriction was a viewpoint based regulation. *Id.*

The same is true here. Read together, the Ordinance and 1977 Definition penalize a far broader range of speech and expressive behavior where a pro-LGBTQ+ message is involved. For instance, the prohibition on "sexual conduct" in public prohibits only a limited range of public acts by individuals or heterosexual couples—public masturbation and intercourse[3]—but would prohibit *any* acts of homosexuality, including non-obscene (and even non-sexual) displays of same-sex attraction, such as kissing or hand-holding. By extension, the prohibition on indecent materials— any materials that "suggest, advertise, or display indecent behavior"—encompasses materials *suggesting* heterosexual *intercourse* while including anything *suggesting* homosexuality at all. (As discussed below, the vagueness of this definition makes it nearly impossible to determine what would be prohibited, even for the sake of argument). Just as the statute in *Friends of Georges* discriminated based on viewpoints relating to gender identity, the Ordinance and 1977 Definition discriminate based on "homosexuality"—in modern terms, LGBTQ+ identity—and viewpoints supporting inclusion and equality for LGBTQ+ individuals. Thus, the Ordinance is presumptively unconstitutional and subject to strict scrutiny.

        **2.**      **Even if the Court were to Strike "Homosexuality" from the 1977 Definition, the Ordinance is At Least a Content-Based Restriction**

Even if the Court were to strike the word "homosexuality" from the incorporated 1977 Definition—and it should—the Ordinance still would be subject to strict scrutiny as a content-

---

[3] TEP is not challenging the underlying 1977 Definition to the extent it prohibits masturbation and sexual intercourse in public, only the portion that would prohibit *any* acts of homosexuality.

based restriction on speech, because it seeks to limit any conduct or content that is suggestive or sexual in nature. *See Reed*, 576 U.S. at 169 ("[I]t is well established that the First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." (internal quotation marks omitted)).

Though framed as a prohibition on indecent sexual behavior, the plain language of the Ordinance prohibits any speech—including expressive conduct, spoken words, or printed materials—that constitutes, displays, or ***even suggests*** "lewd behavior, nudity or sexual conduct" or that may be deemed, in the unfettered discretion of the City, as "harmful to minors."[4] Thus, on its face, the Ordinance "targets speech based on its communicative content," namely, content that is deemed "indecent" or "that is not obscene for adults but may be indecent and harmful to minors," and it is therefore subject to strict scrutiny. *See Friends of Georges*, 2023 U.S. Dist. LEXIS 96766, at *55-56 (ruling that drag ban at issue was both viewpoint and content-based discrimination).

### 3. The City Passed the Ordinance for an Impermissible Purpose

Finally, the Ordinance is unconstitutional and should be subject to strict scrutiny for the separate and additional reason that the City passed it for an impermissible purpose. The Supreme Court has long recognized "a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech"—laws "that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164. "If there is evidence that an impermissible purpose or justification underpins a facially

---

[4] The Ordinance's intertwined definitions prohibit indecent behavior defined as "indecent exposure, public indecency, lewd behavior, nudity or sexual conduct" (a term that incorporates the 1977 Definition of "homosexuality" as indecent), as well as the "display, distribut[ion], or broadcast [of] indecent material," defined as "printed materials, broadcasts, shows, parades, or other such displays that ***suggest***, ***advertise***, or ***display*** indecent behavior or that is harmful to minors." *See* Compl. Ex. N (emphasis added).

11

content-neutral restriction, for instance, that restriction may be content based" and will still be subject to strict scrutiny. *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1476 (2022); *see Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563-566 (2011) ("Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional.").

The legislative history here could not be clearer: TEP has hosted BoroPride in Murfreesboro, without issue, for years. Compl. ¶ 45. McFarland even expressly acknowledged that TEP had a constitutional right to host this event in the City's public spaces. *Id*. ¶ 68 & Ex. D. Then, under pressure from a small group of anti-drag activists advancing the same baseless claims about "sexualizing children" that have been seen across the country, McFarland, Tindall, and the City reversed course and passed an entirely unnecessary Ordinance that mimics language seen in similarly motivated bills across the country. *See Friends of Georges*, 2023 U.S. Dist. LEXIS 5911396766, at *87-89. The City clearly intended to use the Ordinance to discourage, exclude, or silence TEP, drag performers, and anyone that would advance pro-LGBTQ+ views.

### 4.     The Ordinance Does Not Pass Strict Scrutiny

The Ordinance and the 1977 Definition do not pass strict scrutiny. While the City may have a legitimate government interest in protecting minors from certain content, the laws' egregious, blanket prohibition on any speech or expression that even suggests "homosexuality" does not further that interest in any way. Rather, these laws demonstrate a blatant "desire to harm a politically unpopular group"—here, the LGBTQ+ community—which "cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (finding that laws discriminating against the LGBTQ+ community cannot survive even rational scrutiny). Because the City has *no legitimate interest* in preventing homosexuality, the laws cannot survive any level of scrutiny, let alone the extraordinarily high bar of strict scrutiny.

12

Even if the Ordinance were applied equally regardless of sexual orientation, it will not pass strict scrutiny. Courts have recognized a compelling state interest in protecting the well-being of minors, *see Friends of Georges*, 2023 U.S. Dist. LEXIS 96766, at *83, but there is no compelling government interest in protecting minors from any and all sexually suggestive content. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 794-795 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." (internal citations omitted)). Moreover, the Ordinance is in no way tailored to content that might properly be regulated as to children. Indeed, it would prohibit materials that are widely regarded as being *beneficial* to children, for example, educational materials about puberty or sex education, works of art involving nudity, and works of literature that simply happen to reference or allude to sexuality.

### B.     The Ordinance is Unconstitutionally Overbroad

Under the First Amendment, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). This principal seeks to balance the risk of invalidating a constitutionally acceptable law against the risk that the "threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 553 U.S. 285, 292 (2008).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* at 293. Here, the Ordinance seeks to prohibit "indecent behavior," broadly defined as including "indecent exposure, public indecency, lewd behavior, nudity or sexual conduct" (and, through the incorporated 1977 Definition, "homosexuality'), as well as any materials, broadcasts, or other speech advertising or even suggesting any of these things. The Ordinance thus penalizes

overwhelming amounts of constitutionally protected speech—not merely obscene content or conduct that is indecent in public,[5] but also expressive and political speech, conduct, and written materials if they so much as *suggest* nudity or sexuality.

There can be no doubt that this overbreadth has already had a chilling effect on speech: TEP has had to move its drag shows to an indoor, adults-only venue, for fear that City officials opposed to drag shows or law enforcement officials unclear on what is prohibited will penalize or even arrest organizers, performers, or attendees. *See* Compl. ¶¶ 116-122; *Friends of Georges*, 2023 U.S. Dist. LEXIS 96766, at *95 (noting "[t]he threat of prosecution from a law officer armed with a vague 'harmful to minors' standard from the AEA could chill a drag show group into paralysis").

### C.      The Ordinance is Also Unconstitutionally Vague

Under the Due Process Clause of the Fourteenth Amendment, laws must reasonably inform citizens of what conduct is prohibited. Thus, a law is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or is so standardless that "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Where, as here, the law at issue reaches "expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 572-573 (1974); *see Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 422 (6th Cir. 2014) ("[R]igorous adherence to [fair notice] requirements is necessary to ensure that ambiguity does not chill protected speech.").

---

[5] As existing laws already prohibit masturbation and intercourse in public (*e.g.,* TN Code § 39-13-517 (2021), there is no need to protect an acceptable law, *see Williams*, 553 U.S. at 292, and no need to salvage the limited portions of the Ordinance that seek to do so, *see Triplett Grille v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994) ("It is well recognized that federal courts do not rewrite statutes to create constitutionality.").

Here, the Ordinance proscribes "indecent behavior" and "indecent materials or events," which includes any material that even *suggests* indecent behavior. *See* Compl. Ex. N. Citizens searching to understand what conduct falls within these amorphous concepts will find no meaningful guidance. The Ordinance states it is to be "interpreted to promote public decency[;] maintain a family-friendly environment in public places[;] and protect against potential harm to minors," but offers no real limits or guidance on what speech or conduct might fall within these categories at a given time. Courts routinely strike down this type of language on vagueness grounds. *See, e.g.*, *Friends of Georges*, 2023 U.S. Dist. LEXIS 96766, at *87-89 (ruling that "harmful to minors" standard using nearly identical language to the Ordinance was unconstitutionally vague); *Reno v. ACLU*, 521 U.S. 844, 873 (1997) (without "specifically defined" prohibitions, the "open-ended term 'patently offensive'" is unconstitutionally vague). For example, a person of ordinary intelligence cannot determine whether the Ordinance prohibits a bookstore's window display featuring romance novels with suggestive covers, a same-sex couple holding hands on the sidewalk, or a drag performance. It is unconstitutionally vague.

### D. The Ordinance's Targeting of Homosexuality Violates the Equal Protection Clause

"Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Sweatt v. Painter*, 339 U.S. 629, 635 (1950). Yet here, motivated by "animus against individuals based on their sexual orientation," the City enacted the Ordinance and incorporated the 1977 Definition to deprive the LGBTQ+ community of equal protection under the law without any legitimate governmental interest. *Gay v. Cabinet for Health & Family Servs.*, No. 18-5285 2019 U.S. App. LEXIS 2336, at *14 (6th Cir. Jan. 23, 2019) (citing *Romer*, 517 U.S. at 632).

15

### 1. The Ordinance Discriminates Based on a Quasi-Suspect Class

For the purposes of an Equal Protection challenge, those against whom a law discriminates based on sexual orientation are considered a quasi-suspect class for at least two reasons. First, the four factors "mandated by the Supreme Court" inform this classification. *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 986-87 (S.D. Ohio 2013), *aff'd on other grounds sub nom. Obergefell v. Hodges*, 576 U.S. 644 (2015). That is, whether the group: (A) has been historically "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (B) has a defining characteristic that "frequently bears [a] relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440-41 (1985); (C) exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Bowen*, 483 U.S. at 602; and (D) is "a minority or politically powerless," *id.*

Here, (A) the LGBTQ+ community as a group has historically endured persecution and discrimination; (B) LGBTQ+ identity has no relation to aptitude or ability to contribute to society; (C) the LGBTQ+ community is a discernible group with obvious distinguishing characteristics; and (D) the class remains a politically weakened minority. Accordingly, those against whom a law discriminates based on sexual orientation are considered a quasi-suspect class, and the discriminating law is subject to at least intermediate scrutiny.

District courts in this Circuit have repeatedly reached the same conclusion. *See, e.g.*, *Obergefell*, 962 F. Supp. 2d at 986-87 (finding that the Sixth Circuit "no longer" has "sound precedential authority for the proposition that restrictions on gay and lesbian individuals are subject to rational basis analysis"); *Love v. Beshear*, 989 F. Supp. 2d 536, 547 (W.D. Ky. 2014) ("This Court finds that homosexual persons constitute a quasi-suspect class based on the weight of the factors and on analogy to the classifications recognized as suspect and quasi-suspect.").

Second, under Supreme Court precedent, this Court has ruled that "[t]he prohibition against sex-based discrimination includes discrimination based on [one]'s sexual orientation." *Kilpatrick v. HCA Hum. Res., LLC*, No. 3:17-cv-00670, 2022 U.S. Dist. LEXIS 50801, at *13 (M.D. Tenn. Mar. 22, 2022) (quoting *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)). Government regulations based on sex are subject to intermediate scrutiny. *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 152 (1994).

Accordingly, both under the Supreme Court's factors guiding classification and in light of the Supreme Court's precedent regarding sex-based discrimination, the Court must evaluate the 1977 Definition and the Ordinance under intermediate scrutiny.

### 2. The Ordinance Cannot Survive Intermediate Scrutiny

"To withstand intermediate scrutiny, a classification must be 'substantially related to an important government interest.'" *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) (quoting *Clark v. Jeter*, 486 U.S. 456 (1988)), *aff'd on other grounds by United States v. Windsor*, 570 U.S. 744 (2013). "'Substantially related' means that the explanation must be 'exceedingly persuasive.'" *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.*

Here, the City will not be able to demonstrate the blanket prohibition on "homosexuality" in the 1977 Definition and the Ordinance, resulting in the deprivation of equal protection for the LGBTQ+ community, satisfies the heavy burden of intermediate scrutiny. It is worth repeating that the City has ***no legitimate interest*** in depriving the LGBTQ+ community equal protection under the law. The City's "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest," let alone the requisite important governmental interest. *Romer*, 517 U.S. at 634-35 (finding that laws discriminating against the LGBTQ+ community cannot survive even rational basis scrutiny). Because the City has no legitimate interest in preventing

homosexuality, neither the 1977 Definition nor the Ordinance can survive any level of scrutiny. Thus, it certainly fails to meet the high bar of intermediate scrutiny.

### E. The Ordinance is an Unlawful Bill of Attainder

The United States Constitution prohibits the government from enacting a Bill of Attainder—that is, a law that (1) specifies the affected persons and (2) inflicts punishment (3) without a judicial trial. U.S. Const. Art. 1, § 10, cl. 1; *see Nixon v. Administrator of General Services*, 433 U.S. 425, 468 (1977). A law that punishes an individual based on his or her sexual status or identity is an unconstitutional Bill of Attainder. S*ee, e.g.*, *Meinhold v. United States DOD*, 808 F. Supp. 1453, 1455 (C.D. Cal. 1992) ("The Navy's regulations, which mandate the discharge of all homosexual service members on the basis of their sexual status, is a bill of attainder."). Here, the 1977 Definition (via incorporation into the Ordinance) penalizes "acts of . . . homosexuality." The identity of a "homosexual" person (or LGBTQ+ persons in today's terms) is inextricably linked to the action of "homosexuality," such that one engages in an act of homosexuality simply by having an attraction to a member of the same sex or expressing that attraction in any manner. Therefore, the laws at issue specify the affected persons, namely, "homosexuals," and inflict civil and criminal punishment without a judicial trial. They are unconstitutional Bills of Attainder.

### F. The City's Policy Against Issuing Permits to TEP is Unconstitutional

Governments "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views" and "may not select which issues are worth discussing or debating in public facilities." *Carey*, 447 U.S. at 463. By implementing a blanket prohibition on the issuance of permits to TEP—effectively prohibiting TEP from using the public forums available to others—Defendants McFarland, Tindall, and the City have violated the Constitution in at least two ways: (1) by imposing an unconstitutional prior restraint; and (2) by retaliating against TEP for the exercise of its First Amendment rights.

18

### 1. The Policy is an Unconstitutional Prior Restraint

The policy is an unconstitutional prior restraint; under the policy, whether TEP may exercise its First Amendment rights is based on Tindall's unilateral discretion, as the self-proclaimed arbiter of "community standards of Murfreesboro." Compl. ¶ 73. "A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). Prior restraints have a "heavy presumption" against validity, *Freedman v. Maryland*, 380 U.S. 51, 57–59 (1951), because "the risks of freewheeling censorship are formidable," *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

In the context of public permits, the Constitution imposes strict procedural safeguards for a prior restraint to avoid constitutional infirmity: (1) the decision whether or not to grant a permit must be made within a specified, brief period, and the status quo must be preserved pending a final judicial determination on the merits; (2) the scheme must also assure a prompt judicial decision to minimize the deterrent effect of a possibly erroneous denial of a license; and (3) the burden of instituting proceedings and proving that the expression is unprotected speech must be on the licensor, rather than the exhibitor. *See Freedman*, 380 U.S. at 57–59.[6]

The City's policy lacks even a single one of the *Freedman* safeguards, which renders the policy a fatally unconstitutional prior restraint on TEP's First Amendment rights. On October 17, 2022, City Manager Tindall sent TEP a letter falsely alleging that the 2022 BoroPride event intentionally exposed young children to sexual conduct, and stating definitively that he would

---

[6] Some courts following *Freedman* have suggested that the third factor may not be as indispensable as the first two procedural safeguards, *see Odle v. Decatur County*, 421 F.3d 386, 389 (6th Cir. 2005) (collecting cases); but in any event, lack of even one of the safeguards is fatal to the scheme. Such is the case here.

"deny future special events permit [sic] submitted by [TEP]." Compl. Ex. F. That same day, he issued a Memorandum to City of Murfreesboro Parks & Recreation officials forbidding them from renting any City facilities to TEP or any of its affiliates and attached that same letter. *Id.* Ex. G.

The policy disregards all three of the required *Freedman* safeguards. First, the decision to deny permits to TEP is indefinite and perpetual, not specified or brief, and the status quo of letting TEP participate in public spaces was not preserved pending any final judicial determination on the merits. Second, the policy contains zero judicial decision-making procedures to avoid erroneous denials of permits. *See Déjà Vu*, 274 F.3d at 400–01 (finding that even where ordinance contained procedure for aggrieved applicants to proceed to court via a discretionary route, it failed *Freedman* safeguards). Third, the policy assumes that all speech made by TEP going forward is unprotected and places the burden on TEP to prove that any future speech is entitled to First Amendment protection and should be exempt from the blanket policy.

The policy is unquestionably a prior restraint on TEP's speech. From October 17, 2022, and continuing indefinitely forward, the City preemptively prohibited speech by TEP, without any recourse available to TEP. Such a policy is an unconstitutional prior restraint and must be enjoined.

### 2. The Policy is an Unconstitutional Retaliation Against TEP for the Exercise of its First Amendment Rights

Not only is the October 2022 policy denying all future permits an unconstitutional prior restraint, but it also is impermissible retaliation for TEP's exercise of its First Amendment rights. Namely, the unconstitutional October 2022 policy is, by City Manager Tindall's own admission, in direct reaction to TEP's inclusion of a drag performance at its 2022 BoroPride festival.

"In order to prove a claim for retaliation, a plaintiff must establish the following elements: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary

firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998) (citations omitted). The City's policy is an impermissible retaliation for TEP's exercise of its First Amendment rights.

First, TEP was engaged in constitutionally protected activity when it hosted the 2022 BoroPride Festival. Where the plaintiff has engaged in conduct protected by the First Amendment, the first element of the retaliation test is satisfied. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) ("Here, the First Amendment properly covers the retaliation claims of X and Bell, as we explain below, and so we turn to that framework for guidance."). As shown in TEP's Complaint, the drag performances and other expressive conduct that gave rise to Tindall's, McFarland's and the City's retaliation were protected by the First Amendment. *See, e.g.*, Compl. ¶¶ 43 (LGBTQ+ events "epitomize the rights to freedom of speech, expression, and association that are enshrined in the First Amendment"); 57 ("Drag is '[a]t its core . . . a creative act—a powerful and personal form of self-expression."); 58 ("In this political environment, where one political party has embarked on a concerted legislative campaign to eradicate the art form from society, the performance of drag, in and of itself, is an act of protest and core political speech.").

Second, the City's policy caused TEP to suffer an injury that not only *would* chill a person of ordinary firmness from continuing to engage in that activity, but *has already* chilled TEP's activity. *See Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (evidence of an improper denial of a permit request was sufficient for the adverse action element). Here, the chilling effect is clear: (1) Tindall denied all future special events permits, functionally eliminating TEP's ability to exercise its First Amendment free speech rights in public spaces; and (2) the City passed the Ordinance, including mechanisms for civil and criminal penalties that certainly deter a

person of ordinary firmness from exercising free speech rights. Indeed, with regard to this second point, TEP elected not to include drag performance as a part of the main BoroPride agenda this year, instead hosting them at a separate, adults-only venue, even after moving the event from City property to Middle Tennessee State University property, out of fear of penalties under the Ordinance. *See* Compl. ¶ 93.

Third, the City's policy was a response to TEP's exercise of its constitutional rights, as is clearly evidenced by the events leading up to the October 17, 2022 letter and the text of the letter itself. In the weeks leading up to the 2022 BoroPride Festival, Mayor McFarland received pressure from anti-drag activists, who opposed the event and took issue with the planned drag performances. *Id*. ¶¶ 59‐63. Following the well-attended and successful 2022 BoroPride event, McFarland received more complaints from anti-drag activists, including "a lengthy diatribe" by one social media activist and another email claiming he "allowed this." *Id*. ¶¶ 66‐67. In response, McFarland acknowledged that he "legally do[es] not have the authority to stop someone's freedom of speech or right to gather." *Id*. ¶ 68. Nevertheless, the very next morning, he folded under pressure and changed course, replying that he was investigating the issue. He then forwarded the social media post to other City officials. *Id*. ¶¶ 69‐70. Shortly thereafter, McFarland, Tindall and the City enacted the unconstitutional policy. One need only look to the language of the letter to see that Tindall admits that the policy was a direct result of the events of 2022 BoroPride:

> It has come to my attention that the event your organization conducted on September 17, 2022 at a City facility, Cannonsburgh Village, violated City ordinances…. The portion of the event was far from "family friendly" and clearly unsuitable for "all ages." The event contained conduct and speech of an explicitly sexual nature… ***As a result***, I will deny future special events permit submitted by your organization…. The above-described conduct, specifically the exposure of children to a harmful prurient interest, is inconsistent with the community standards of Murfreesboro.

*Id*. Ex. F (emphasis added).

Clearly, the policy was "motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Bloch*, 156 F.3d at 678. There is no doubt that the City's policy was a retaliation against TEP for including drag shows and other pro-LGBTQ+ messages in the 2022 BoroPride Festival. It is a violation of TEP's First Amendment rights, and the policy must be enjoined.

## II.    TEP WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (granting injunctive relief where First Amendment claims were likely to prevail) (quotation omitted). "Indeed, when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *S. Utah Drag Stars v. City of St. George*, No. 4:23-cv-00044-DN-PK, 2023 U.S. Dist. LEXIS 105876, at *67 (D. Utah June 16, 2023) (internal quotation marks omitted) (granting preliminary injunction reversing permit denial for drag show).

For the avoidance of doubt, TEP will continue to suffer irreparable harm of at least two kinds absent injunctive relief. First, the mere possibility of the Ordinance's enforcement is already chilling and will continue to chill TEP and its performers' speech and expression—at BoroPride and elsewhere—because the Ordinance is so vague and overly broad that there is no way for TEP and other citizens to know what speech or expressive activity may criminalized. *Friends of Georges*, 2023 U.S. Dist. LEXIS 59113, at *19–20 (preliminarily enjoining enforcement of statute criminalizing "adult cabaret entertainment" where, "[b]ecause of the [Ordinance's] vagueness and overbreadth, it is unclear whether Plaintiff's performances may be penalized").

Second, the City's discriminatory policy denying all future permits to TEP is an ongoing unconstitutional prior restraint on TEP's speech in traditional public forums, which on its own

constitutes irreparable harm. *See S. Utah Drag Stars*, 2023 U.S. Dist. LEXIS 105876, at *67. As an additional, practical matter, TEP intends to begin planning next year's BoroPride event in the near future, and so long as the City is refusing to issue permits (or as this year, delaying, without expressly denying, for months), TEP will have to take additional steps and incur additional costs to plan its event, all with the stigma and uncertainty of the Ordinance and the City's policy overhead. An injunction is necessary to stop this harm while the case proceeds.

## III. THE PROPOSED INJUNCTION IS IN THE PUBLIC INTEREST AND DOES NOT POSE ANY RISK OF HARM TO OTHERS

The proposed injunction would stop the City's ongoing interference with TEP's and the public's exercise of constitutional rights, so the third and fourth factors weigh in favor of an injunction.[7] As the Sixth Circuit has explained, "no cognizable harm results from stopping unconstitutional conduct, so it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021); *see S. Utah Drag Stars*, 2023 U.S. Dist. LEXIS 105876, at *67–68 ("Protection of a party's constitutional rights against governmental action that violate those rights is always in the public interest."); *Woodlands Pride, Inc. v. Paxton*, No. H-23-2847, 2023 U.S. Dist. LEXIS 171268, at *51 (S.D. Tex. Sept. 26, 2023) ("Injunctions protecting First Amendment freedoms are always in the public interest.").

To the extent the City attempts to argue that the Ordinance and its permitting policy would serve to protect minors, this concern is entirely imagined—arising out of prejudice, not any actual issues—and, in any event, for any real concerns about actual indecent public behavior, there are obscenity laws already in place. *See Friends of Georges*, 2023 U.S. Dist. LEXIS 59113, at *21

---

[7] "The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—'merge when the Government is the opposing party.'" *Does #1-9 v. Lee*, 574 F. Supp. 3d 558, 563 (M.D. Tenn. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

(noting that the public interest favored an injunction where "the state's existing obscenity laws can prosecute most—and arguably even all—of the conduct that the Statute seeks to regulate").

## CONCLUSION

For the foregoing reasons, TEP respectfully requests that the Court grant this motion; enter a preliminary injunction prohibiting the City from (1) enforcing its retaliatory and discriminatory policy against issuing permits to TEP, and (2) enforcing or taking any action pursuant to the Ordinance and the underlying 1977 Definition; and granting such other and further relief as the Court deems appropriate.

Respectfully submitted,

*/s/ J. Alex Little*
J. Alex Little, # 029858
**Burr Forman LLP**
222 Second Avenue South, Suite 2000
Nashville, TN 37201
(615) 724-3200
alex.little@burr.com

Stella Yarbrough, # 033637
Lucas Cameron-Vaughn, # 038451
Jeff Preptit, # 038451
**ACLU Foundation of Tennessee**
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org

Li Nowlin-Sohl (*pro hac vice forthcoming*)
(admitted only in Washington)
**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org

Michael P. Robotti (*pro hac vice forthcoming*)
Jacquelyn N. Schell (*pro hac vice forthcoming*)

25

Andrew M. Hensley (*pro hac vice forthcoming*)
D. Alan White (*pro hac vice forthcoming*)
Catherine I. Seibel (*pro hac vice forthcoming*)
**Ballard Spahr LLP**
1675 Broadway, 19th Floor
New York , NY 10019-5820
(212) 223-0200
robottim@ballardspahr.com
schellj@ballardspahr.com
hensleyd@ballardspahr.com
whiteda@ballardspahr.com
seibelc@ballardspahr.com

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to LR 7.01(a)(1), the undersigned counsel hereby certifies that we have attempted to meet and confer with counsel for Defendants prior to filing the foregoing Motion for Preliminary Injunction. Defendants are not yet formally represented by counsel in this action, but we spoke with the lawyers who are likely to represent the City, City Council, and City Officials in their official capacities and the lawyers who are likely to represent the City Officials sued in their individual capacities by telephone on October 12, 2023. We discussed our intended motion for preliminary injunction and our request for expedited briefing.

As counsel are still finalizing representation, they do not consent to any of the requested relief, but we will continue to discuss possible agreements as to the briefing schedule and interim agreements, if possible, once representation is finalized.

We also note that we have been engaged in ongoing discussions with the City and its counsel regarding the underlying issues since last spring and regarding the Ordinance specifically in recent weeks, as outlined in the Complaint. Given the time-sensitive nature of the relief Plaintiff seeks, Plaintiff could not delay in filing the Motion.

*/s/ J. Alex Little*
J. Alex Little, # 029858
**Burr Forman LLP**

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of the foregoing Motion for Preliminary

Injunction to be served on all Defendants and counsel of record by Federal Express, overnight

delivery, addressed as follows:

The City of Murfreesboro, Tennessee
City Hall
111 W Vine St.
Murfreesboro, TN 37130

City Council of Murfreesboro
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Jamie Averwater
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Michael Bowen
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Kevin Jones
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Austin Maxwell
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Shane McFarland
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Madelyn Scales Harris
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Craig G. Tindall
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Kirt Wade
City Hall
111 W Vine St.
Murfreesboro, TN 37130

Shawn Wright
City Hall
111 W Vine St.
Murfreesboro, TN 37130

*/s/ J. Alex Little*
J. Alex Little, # 029858
**Burr Forman LLP**

28