**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

**TENNESSEE EQUALITY PROJECT FOUNDATION, INC.,**

**Plaintiff,**

**v.**

**THE CITY OF MURFREESBORO, et al.,**

**Defendants.**

**Case No. 3:23-cv-01044**

# REPLY IN SUPPORT OF TENNESSEE EQUALITY PROJECT FOUNDATION INC.'S MOTION FOR PRELIMINARY INJUNCTION


**Ballard Spahr LLP**
1675 Broadway, 19th Floor
New York , NY 10019-5820

**American Civil Liberties Union Foundation**
125 Broad St.
New York, NY 10004

**ACLU Foundation of Tennessee**
P.O. Box 120160
Nashville, TN 37212

**Burr Forman LLP**
222 Second Avenue South, Suite 2000
Nashville, TN 37201

*Counsel for Plaintiff*
*Tennessee Equality Project Foundation, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

I. TEP IS LIKELY TO SUCCEED ON THE MERITS ........ 1

A. Under the First Amendment, the Ordinance Must, but Cannot, Satisfy Strict Scrutiny ........ 1

1. The Ordinance Regulates Far More than Constitutionally Obscene Speech ........ 2

2. The Ordinance Is Not a Time, Place, and Manner Restriction ........ 3

3. The Secondary Effects Doctrine Is Inapplicable ........ 4

4. The City Cannot Hide Behind the Statement of Legislative Purpose ........ 5

5. The Ordinance Cannot Survive Strict Scrutiny ........ 6

B. The Ordinance Is Unconstitutionally Vague ........ 8

C. The Ordinance Is Unconstitutionally Overbroad ........ 8

D. TEP Is Likely to Succeed on its Section 1983 Claims ........ 9

II. ALL THREE EQUITABLE FACTORS FAVOR AN INJUNCTION ........ 10

III. CONCLUSION ........ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Booksellers v. Webb*,
919 F.2d 1493 (11th Cir. 1990) ....................3, 7

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002)....................2

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011)....................7

*City of Austin v. Reagan National Advertising of Austin*,
142 S. Ct. 1464 (2022) ....................6

*City of Erie v. Pap's A.M.*,
529 U.S. 277 (2000)....................6

*Coalition for Humane Immigrant Rights v. Burke*,
No. CV 98-4863-GHK(CTx), 2000 U.S. Dist. LEXIS 16520 (C.D. Cal. Sept. 12, 2000) ....................4

*Crawford v. Lungren*,
96 F.3d 380 (9th Cir. 1996) ....................4, 5

*Friends of Georges, Inc. v. Mulroy*,
No. 2:23-cv-02163-TLP-tmp, 2023 U.S. Dist. LEXIS 96766 (W.D. Tenn. June 2, 2023) ....................2, 5, 8

*Ginsberg v. New York*,
390 U.S. 629 (1968)....................8

*M.S. News Co. v. Casado*,
721 F.2d 1281 (10th Cir. 1983) ....................4

*Miller v. California*,
413 U.S. 15 (1973)....................2

*Putnam Pit, Inc. v. City of Cookeville*,
221 F.3d 834 (6th Cir. 2000) ....................4

*R. A. V. v. St. Paul*,
505 U.S. 377 (1992)....................2, 7

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................6

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 2, 5, 8

*Renton v. Playtime Theaters, Inc.*,
475 U.S. 41 (1986) .......... 3, 5

*Roman Catholic Diocese v. Cuomo*,
141 S. Ct. 63 (2020) .......... 10

*Sable Communications of California, Inc. v. FCC*,
492 U.S. 115 (1989) .......... 7

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011) .......... 6

*United States v. O'Brien*,
391 U.S. 367 (1968) .......... 5

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 3, 8

*Upper Midwest Booksellers Association v. City of Minneapolis*,
780 F.2d 1389 (8th Cir. 1985) .......... 4

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) .......... 10

*Young v. American Mini Theatres*,
427 U.S. 50 (1972) .......... 3

**Statutes**

Murfreesboro City Code § 21-22 .......... 7, 8

The City's Opposition (Dkt. 38) to TEP's Motion for Preliminary Injunction hinges on the incorrect theory that the Ordinance exists solely to protect minors from obscenity.[1] This theory is belied by the plain language of the Ordinance, which regulates far more than obscene speech and does so in a manner that impacts all citizens' access to that speech. Even after the amendments to the 1977 Definition,[2] the Ordinance remains a content-based restriction on speech, which must—but cannot—satisfy strict scrutiny and remains unconstitutionally vague and overbroad on its face.

The Opposition to TEP's Section 1983 arguments is similarly unavailing. The City does not dispute that drag performances, generally, are protected by the First Amendment, but instead, relies on the baseless claims that the 2022 BoroPride Festival included constitutionally obscene conduct or that the stated policy against issuing permits was not truly a policy, because the City engaged in discussions about the proposed permit. The City also offers no evidence to support these arguments, which are belied by the record already in this case.

The City's arguments against the remaining equitable factors all rise and fall on these theories. As they fail, so too do the City's arguments against the entry of a preliminary injunction.

## I. TEP IS LIKELY TO SUCCEED ON THE MERITS

### A. Under the First Amendment, the Ordinance Must, but Cannot, Satisfy Strict Scrutiny

The plain language of the Ordinance prohibits any expressive conduct, spoken words, or printed materials that constitute or "***suggest, advertise, or display*** indecent behavior" or that are deemed "harmful to minors." Compl. Ex. N (emphasis added). Thus, the Ordinance is a content-

[1] Capitalized terms not otherwise defined have the meaning assigned in TEP's Memorandum in Support of its Motion for Preliminary Injunction ("Mem.") (Dkt. 9).

[2] The City's amendment of City Ordinance 23-O-31 to remove the term "homosexuality" from the 1977 Definition resolves some, but not all, of TEP's concerns about the constitutionality of the Ordinance.

based restriction on speech that "targets speech based on its communicative content," namely, whether content is suggestive, "indecent," or otherwise deemed "harmful to minors." *See Friends of Georges, Inc. v. Mulroy*, No. 2:23-cv-02163-TLP-tmp, 2023 U.S. Dist. LEXIS 96766, at *56-57 (W.D. Tenn. June 2, 2023) (cleaned up).[3] The City's arguments to the contrary would require that the Court ignore this plain language, but as the Ordinance extends far beyond true obscenity, regulates speech as to all ages, and fails to satisfy strict scrutiny, those arguments all fail.

**1. The Ordinance Regulates Far More than Constitutionally Obscene Speech**

The Ordinance's reference to the *Miller* standard cannot save it from constitutional scrutiny. Constitutional obscenity is "an exceptionally high standard." *Id*. "[T]here is a difference between material that is 'obscene' in the vernacular, and material that is 'obscene' under the law." *Id*. at *56; *see Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) ("It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities."); *Reno v. ACLU*, 521 U.S. 844 (1997) (the First Amendment protects expression which is indecent but not obscene); *Miller v. California*, 413 U.S. 15, 27 (1973) (limiting law to "obscene materials [that] depict or describe patently offensive 'hard core' sexual conduct").

Even as to constitutionally obscene speech, the Supreme Court has explained that labeling such speech "unprotected" means simply "that these areas of speech can, consistently with the First Amendment, be regulated . . . not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *R. A. V. v. St. Paul*, 505 U.S. 377, 383-384 (1992).

Here, the Ordinance recites the *Miller* standard but *also* prohibits any expressive conduct,

[3] The City's use of the Ordinance to date—including as grounds to remove four library books that are not constitutionally obscene under *Miller*—also supports this conclusion. Compl. ¶ 114.

speech, or materials that constitute, display, or even suggest "lewd behavior, nudity or sexual conduct." Compl. Ex. N. The City does not, and cannot, point to any case law holding that this full list of proscribed speech is not protected by the First Amendment, nor can it rely on the recitation of *Miller*'s test where the Ordinance's text clearly extends beyond constitutionally obscene speech to regulate protected speech as well. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 479 (2010) (invaliding statute, despite claim that it was based on *Miller*, where it impacted protected, in addition to unprotected, speech).

**2. The Ordinance Is Not a Time, Place, and Manner Restriction**

As the name suggests, time, place, and manner restrictions regulate speech based on its time, place, or manner, without regard for its content. *See, e.g.*, *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 46-47 (1986) (upholding regulation that "does not ban adult theaters" but required they be 1,000 feet from certain establishments). The Ordinance does no such thing. It does not limit, for instance, the decibel level for performances or the time of day or areas of the City where events can be held, nor does it limit only minors' access to the speech at issue. *See* Opp. at 3 (claiming the "Ordinance's purpose is to protect minors from obscene content in public spaces"). Rather, it prohibits certain speech in *any* public space at *any* public time, regardless of whether minors are present. *See* Section I.A.5, *infra*.

This case is distinguishable from the cases on which the City relies, which involve (a) explicit material and (b) geographic or other restrictions on minor's exposure to that material, while leaving adult access open and minimally impacted, if at all. *See Renton*, 475 U.S. at 47 (1000 foot rule for adult theaters); *Young v. Am. Mini Theatres*, 427 U.S. 50, 64 (1972) (same); *Am. Booksellers v. Webb*, 919 F.2d 1493, 1501-02 (11th Cir. 1990) (law required booksellers to separate or partially cover sexually explicit magazine covers, to decrease likelihood of viewing by

minors); *M.S. News Co. v. Casado*, 721 F.2d 1281, 1288 (10th Cir. 1983) (same); *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1394 (8th Cir. 1985) (same).

Even if the Ordinance were a time, place, or manner restriction on speech, strict scrutiny would still apply, because the regulation is content-based and because it affects traditional public fora, such as streets, sidewalks, and parks. *See Crawford v. Lungren*, 96 F.3d 380, 384 (9th Cir. 1996) ("In assessing the constitutionality of a regulation that limits the time, place, or manner of speech, [a court] must determine whether the statute is content-neutral or content-based" and, if content-based, apply strict scrutiny); *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 843 (6th Cir. 2000) (where regulation affects traditional public fora, it must be "narrowly tailored, serve a significant public interest, and allow ample alternative avenues of communication").

Under any standard, relegating speech to private spaces is not a reasonable time, place, or manner restriction, as it is not narrowly tailored—or tailored at all—and does not leave open *any* public alternatives. *See Coal. for Humane Immigrant Rights v. Burke*, No. CV 98-4863-GHK(CTx), 2000 U.S. Dist. LEXIS 16520, at *41 (C.D. Cal. Sept. 12, 2000) (government's argument that restriction allowed speech in private, but not public, "would render the 'alternative avenues' element meaningless"). This argument is particularly offensive here, given the Ordinance's impact on the LGBTQ+ community. The LGBTQ+ community has faced decades of discrimination, and the BoroPride Festival—undisputedly the impetus for the Ordinance—is a celebration of the LGBTQ+ community's ability to live authentically in public, to which the City has responded by seeking to force the LGBTQ+ community back into the closet.

### 3. The Secondary Effects Doctrine Is Inapplicable

Historically, the secondary effects doctrine has allowed a lower level of scrutiny for zoning laws on sexually explicit businesses because of the secondary effect they might have on the

neighborhood. *See Renton*, 475 U.S. at 47 (explaining that doctrine's application of lesser scrutiny where "predominate concerns were there secondary effects of adult theaters, not with the content of the adult films themselves" (cleaned up)).

The City's argument that the Ordinance seeks to prevent "secondary effects" of "obscene content" on children, Opp. at 6, is simply not analogous, and the City has not pointed to any case suggesting that it is. *See id*. (citing *Daunt v. Benson*, 956 F.3d 396, 420 (6th Cir. 2020)), involving allocation of commissioner seats based on political affiliation).[4] This theory would use "protection of minors" as a justification to exclude any suggestive content from public spaces in Murfreesboro. Courts have already rejected similar attempts to rely on the secondary effects doctrine where a law's primary focus is, in fact, the content of speech. *See Reno*, 521 U.S. at 868 (invalidating provision of statute where "the purpose . . . is to protect children from the primary effects of 'indecent' and 'patently offensive' speech, rather than any 'secondary' effect of such speech"); *Crawford*, 96 F.3d at 385 ("The statute is designed to prevent the materials from provoking harmful reactions in minor readers. That justification does not fall within the parameters of the secondary effects doctrine."); *Friends of Georges*, 2023 U.S. Dist. LEXIS 96766, at *77-78 (rejecting argument where "the suppression of unpopular views" was a "predominate concern").

**4. The City Cannot Hide Behind the Statement of Legislative Purpose**

The Ordinance's stated purpose does not preclude further inquiry. The City cites *United States v. O'Brien*, 391 U.S. 367, 383 (1968), for the proposition that the "Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive," Opp.

[4] This claim is also belied by the plain language of the Ordinance, which clearly seeks to regulate suggestive content, and by the record in this case, which shows that the City enacted the Ordinance in response to the BoroPride Festival and in order to silence pro-LGBTQ+ speech and drag performances in public spaces. *See, e.g.*, Compl. ¶¶ 109-10, Ex. Q.

at 5, but subsequent Supreme Court rulings show that the Court may both inquire into legislative purpose and impose a higher First Amendment standard if that purpose is impermissible. *See City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464, 1476 (2022) (remanding question of whether "there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction"); *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563-566 (2011) ("Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional.").

The City points to cases where the Court credited a cited justification, but the cases do not hold that a Court *cannot* inquire into the legislative purpose beyond that. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 329 (2000) (Souter, J., dissenting) (discussing the expressed views of several councilmembers who voted for an ordinance); *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015) (Courts "have repeatedly considered whether a law is content neutral on its face *before* turning to the law's justification or purpose"). Further, while "the 'actual' or 'primary' purpose of a statute" may be "elusive" in some cases, Opp. at 5 (citing *M. v. Superior Court*, 450 U.S. 464, 470 (1981)), that is not the case here. Even before discovery, the record shows that the City enacted the Ordinance in response to pressure from known anti-drag activists after TEP's BoroPride Festival. Compl. ¶¶ 59-63, 66-69, 109-10. The City does not deny Tindall's or McFarland's comments evidencing that impermissible purpose; it simply suggests that other members may not have shared in it. *See* Opp. at 6. The mere possibility that some members may have acted in good faith does not change the City's impermissible purpose or allow the City to avoid strict scrutiny.

### 5. The Ordinance Cannot Survive Strict Scrutiny

While the law recognizes a compelling interest in protecting minors from truly obscene content, and possibly even from some content that is not obscene for adults, it does not give the

City carte blanche to decide what material children may access. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 794-795 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." (internal citations omitted)). Nor does it allow the City to rely on that interest to prohibit adults from accessing information that might be obscene as to children. *Am. Booksellers*, 919 F.2d at 1501 ("[A] state may not prohibit an adult's access to material that is obscene for minors but not for adults. . . . [T]he First Amendment forbids reducing the adult population to reading and viewing only works suitable for children"). Nor does it allow the City to use the specter of obscene content to restrict access to constitutionally protected speech:

> [J]ust as the power to proscribe particular speech on the basis of a noncontent element (e.g., noise) does not entail the power to proscribe the same speech on the basis of a content element; so also, the power to proscribe it on the basis of *one* content element (e.g., obscenity) does not entail the power to proscribe it on the basis of *other* content elements.

*R.A.V.*, 505 U.S. at 386. Yet this is exactly what the Ordinance seeks to do—to rely on a claimed interest in protecting minors from obscenity as grounds to exclude any suggestive, protected speech from public spaces, regardless of the presence of minors or true obscenity in that content.

Moreover, "[i]t is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 131 (1989) (invalidating federal statute that was "not a narrowly tailored effort to serve the compelling interest of preventing minors from being exposed"). As the Ordinance regulates far more than speech that is obscene (or even obscene as to minors) and is in no way limited to minors' access to that speech,[5] it is not narrowly tailored to achieve any compelling

[5] The Ordinance prohibits "indecent behavior" and the "display, distribut[ion], or broadcast [of] indecent material" irrespective of whether minors are present, § 21-22(C)(1); penalizes certain uses of City funds in connection with minors, § 21-22(C)(2)(b), or not, § 21-22(C)(2)(a)); and

governmental interest and cannot survive the strict scrutiny that the First Amendment requires.

**B. The Ordinance Is Unconstitutionally Vague**

The phrase "harmful to minors" does not correct the unconstitutional vagueness of the Ordinance. The Supreme Court held that phrase to be sufficiently definite in *Ginsberg v. New York*, 390 U.S. 629, 643 (1968), where the law at issue made it a crime "knowingly to sell . . . to a minor under 17 (a) any picture . . . which depicts nudity . . . and which is harmful to minors" under the then-governing definition of obscenity. But that case does not stand for the proposition that any use of that phrase "provides adequate notice to the public." *See* Opp. at 8; *Friends of Georges*, 2023 U.S. Dist. LEXIS 96766, at *87-89 (ruling that "harmful to minors" standard using nearly identical language to the Ordinance was unconstitutionally vague). It is also not instructive here, where the Ordinance parrots the *Miller* standard in the definition of "harmful to minors," but then also prohibits a broad range of speech, content, and written communications that, to offer a few examples, "suggest" "indecent behavior" or constitute "patently offensive" conduct, none of which the Ordinance adequately defines. *See Reno*, 521 U.S. at 873 (without more, the "open-ended term 'patently offensive'" is unconstitutionally vague).[6]

**C. The Ordinance Is Unconstitutionally Overbroad**

The City cannot meaningfully dispute that the Ordinance is overbroad. It unambiguously prohibits a substantial amount of protected speech—including all "printed materials, broadcasts, shows, parades, or other such displays" that "suggest, advertise, or display indecent behavior or that is harmful to minors." *See* Compl. Ex. N; *Stevens*, 559 U.S. at 479. The fact that it "only"

---

most glaringly, creates two tiers of punishment, one for violations in the presence of minors, § 21-22(E)(2), and one regardless of the presence of minors, §21-22(E)(1).

[6] The scienter requirement also cannot save the Ordinance, Opp. at 9, as one cannot "know" whether he is violating an ordinance that does not provide fair notice of what is proscribed.

prohibits this protected speech in the entirety of public spaces in Murfreesboro, Opp. at 9, does not save the Ordinance. If anything, that is another way in which the City has overreached.

### D. TEP Is Likely to Succeed on its Section 1983 Claims

***First***, the City offers no evidentiary or legal basis to suggest that TEP will not succeed in proving that the City implemented a policy against issuing permits to TEP or that the policy was an unconstitutional prior restraint. Beyond a cursory denial, the City does not dispute that such a policy is a prior restraint on speech. Opp. at 10. The City also does not deny that Tindall's October 17, 2022 letter prohibits the issuance of permits to TEP. *Id*. Instead, the City argues that (1) the policy was justified because the event included "performers dancing in a sexually suggestive manner" such that it was not "all ages" or (2) the policy was not truly a policy, because the City engaged in "negotiations" with TEP, rather than immediately denying its permit request. *Id*.

The characterization of 2022 BoroPride as "sexually suggestive" and "unsuitable for 'all ages'" is inaccurate—it was family-friendly, consistent with TEP's permit application. Even if it were not, the City has not pointed to any law allowing a categorical ban on all future permits because of "suggestive" dancing. Nor can the City meaningfully argue that a written policy issued by the City Manager with the knowledge and implicit approval of the Mayor was not *really* a policy, simply because the City exchanged a few (insulting and unnecessary) emails, rather than immediately denying the permit application.[7]

***Second***, as to the retaliation claim, the City admits "an adverse action was taken," namely, the City's policy, and that, as Tindall's letter confirms, that action was taken in direct response to the 2022 BoroPride festival. Opp. at 11. It argues only that the 2022 BoroPride Festival was not

[7] The City suggests that TEP did not submit a proper permit application, but TEP filed a Verified Complaint showing that it did, and the City has offered no evidence or explanation to the contrary. This argument and the claim that TEP lacks standing as a result, fail.

protected by the First Amendment. *Id.* The City does not dispute TEP's showing that drag performances are protected expressive and political speech; it relies on the unsupported claim that the performances included "dancing lewdly, grinding, and accepting cash tips . . . in a public place where children were present." *Id.* Even if this were a fair description—and it is not—there is no legal basis for the City's claim that "suggestive" or "lewd" conduct is not protected by the First Amendment, particularly in the context of expressive, even political, speech. TEP has demonstrated a likelihood of success on its Section 1983 claims.

## II. ALL THREE EQUITABLE FACTORS FAVOR AN INJUNCTION

The City's arguments that the equitable factors do not support an injunction all rely on its theory that the Ordinance only regulates obscene speech. For the reasons above, this is incorrect. The Ordinance and the City policy constitute ongoing infringements on TEP's First Amendment rights, sufficient to establish irreparable harm. *See Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").[8] Further, "no cognizable harm results from stopping unconstitutional conduct, so it is always in the public interest to prevent violation of a party's constitutional rights." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (cleaned up).

## III. CONCLUSION

For the foregoing reasons, and for the reasons stated in TEP's Memorandum in Support of its Motion for Preliminary Injunction, TEP requests the Court enter a preliminary injunction.

Respectfully submitted,

*/s/ Jacquelyn N. Schell*
Michael P. Robotti (*pro hac vice*)
Jacquelyn N. Schell (*pro hac vice*)
Catherine I. Seibel (*pro hac vice*)

[8] The fact that TEP went forward with the 2023 BoroPride Festival, after finding an alternative, private venue, does not mean that its speech was not chilled or that the ongoing policy or risk of enforcement of the Ordinance is not continuing to chill TEP's speech and the speech of others.

D. Alan White (*pro hac vice*)
Andrew M. Hensley (*pro hac vice*)
Ballard Spahr LLP
1675 Broadway, 19th Floor
New York, NY 10019-5820
(212) 223-0200
robottim@ballardspahr.com
schellj@ballardspahr.com
seibelc@ballardspahr.com
whiteda@ballardspahr.com
hensleyd@ballardspahr.com

Alex Little, # 029858
Burr Forman LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
(615) 724-3200
alex.little@burr.com

Stella Yarbrough, # 033637
Lucas Cameron-Vaughn, # 036284
Jeff Preptit, # 038451
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org

Li Nowlin-Sohl (*pro hac vice*)
(admitted only in Washington)
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org

**[CORRECTED] CERTIFICATE OF SERVICE**

I certify that, on November 28, 2023, the undersigned counsel for Plaintiff Tennessee Equality Project Foundation, Inc. ("TEP") filed the foregoing Reply in Support of TEP's Motion for Preliminary Injunction ("Reply") using the Court's cm/ecf system, which automatically provides notice via email to the following counsel of record:

Robert M. Burns
Samantha Burnett
HOWELL & FISHER, PLLC
3310 West End Avenue, Ste. 550
Nashville, TN 37203
rburns@howell-fisher.com
SBurnett@howell-fisher.com

*Attorneys for City of Murfreesboro, Tennessee*

Kristin E. Berexa
Cassandra M. Crane
FARRAR & BATES, LLP
12 Cadillac Drive, Suite 480
Brentwood, TN 37027
kberexa@fbb.law
ccrane@fbb.law

*Attorneys for Defendants McFarland & Tindall, in their individual capacities*

Pursuant to L.R. 5.01 and the Court's November 30, 2023 Notice to Filer, I am on November 30, 2023, refiling the Reply with a Corrected Certificate of Service, which includes the name of the persons served, document served, method of service, and date of service. This revised version will also be served automatically by email on the foregoing counsel through the Court's cm/ecf system.

Respectfully submitted,

/s/ *Jacquelyn N. Schell*
Jacquelyn N. Schell